**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| IN RE: CAPITAL ONE 360 SAVINGS ACCOUNT INTEREST RATE LITIGATION | Case No. 1:24-md-03111-DJN-WBP |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 3

I.  Material Features of Capital One High-Interest Online Savings Accounts ...................... 3

II.  Capital One's "360 Savings" Account ............................................................... 4

III.  Capital One Creates the Duplicative "360 Performance Savings" Account and Conceals
    360 Savings ................................................................................................. 5

IV.  Capital One Raises the Interest Rate on the 360 Performance Savings Account but Caps
    the Rate on 360 Savings ................................................................................. 7

V.  Plaintiffs and the Class Discover and React to Capital One's Conduct .......................... 8

VI.  Capital One's Website ................................................................................. 10

VII.  Plaintiffs' Claims ...................................................................................... 11

STANDARD OF REVIEW ..................................................................................... 11

ARGUMENT ....................................................................................................... 11

I.  Plaintiffs' Claims Against CONA Are Not Preempted ............................................ 11

II.  CONA Breached the Covenant of Good Faith and Fair Dealing (Count I) ..................... 18

    A.  The Implied Covenant of Good Faith and Fair Dealing Applies to CONA's
        Exercise of "Discretion" ......................................................................... 18

    B.  CONA's Conduct is a Breach of the Implied Covenant ...................................... 22

III.  CONA and COFC Violated Consumer Protection Statutes ....................................... 28

    A.  CONA and COFC Are Jointly Responsible for Capital One's Website ..................... 28

    B.  CONA's Choice of Law Provision Does Not Bar Plaintiffs' Statutory Claims ... 29

    C.  Capital One's Conduct Is Misleading to a Reasonable Consumer ......................... 32

    D.  Capital One's Sweeping, Generic Challenges to Plaintiffs' Claims Fail.............. 35

    E.  Each of Plaintiffs' Statutory Claims Is Plausibly Alleged................................... 38

        1.  Virginia: VCPA (Count II, Against COFC Only) ................................... 38

2.     California: CLRA (Count III, Against CONA and COFC) ...................... 39

3.     California: UCL (Count IV, Against CONA and COFC)......................... 39

4.     Texas: DTPA (Count V, Against CONA and COFC) .............................. 40

5.     New York: GBL (Count VI, Against CONA and COFC) ........................ 41

6.     New Jersey: CFA (Count VII, Against CONA and COFC) .................... 42

7.     Pennsylvania: UTPCPL (Count VIII, Against CONA and COFC).......... 42

8.     Massachusetts: MGL 93A (Count IX, Against CONA and COFC)......... 42

9.     Illinois: ICFA (Count X, Against CONA and COFC)............................. 44

10.    Maryland: MCPA (Count XI, Against CONA and COFC)..................... 45

11.    Florida: FDUTPA (Count XII, Against COFC Only) ............................. 45

12.    North Carolina: UDTPA (Count XIII, Against CONA and COFC)......... 46

13.    Georgia: FBPA (Count XIV, Against CONA and COFC) ...................... 46

14.    Oregon: UTPA (Count XV, Against CONA and COFC)........................ 46

15.    Ohio: DTPA (Count XVI, Against CONA and COFC) ......................... 47

16.    Michigan: CPA (Count XVII, Against CONA and COFC) .................... 47

17.    Missouri: MPA (Count XVIII, Against CONA and COFC) ................... 48

18.    Nebraska: CPA (Count XIX, Against CONA and COFC)..................... 48

19.    Delaware: CFA (Count XXI, Against CONA and COFC)...................... 49

IV.    Plaintiffs Adequately Allege Claims for Unjust Enrichment and Promissory Estoppel (Counts XXII and XXIII)................................................................................................. 49

CONCLUSION..................................................................................................................... 50

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*1409 W. Diversey Corp. v. JPMorgan Chase Bank, N.A.*,
    2016 U.S. Dist. LEXIS 101440 (N.D. Ill. Aug. 3, 2016) ....................................................... 15

*Amin v. Mercedes-Benz USA, LLC*,
    301 F. Supp. 3d 1277 (N.D. Ga. 2018) ................................................................................. 46

*Anderson National Bank v. Luckett*,
    321 U.S. 233 (1944) ............................................................................................................... 13

*Arrowsmith v. Warnick (In re Health Diagnostic Lab., Inc.)*,
    2018 Bankr. LEXIS 2953 (Bankr. E.D. Va. Sep. 27, 2018) ................................................... 20

*Arthur D. Little, Inc. v. Dooyang Corp.*,
    147 F.3d 47 (1st Cir. 1998) ................................................................................................... 43

*Aspinall v. Philip Morris Cos.*,
    813 N.E.2d 476 (Mass. 1984) ............................................................................................... 43

*Ass'n of Banks in Ins. v. Duryee*,
    270 F.3d 397 (6th Cir. 2001) ............................................................................................... 15

*Ballagh v. Fauber Enters.*,
    290 Va. 120 (2015) ............................................................................................................... 38

*Bankers Tr. Co. v. Basciano*,
    960 So. 2d 773 (Fla. 5th DCA 2007) ................................................................................... 45

*Barnett Bank of Marion Cty., N. A. v. Nelson*,
    517 U. S. 25 (1996) ............................................................................................................... 13

*Barnia v. Kaur*,
    646 F. Supp. 3d 154 (D. Mass. 2022) ................................................................................. 43

*Barry v. Novartis Pharm. Corp.*,
    2022 U.S. Dist. LEXIS 116391 (E.D. Va. June 30, 2022) ..................................................... 29

*Barton v. Cap. One Bank (USA), N.A.*,
    2013 U.S. Dist. LEXIS 188174 (N.D. Cal. Apr. 16, 2013) ................................................... 26

*Bassett v. Credit Bureau Servs.*,
    554 F. Supp. 3d 1000 (D. Neb. 2021) ................................................................................. 49

*Bennett v. Bank of Am., N.A.*,
    2012 U.S. Dist. LEXIS 54725 (E.D. Va. Apr. 18, 2012) ....................................................... 21

*Borg v. Warren*,
    545 F. Supp. 3d 291 (E.D. Va. 2021) ................................................................................... 45

*Bourdelais v. JPMorgan Chase Bank, N.A.*,
    2012 U.S. Dist. LEXIS 158508 (E.D. Va. Nov. 5, 2012) ....................................................... 25

*Bower v. Int'l Bus. Machines, Inc.*,
    495 F. Supp. 2d 837 (S.D. Ohio 2007) ............................................................................... 47

*Burnett v. Nat'l Ass'n of Realtors*,
  2022 U.S. Dist. LEXIS 73682 (W.D. Mo. Apr. 22, 2022) ................................... 32

*Burns v. TD Bank, N.A.*,
  2022 U.S. Dist. LEXIS 222173 (D.N.J. Dec. 8, 2022) ........................ 15, 17, 41, 42

*Burrell v. Bayer Corp.*,
  918 F.3d 372 (4th Cir. 2019) ........................................................................... 18

*Canfield v. FCA US LLC*,
  2019 U.S. Dist. LEXIS 3218 (D. Del. Jan. 8, 2019) .............................................. 47

*Cantero v. Bank of Am., N.A.*,
  144 S. Ct. 1290 (2024) ......................................................................... 13, 16, 18

*In re Capital One Bank Credit Card Interest Rate Litigation*,
  51 F. Supp. 3d 1316 (N.D. Ga. 2014) ............................................................ 21, 26

*In re Capital One Consumer Data Sec. Breach Litig.*,
  488 F. Supp. 3d 374 (E.D. Va. 2020) ........................................................... *passim*

*Capital One Fin. Corp. v. Capital One Auto Group 1*,
  2022 U.S. Dist. Lexis 38798 (E.D.N.Y. March 4, 2022) ...................................... 28

*Carr v. Sheehy Ashland, Inc.*,
  65 Va. Cir. 4 (Cir. Ct. 2004) ...................................................................... 37, 38

*Carrow v. Fedex Ground Package Sys.*,
  2017 U.S. Dist. LEXIS 48536 (D.N.J. Mar. 30, 2017) .......................................... 32

*Catena v. NVR, Inc.*,
  2023 U.S. Dist. LEXIS 4682 (W.D. Pa. Jan. 9, 2023) ........................................... 32

*Chance v. Wells Fargo Bank*,
  2012 U.S. Dist. LEXIS 137507 (E.D. Va. Sept. 25, 2012) ...................................... 27

*Chandler v. Am. Gen. Fin.*
  329 Ill. App. 3d 729 (Ill. Ct. of Appeals Mar. 27, 2002) ....................................... 44

*Charles E. Brauer Co. v. NationsBank of Va., N.A.*,
  251 Va. 28 (1996) ........................................................................................... 23

*In re Checking Account Overdraft Litig.*,
  694 F. Supp. 2d 1302 (Fla. S.D. 2010) ............................................................... 15

*Chery v. Conduent Educ. Servs., LLC*,
  581 F. Supp. 3d 436 (N.D.N.Y. 2022). ................................................................ 41

*Chisolm v. TranSouth Fin. Corp.*,
  194 F.R.D. 538 (E.D. Va. 2000) ........................................................................ 37

*Cooper v. Charter Communs. Entm'ts I, LLC*,
  760 F.3d 103 (1st Cir. 2014) ............................................................................ 43

*Cormier v. Carrier Corp.*,
  2019 U.S. Dist. LEXIS 53222  (C.D. Cal. Mar. 25, 2019) ...................................... 43

*Costa v. FCA US LLC*,
  2022 U.S. Dist. LEXIS 239194 (D. Mass. Sep. 30, 2022) ...................................................... 43

*Currie v. Wells Fargo Bank, N.A.*,
  950 F. Supp. 2d 788 (D. Md. 2013) ...................................................................................... 45

*Custard Hut Franchise LLC v. H & J Jawad LLC*,
  697 F. Supp. 3d 723 (E.D. Mich. 2023). .............................................................................. 48

*Deming v. Merrill Lynch & Co.*,
  528 F. App'x 775 (9th Cir. 2013) .......................................................................................... 16

*Diep v. Apple, Inc.*,
  2024 U.S. App. LEXIS 7214 (9th Cir. Mar. 27, 2024) ......................................................... 32

*Doe v. Boys Clubs of Greater Dall., Inc.*,
  907 S.W.2d 472 (Tex. 1995) ................................................................................................. 40

*Dress v. Cap. One Bank (USA), N.A.*,
  2019 U.S. Dist. LEXIS 126980 (E.D. Va. Jul. 30, 2019) ..................................................... 21

*Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*,
  3 F.4th 605 (4th Cir. 2021) ................................................................................................... 25

*Easton v. Iowa*,
  188 U.S. 220 (1903) .............................................................................................................. 15

*Elliott v. Am. States Ins. Co.*,
  883 F.3d 384 (4th Cir. 2018) ................................................................................................ 46

*Enomoto v. Space Adventures, Ltd.*,
  624 F. Supp. 2d 443 (E.D. Va. 2009) ..................................................................... 18, 23, 38

*Fernandez v. Progressive Mgmt. Sys.*,
  2022 U.S. Dist. LEXIS 120329 (S.D. Cal. July 7, 2022) ..................................................... 40

*Fidelity Federal Savings & Loan Association v. De la Cuesta*,
  458 U. S. 141 (1982) ............................................................................................................. 13

*Finney v. Clark Realty Capital, LLC*,
  2022 U.S. Dist. LEXIS 18645 (E.D. Va. Jan. 31, 2022) ...................................................... 38

*Fleury v. GM LLC*,
  2023 U.S. Dist. LEXIS 95961 (N.D. Ill. June 2, 2023) ....................................................... 45

*Flynn v. FCA US LLC*,
  327 F.R.D. 206 (S.D. Ill. 2018) ............................................................................................ 47

*Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*,
  945 F. Supp. 2d 543 (D.N.J. 2013) ....................................................................................... 42

*Franklin National Bank v. New York*,
  347 U.S. 373 (1954) .............................................................................................................. 13

*Gartner, Inc. v. HCC Specialty Underwriters, Inc.*,
  2023 U.S. Dist. LEXIS 16426 (S.D.N.Y. Jan. 31, 2023) ..................................................... 30

*Gleit v. Francois-Bodine*,
    2018 U.S. Dist. LEXIS 85038 (S.D.N.Y. May 18, 2018) ...................................................... 32

*In re GM LLC Ignition Switch Litig.*,
    257 F. Supp. 3d 372 (S.D.N.Y. June 30, 2017) ...................................................... 43

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ...................................................... 28

*Golden Star Wholesale, Inc. v. ZB Importing, Inc.*,
    531 F. Supp. 3d 1231 (E.D. Mich. 2021) ...................................................... 47

*Gouwens v. Target Corp.*,
    2022 U.S. Dist. LEXIS 233653 (N.D. Ill. Dec. 30, 2022) ...................................................... 44

*Great Am. Ins. Co. v. GRM Mgmt., LLC*,
    2014 U.S. Dist. LEXIS 164147 (E.D. Va. Nov. 24, 2014) ...................................................... 22

*Gregory v. Metro Auto Sales, Inc.*,
    158 F. Supp. 3d 302 (E.D. Pa. 2016) ...................................................... 42

*Gutierrez v. Wells Fargo Bank*,
    704 F.3d 712 (9th Cir. 2012) ...................................................... 16

*Guzman v. Candles, LLC*,
    2016 U.S. Dist. LEXIS 135501 (M.D.N.C. Sept. 30, 2016) ...................................................... 30

*Hamilton Nat'l Bank*,
    156 F.2d 843 (D.C. Cir. 1946) ...................................................... 12

*Hartley v. Sig Sauer*,
    2019 U.S. Dist. LEXIS 229507 (W.D. Mo. Mar. 25, 2019) ...................................................... 48

*Hawkins v. Nestle U.S.A. Inc.*,
    309 F. Supp. 3d 696 (E.D. Mo. 2018) ...................................................... 48

*Hawthorne v. Umpqua Bank*,
    2013 U.S. Dist. LEXIS 153697 (N.D. Cal. Oct. 25, 2013) ...................................................... 16, 39

*In re HSBC Bank, USA, N.A.*,
    1 F. Supp. 3d 34 (E.D.N.Y. 2014) ...................................................... 15, 40

*ITCO Corp. v. Michelin Tire Corp., Commercial Div.*,
    722 F.2d 42 (4th Cir. 1983) ...................................................... 31

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
    298 Va. 582 (Va. 2020) ...................................................... 49

*In re Jpg Renewables LLC*,
    Nos. 23-30628, 23-3027, 2024 Bankr. LEXIS 329 (Bankr. S.D. Tex. Feb. 7, 2024) ...................................................... 41

*Kahn v. Walmart Inc.*,
    107 F.4th 585 (7th Cir. 2024) ...................................................... 33, 34, 44

*Kasmin v. Josephs*,
    2024 NY Slip Op 03085, 228 A.D.3d 431 (App. Div. 2024) ...................................................... 50

*King v. Carolina First Bank*,
　26 F. Supp. 3d 510 (D.S.C. 2014) ............................................................. 15, 18

*Kleiner v. Cenage Learning Hldg. II, Inc.*,
　66 F.4th 28 (1st Cir. 2023) ................................................................................. 32

*Kriegel v. Bank of Am., N.A.*,
　No. 07cv12246-NG, 2010 U.S. Dist. LEXIS 82657 (D. Mass. Aug. 10, 2010) ..................... 15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
　2015 U.S. Dist. LEXIS 149629 (S.D.N.Y. Nov. 3, 2015) ..................................... 15

*Lincoln v. Ford Motor Co.*,
　2020 U.S. Dist. LEXIS 180985 (D. Md. Sep. 29, 2020) ......................................... 49

*Los Alamitos Luxury Apts. v. City of Los Alamitos*,
　2023 Cal. Super. LEXIS 69548 (Sup. Ct., Orange Cnty. Sept. 7, 2023) ................................ 50

*In re Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. & Sales Practice Litig.*,
　2017 U.S. Dist. LEXIS 105335 (E.D. Va. July 7, 2017) ........................................ 36

*Lytle v. Nutramax Labs., Inc.*,
　99 F.4th 557 (9th Cir. 2024) ............................................................................... 39

*Marcus v. Dennis*,
　2022 U.S. Dist. LEXIS 87149 (E.D. Va. May 13, 2022) ................................... 23, 38

*Marriott Int'l Inc. v. Dynasty Mktg. Grp. LLC*,
　2022 U.S. Dist. LEXIS 245639 (E.D. Va. Sep. 21, 2022) ................................... 29

*Mawyer v. Atl. Union Bank*,
　2022 U.S. Dist. LEXIS 65397 (E.D. Va. Apr. 7, 2022) ........................................ 20

*McClellan v. Chipman*,
　164 U.S. 347 (1896) ................................................................................. 14, 18

*McKay v. Sazerac Co.*,
　2023 U.S. Dist. LEXIS 86621 (N.D. Cal. May 17, 2023) ..................................... 34

*McLean v. BB&T Bank Corp.*,
　2020 WL 2744107 (E.D. Va. Jan. 13, 2020) ....................................................... 39

*Mihalich v. Johnson & Johnson*,
　2016 U.S. Dist. LEXIS 128082 (S.D. Ill. Sep. 20, 2016) ..................................... 44

*Miller v. Winco Foods*,
　2020 U.S. Dist. LEXIS 212534 (D. Or. Sep. 3, 2020) ......................................... 46

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
　589 F.3d 274 (6th Cir. 2009) .............................................................................. 16

*Moss v. Mfrs. & Traders Tr. Co.*,
　2018 U.S. Dist. LEXIS 41794 (E.D. Va. Mar. 13, 2018) ..................................... 25

*Murr v. Capital One Bank (USA), N.A.*,
　28 F. Supp. 3d 575 (E.D. Va. 2014) ............................................. 17, 23, 25, 28

*National Bank v. Commonwealth*,
    76 U.S. 353 (1870) ................................................................................ 14

*Ne. Data Sys. v. McDonnell Douglas Comput. Sys.*,
    986 F.2d 607 (1st Cir. 1993) ................................................................ 31

*Newton v. Bank, W.*,
    686 N.W. 2D 491 (Mich. Ct. App. 2004) ............................................ 48

*Norman v. Wells Fargo Bank, N.A.*,
    2018 U.S. Dist. LEXIS 29818 (E.D. Va. Feb. 23, 2018) ...................... 39

*Nunez v. Saks Inc.*,
    2023 U.S. Dist. LEXIS 85984 (S.D. Cal. May 16, 2023) ...................... 40

*Offley v. Fashion Nova, LLC*,
    2023 U.S. Dist. LEXIS 169106 (D. Mass. Sept. 22, 2023) ................... 43

*Orange Barrel Media, LLC v. KR Sunset Weho, LLC*,
    2022 U.S. Dist. LEXIS 119499 (S.D. Ohio July 6, 2022) ..................... 50

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015) ................................................................ 41

*P&L Dev., LLC v. Bionpharma, Inc.*,
    367 F. Supp. 3d 421 (M.D.N.C. 2019) ................................................ 31

*Parrish v. Gordon Lane Healthcare, LLC*,
    2023 U.S. Dist. LEXIS 173477 (C.D. Cal. Sep. 26, 2023) ................... 37

*Pfahning v. Cap. One Bank (USA), N.A.*,
    570 F. Supp. 3d 337 (E.D. Va. 2019) .................................................. 21

*Phillips v. Wells Fargo Bank, N.A.*,
    2018 U.S. Dist. LEXIS 16995 (E.D. Va. Feb. 1, 2018) ........................ 19

*Plaza Nat. Bank v. Walker*,
    767 S.W.2d 276 (Tex. App. 1989) ...................................................... 40

*Precision Pipeline, LCC v. Dominion Trans., Inc.*,
    2017 U.S. Dist. LEXIS 42498 (E.D. Va. Mar. 23, 2017) ..................... 31

*Pyott-Boone Elecs. Inc. v. IRR Tr. for Donald L. Fetterolf Dated December 9, 1997*,
    918 F. Supp. 2d 532 (W.D. Va. 2013) ................................................ 31

*Richardson RFPD, Inc. v. Nexus Techs., Inc.*,
    2022 U.S. Dist. LEXIS 96119 (W.D.N.C. May 4, 2022) ...................... 50

*Rieger v. Volkswagen Grp. of Am., Inc.*,
    2023 U.S. Dist. LEXIS 78785 (D.N.J. May 4, 2023) ....................... 29, 44

*Riggs National Bank of Washington, D.C. v. Linch*,
    36 F.3d 370 (4th Cir. 1994) ................................................................ 20

*Rivera v. Navient Sols., LLC*,
    2020 U.S. Dist. LEXIS 150129 (S.D.N.Y. Aug. 19, 2020) ............. 34, 41

*Rose v. Chase Bank USA, N.A.*,
    513 F.3d 1032 (9th Cir. 2008) ........................................................ 15

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) .................................................... 39, 40

*Run Them Sweet, LLC v. CPA Glob. Ltd.*,
    224 F. Supp. 3d 462 (E.D. Va. 2016) ............................................. 31

*Salois v. Dime Sav. Bank, FSB*,
    1996 U.S. Dist. LEXIS 21901 (D. Mass. Nov. 13, 1996) ...................... 43

*In re Saturn L-Series Timing Chain Prods. Liab. Litig.*,
    2008 U.S. Dist. LEXIS 109978 (D. Neb. Nov. 7, 2008) ....................... 48

*Schumacher v. State Auto. Mut. Ins. Co.*,
    47 F. Supp. 3d 618 (S.D. Ohio 2014) ............................................. 47

*Sec. Indus. Ass'n v. Clarke*,
    885 F.2d 1034 (2d Cir. 1989) ....................................................... 15

*Skillstorm, Inc. v. Elec. Data Sys., LLC*,
    666 F. Supp. 2d 610 (E.D. Va. 2009) ............................................. 27

*Smith v. Capital One Auto Fin., Inc.*,
    2011 U.S. Dist. LEXIS 84853 (D. Md. Aug. 2, 2011) .......................... 45

*Steele v. Goddard*,
    2013 WL 3013671 (Tex. App. June 13, 2013) ................................... 41

*Stockley v. Nissan of N. Am., Inc.*,
    2023 U.S. Dist. LEXIS 198744  (M.D. Tenn. Nov. 6, 2023) ................... 44

*Stoney Glen, LLC v. Southern Bank & Trust Co.*,
    944 F. Supp. 2d 460 (E.D. Va. 2013) .......................................... 19, 20

*SunTrust Mortg., Inc. v. Mortgs. Unlimited, Inc.*,
    2012 U.S. Dist. LEXIS 74106 (E.D. Va. May 29, 2012) ....................... 25

*Suttle v. Calk*,
    2022 U.S. Dist. LEXIS 39486 (N.D. Ill. Mar. 7, 2022) ........................ 44

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
    150 F. Supp. 3d 593 (S.D. S.C. 2015) ............................................ 15

*Tech. Sols. Int'l v. Partech, Inc.*,
    2010 U.S. Dist. LEXIS 157566 (S.D. Fla. Nov. 8, 2010) ...................... 32

*Teitz v. Va. Elec. Power Co. (In re Buffalo Coal Co.)*,
    2010 Bankr. LEXIS 473 (E.D. Va. May 2, 2013) ............................... 19

*Toth v. Northwest Sav. Bank*,
    2013 Pa. Dist. & Cnty. Dec. LEXIS 176 (Ct. of Common Pleas 2013) ...... 42

*Townsley v. Atl. Union Bank*,
    2020 U.S. Dist. LEXIS 151712 (E.D. Va. Aug. 19, 2020) ..................... 26

*Trinity Metals, LLC v. U.S. Conveyor Techs. Mfg.*,
2023 U.S. Dist. LEXIS 124159 (C.D. Ill. July 19, 2023) ............... 32

*Tucker v. Gen. Motors LLC*,
58 F.4th 392 (8th Cir. 2023) ............................................................ 48

*Va. Is for Movers, LLC v. Apple Fed. Credit Union*,
2024 U.S. Dist. LEXIS 45281 (E.D. Va. Mar. 13, 2024) ............... 11

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.*,
156 F.3d 535 (4th Cir. 1998).................................................... 19, 20

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith*,
2021 U.S. Dist. LEXIS 13384 (S.D.N.Y. Jan. 25, 2021)............... 43

*Vinci v. Hyundai Motor Am.*,
2018 U.S. Dist. LEXIS 139979 (C.D. Cal. Apr. 10, 2018)............. 47

*Vino 100, LLC v. Smoke on the Water, LLC*,
2011 U.S. Dist. LEXIS 71172 (E.D. Pa. July 1, 2011) .................. 32

*Walker v. People's United Bank*,
305 F. Supp. 3d 365 (D. Conn. 2018) ............................................ 15

*Ward's Equipment, Inc. v. New Holland N. Am., Inc.*,
493 S.E.2d 516 (Va. 1997)............................................................. 22

*Waters v. CitiMortgage, Inc.*,
92 Va. Cir. 460 (Cir. Ct. 2013) ..................................................... 21

*Watters v. Wachovia Bank, N.A.*,
550 U.S. 1 (2007) .......................................................................... 15

*Wenzel v. Knight*,
2015 U.S. Dist. LEXIS 70536 (E.D. Va. June 1, 2015)................. 27

*Wilkins v. United States*,
2016 U.S. Dist. LEXIS 61466 (E.D. Va. May 9, 2016)................. 21

*Williams v. Big Picture Loans, LLC*,
2021 U.S. Dist. LEXIS 130251 (E.D. Va. July 12, 2021) ............. 30

*Withers v. BMW of N. Am., LLC*,
560 F. Supp. 3d 1010 (W.D.N.C. 2021) ........................................ 46

*Wrede v. Exch. Bank of Gibbon*,
531 N.W. 2d 523 (Neb. 1995)........................................................ 49

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015)......................................................... 28

## Statutes

12 U.S.C. § 371 ................................................................................... 12

12 U.S.C. § 1841 ................................................................................. 39

49 Stat. 684 ......................................................................................... 12

73 Pa. Stat. § 201-1 et seq ................................................................ 33

815 ICLS § 505/1, et seq ................................................................. 33

815 ILCS 505/2 ............................................................................... 44

88 Stat. 633 ..................................................................................... 12

Cal. Civ. Code § 1751 ..................................................................... 32

Cal. Civ. Code § 1770(a)(9) ............................................................ 33

Del. Code tit. 6, §§ 2511, et seq ...................................................... 33

Del. Code Ann. tit. 6, §§ 2511(6), 2511(8), & 2513 ....................... 49

Fla. Stat. § 501.201, et seq .............................................................. 33

Ga. Code § 10-1-393(c) ................................................................... 32

Mass. Gen. Laws Ch. 93A, et seq .................................................... 33

Md. Code Ann., Com. Law § 13–301(3) ......................................... 45

Md. Comm. Law Code Ann. § 13-1301, et seq ................................ 33

Mo. Rev. Stat. § 407.010, et seq ...................................................... 33

N.J. Stat. Ann. § 56:8-1, et seq ....................................................... 33

N.Y. Gen. Bus. Law § 349, et seq .................................................... 33

Neb. Rev. Stat. § 59 1601, et seq ..................................................... 33

O.C.G.A. § 10-1-391(a) ................................................................... 46

Or. Rev. Stat. § 646.605, et seq ....................................................... 33

Tex. Bus. & Com. Code § 17.42(a) .................................................. 32

Tex. Bus. & Com. Code § 17.50(a)(1) ............................................. 40

Va. Code Ann. § 59.1-196, et seq .................................................... 33

Va. Code Ann. § 59.1-197 ............................................................... 38

Va. Code Ann. § 59.1-198 ............................................................... 38

Va. Code Ann. § 8.4-105 ............................................................ 38, 39

**Other Authorities**

OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 OCC CB LEXIS 16, 2002 WL 521380 (Mar. 22, 2002) ......................... 16, 28

**Codes & Regulations**

12 C.F.R. § 7.4002(b) ...................................................................... 16

12 C.F.R. § 7.4007(a) ...................................................................... 12

12 C.F.R. § 7.4007(c) ...................................................................... 15

## INTRODUCTION

This case concerns deception and bad faith by Capital One, N.A. ("CONA") and Capital One Financial Corp. ("COFC") (collectively "Capital One")[1] with respect to the interest rate paid on Capital One's 360 Savings account.

In 2013, Capital One introduced the online "360 Savings" account, which Capital One consistently advertised as its "high interest" savings account for the following six years. As of September 2019, as market interest rates were increasing, Capital One paid 1.00% APY on 360 Savings. However, on or about September 16, 2019, instead of continuing to raise interest rates on 360 Savings, Capital One abruptly pulled 360 Savings from its website and furtively substituted a new account called "360 Performance Savings," which had identical features but a higher interest rate of 1.90% APY. Capital One left all existing customers in the inferior 360 Savings account, and never informed them that 360 Performance Savings was a new, different product paying a higher interest rate. Capital One also removed references to the 360 Savings account from its website entirely, maintaining the false impression that Capital One only offered the same, single high-interest online savings account, and concealing that 360 Performance Savings had in fact replaced 360 Savings as Capital One's "high yield" savings account going forward. Over time, the interest rates on the two accounts diverged substantially, leaving 360 Savings customers behind. The interest rate for 360 Performance Savings peaked at 4.35% APY in December 2023, while the rate paid on 360 Savings was dropped from 1.00% APY to 0.30% APY, and has remained there since December 2020.

---

[1] Plaintiffs' operative Consolidated Amended Complaint (ECF 10) is referred to herein as the "Complaint," and citations to paragraphs of the Complaint are in the form "¶ _." CONA and COFC filed a joint motion to dismiss the Complaint (ECF 29) and memorandum in support thereof (ECF 30, the "Motion"). All emphasis herein is added unless otherwise indicated. Citations to docket entries refer to the page numbers generated by the ECF system.

In the 360 Savings account terms, CONA reserved itself the "discretion" to set the interest rate on the 360 Savings account. CONA's position is that it can do whatever it wants because it is a federally chartered bank and because its interest rate discretion is absolute. However, federal law does not permit deception or breach of contract, and CONA's contractual discretion is not absolute, but is bounded by good faith and fair dealing under Virginia law, which CONA chose to govern the 360 Savings account. Even though the 360 Savings and 360 Performance Savings accounts have identical features, and their respective account terms identically give CONA "discretion" regarding interest rates, CONA has used that discretion in bad faith for 360 Savings customers by failing to pay them interest commensurate with the otherwise identical 360 Performance Savings account.

Along with CONA, COFC similarly violated consumer protection statutes because it operates the Capital One website, and therefore is responsible for the deceptive marketing regarding 360 Savings and 360 Performance Savings.

Capital One's Motion ignores Plaintiffs' actual claims and contends that Plaintiffs seek to require the payment of a subjective minimum interest rate and for Capital One to notify consumers anytime it introduces a new product. These are strawmen. It is clear under these circumstances that Capital One's conduct is deceptive and was undertaken in bad faith. The two accounts at issue are identical except for the interest rate. No one "chose" 360 Savings over 360 Performance Savings. And no rational person would keep their money in 360 Savings instead of 360 Performance Savings absent deception by Capital One. Capital One's Motion should be denied.

## BACKGROUND

### I. Material Features of Capital One High-Interest Online Savings Accounts

Consumers choose Capital One's online savings accounts to obtain a high interest rate[2] on deposits. Capital One's website distinguishes between its online savings accounts and "traditional" savings accounts, emphasizing the higher interest associated with Capital One's online accounts. ¶ 51. Capital One's website notes that "high interest" and "high yield" mean the same thing, but that there is a distinction between high-interest (or high-yield) and "traditional" (i.e. **non**-high-interest or **non**-high-yield) accounts. ¶ 47 (a "high-yield" or "high interest" account is an account that "earn[s] higher than average interest on the [account] balance amount"). Capital One's website also describes the characteristics of a variable rate savings account, saying that for such an account, "[i]nterest rates will always fluctuate based on the Fed and the economy, but your Capital One savings account is here to help you save." ¶ 46.

Capital One's website acknowledges that savings accounts are used for "longer-term" deposits than checking accounts. ¶ 49 ("[O]ver time interest can be a nice cushion to your savings account and help you reach your future savings goals."). Capital One explicitly encourages consumers to keep their money in high-yield savings accounts for extended periods of time: "A high-yield savings account can be a safe place to park your hard-earned cash . . . . There are some common things you can do to help your savings grow faster: Put your money into a high-interest savings account and leave it in there to earn interest." ¶ 50.

---

[2] Interest is the amount of money that a bank pays a depositor for the use of the depositor's funds, typically represented as a percentage of the total deposit amount. ¶ 45. The annual percentage yield, or APY, is the percentage reflecting the total amount of interest paid on an account based on the interest rate and frequency of compounding for a 365-day period. *Id.*

In contrast to this wealth of information about the high rates associated with online high-interest savings accounts, and the assurance that they are a "safe place to park your hard-earned cash," Capital One's website does not advise consumers that their "high-interest" or "high-yield" accounts are subject to being converted to **non**-high-interest or **non**-high-yield accounts without warning at Capital One's whim. ¶ 52.

## II.   Capital One's "360 Savings" Account

Capital One announced that it acquired ING Direct in 2012, and on or about February 1, 2013, Capital One converted ING Direct savings accounts to Capital One "360 Savings" accounts and offered those accounts to the general public. *See* ¶¶ 1, 54. Capital One assured depositors that 360 Savings accounts would continue to be "high-interest" accounts. ¶ 54. Capital One's website from 2013 contains the following "pledge" to its customers: "We'll continue to be home to no-fee, no minimum checking and savings accounts—***with the great rates that we know are important to you***." ¶ 57.b. A 2014 "press kit" begins, "***High interest***, no fees, no service charges, no kidding. With a 360 Savings account, you earn a competitive rate…." ¶ 57.c. Similar representations touting high-interest rates for 360 Savings appeared on Capital One's website through mid-2019. ¶ 61.

The 360 Savings interest rate was high by objective metrics. Following the financial crisis in 2008, the federal funds rate and bank deposit interest rates dropped to near zero and stayed at or near historic lows for much of the following decade. *See* ¶ 62. From 2013 through 2017, 360 Savings paid 0.75% APY—significantly higher than the federal funds rate. *See* ¶ 61. Between January 2017 and January 2018, the Federal Reserve gradually increased the federal funds effective rate to 1.41%. ¶ 62. Tracking the Fed's increases, in January 2018, Capital One also increased the interest rate on the 360 Savings account from 0.75% to 1.00%. *See* ¶ 62. Capital One maintained a 1.00% rate on the 360 Savings account throughout 2018 and into 2019.

## III. **Capital One Creates the Duplicative "360 Performance Savings" Account and Conceals 360 Savings**

The federal funds rate continued climbing throughout 2018 and into 2019. *See* ¶¶ 62, 69. However, instead of raising the interest rate on the 360 Savings account in correlation to the federal funds rate, as it had done previously, Capital One instead furtively created a new, duplicate online savings account on or about September 16, 2019 that had a similar name: the Capital One "360 Performance Savings" account. ¶ 63. Capital One did so by simply substituting 360 Performance Savings on its website in place of 360 Savings, creating the misleading impression that its savings product offerings had not changed. An archival webpage from the website shows that as of September 17, 2019, the 360 Savings account was Capital One's only non-retirement online account product. ¶ 63.

# Compare savings accounts.





But by the next day, September 18, 2019, Capital One's website had dropped all references to the legacy 360 Savings account, replacing it with the 360 Performance Savings account. *Id.*

# Compare savings accounts.





As shown, the APY on 360 Performance Savings at its inception was 1.90%, while the APY on the 360 Savings, unbeknownst to anyone viewing Capital One's website, remained at 1.00%. ¶ 64. Since September 2019, Capital One's website has mentioned only the 360 Performance Savings account; indeed, consumers cannot navigate to any information about the 360 Savings account within Capital One's website. ¶ 75. Additionally, the landing page for customers who log in to their accounts shows the account balance and interest paid for each of their accounts, but does ***not*** show the interest rate or APY. ¶ 76.

Capital One advertised the 360 Performance Savings account in the same manner it had done for the 360 Savings account, as Capital One's "High Yield" account. ¶ 74. Meanwhile, Capital One did nothing to warn its existing 360 Savings accountholders that Capital One had effectively converted their accounts from high-interest accounts to low-interest accounts via the surreptitious substitution of 360 Performance Savings. *See* ¶ 65. Customers were guaranteed to be subjected to lower interest rates for as long as they did not discover the unannounced relegation of 360 Savings and substitution of 360 Performance Savings. *See* ¶ 66.

## IV.    Capital One Raises the Interest Rate on the 360 Performance Savings Account but Caps the Rate on 360 Savings

Interest rates fell sharply across the economy in early 2020, and so did Capital One's savings rates. By December 2020, the interest rate on the 360 Savings account had fallen to 0.30%, and 360 Performance Savings account to a slightly higher 0.40%. ¶ 4. From this low point, Capital One would never raise the interest rate on 360 Savings again. ¶ 67. When market conditions began to change in April 2022, prompting the Federal Reserve to increase the federal funds rate dramatically over the following year, Capital One followed suit and increased the interest rate on the 360 Performance Savings account steadily, from 0.40% to a high of 4.35%. ¶¶ 68–70. However, Capital One did not raise the rate for 360 Savings accountholders and instead left their interest rate at 0.30%. ¶ 70. These interest rate changes are illustrated in the following chart:



## V. Plaintiffs and the Class Discover and React to Capital One's Conduct

Plaintiffs discovered that they were not being paid Capital One's advertised online savings account rate between late 2022 and early 2024. ¶¶ 84-109. Capital One's general response to customer inquiries was to admit that Capital One had quietly relegated 360 Savings, and to blame customers for not noticing. *E.g.* ¶ 78. The experience of Plaintiff Hans is informative. Hans called Capital One in April 2023, demanding to know why he was not being paid Capital One's advertised rates and to be compensated for unpaid interest. ¶ 95.a. When he informed Capital One's representative that he had a 360 Savings account, the representative responded that accountholders are responsible for ensuring that they are being paid the highest interest rate possible (contradicting Capital One's public assurances that online savings accounts are suitable to "park" longer-term cash). Hans was dissatisfied with Capital One's response and emailed Capital One in May 2023 to again demand restitution. ¶ 95.b. In an emailed response, dated May 25, 2023, Capital One again refused and stated, "[y]ou can view rates for all our current 360 product offerings at www.capitalone.com by going to the 'Checking & Savings' tab at the top of the page and selecting 'View & Compare Rates.'" *Id.* This was false because the View & Compare Rates webpage has not shown the 360 Savings rate since September 2019. *Id.* Nor does it indicate that Capital One had two separate but identical online savings products with starkly different interest rates. *Id.*

The next day, May 26, 2023, Hans responded to Capital One by email, stating:

> Since there is no information about the 360 Savings Account on your website and since I did not know I was not in the 360 Performance Savings Account how can I compare the features and benefits. . . . I don't expect Capital One to notify me every time the interest rate changes. I do expect Capital One to not keep me in a low interest rate earning savings account while publicly advertising a similar sounding savings account with a significantly higher earned rate of interest. I frequently went to the website to check what the earned interest rate was on the sole savings account listed on your website. How was I supposed to know that you had other products that you no longer advertised. It is a reasonable assumption that since there was only one savings account product listed on the website and that one savings account had a similar sounding name, that was the product my money was in. Having an

account named '360 Savings Account' vs '360 Performance Savings Account' with significantly different earned interest rates with no distinct features has no rational basis other than to mislead and deceive customers into thinking they are receiving the higher rate of interest earned. Keeping existing customers in the '360 Saving[s] Account' while advertising the higher interest rate of '360 Performance Savings Account' and not notify customers that these are different products and not providing a comparison of the products on your website is further evidence that Capital One intended to deceive customers. The fact that both customer service workers I spoke with immediately changed their tone when I asked questions about the difference in these accounts and refused to answer questions while reading from a corporate prepared script suggest that Capital One is aware of this deceit and is actively trying to manage its risk for customers that are similarly situated like me. The difference in these two accounts is intended to mislead the customer. No reasonable customer should be required to see through this deceptive practice and the difference in the rate of interest earned on the accounts is a material difference. (¶ 95.c)

In response to Hans's complaint, Capital One again disclaimed any responsibility to inform its 360 Savings accountholders of the dramatic changes it had made to the nature of their accounts. ¶ 95.d.[3]

Hans's assessment is not an outlier. Various online comments on financial blogs and message boards recount consumers' anger at Capital One. As the author of the Women's Money Blog aptly summarized:

As diligent as I am with my money, I recently discovered I was losing thousands of dollars a year in interest. I thought I had a high-interest bank account with Capital One, but it turns out, my interest rate was only 0.30%. Why was it so low? Because apparently several years ago Capital One essentially archived certain legacy accounts – the "360 Savings Accounts"– and instead created a competing product that actually earns high interest. (These new accounts are called a deceptively similar name – the "360 Performance Savings Account" and currently earn 2.15% interest.) At first upon learning I had only been earning 0.30% interest instead of a competitive rate, I was embarrassed – how could I as a personal finance writer miss this? Then I was angry, not just for myself, but for the millions of consumers who are similarly situated to me. Why was I angry? Because Capital One told us we had high-interest accounts. Further, when Capital One stopped keeping our accounts at high-interest, and instead created a competing product that paid much higher rates, they didn't email us or automatically opt us in to the new accounts. They just left us to sit out there believing we still held high-interest accounts. . . . I believe that

---

[3] Capital One also added, "[w]e confirmed, as of September 2019 the 360 Savings product was grandfathered." ¶ 95.d. Describing the 360 Savings account as "grandfathered" is misleading, because that term applies when an old rule is ***more*** favorable than a new one, not less.

by holding out the legacy ING Direct accounts as high-interest accounts and not contacting consumers of the accounts to let us know that we in fact no longer part of their high-interest rate account family (you can't even find information about the 360 Savings Account on their website), Capital One engaged in deceitful practices. They could have sent an email or automatically rolled our accounts into the new 360 Performance Accounts. But instead, they just let us lose money.

¶ 115. Dozens of other consumer reviews and comments agree, and frequently mention the obvious point that, absent deception, no rational person would choose to keep his or her savings in a lower interest account if the same bank offered an identical account that paid higher interest. *See* ¶¶ 81, 110-117. Commenters have variously described Capital One's conduct as "shady" (¶¶ 111, 112.a), "slimy" (¶112.b), "unscrupulous" (¶114), "bait and switch" (¶114), "deceitful" (¶ 115), "fraudulent" (¶115.b), a "scam" (¶115.c), "cheating" (¶115.d), and "bad faith" (¶116.b), with one commenter exhorting, "I did not know I was playing a shell game with my bank." (¶ 116.a).

## VI.  <u>Capital One's Website</u>

Capital One's website is operated jointly by CONA and COFC. ¶ 53. The website terms and conditions define "Capital One" to mean both CONA and COFC[4]; COFC holds the copyright to the website; and COFC's filings with the U.S. Securities and Exchange Commission state that COFC "maintain[s] a website at www.capitalone.com." *Id.* In addition to controlling the website where savings accounts are offered, COFC has a financial interest in savings accounts held by CONA because it uses the cash to fund its lending business to earn net interest income. ¶¶ 9, 53.

Capital One intends for customers to get information about Capital One accounts, including interest rates, primarily from the website. Again, when Plaintiff Hans contacted Capital One, he was told that, to monitor the interest rates for Capital One's accounts, he could "view rates for all

---

[4] "We refer to Capital One and its affiliates and related entities as 'we,' 'us' and 'our.' This includes Capital One Financial Corporation, Capital One, N.A. and each of their successors, assigns, agents, and representatives." ¶ 53.

[Capital One] current 360 product offerings at www.capitalone.com by going to the 'Checking & Savings' tab at the top of the page and selecting 'View & Compare Rates,'" which was false because 360 Savings had been scrubbed from the website. ¶ 95.b.

## VII.   Plaintiffs' Claims

Plaintiffs are consumers from eighteen different states who have been Capital One 360 Savings accountholders since Capital One created the 360 Performance Savings account. ¶¶ 12-29. Plaintiffs assert one claim for breach of the implied covenant of good faith and fair dealing, under Virginia law, against CONA; twenty claims for violations of various state consumer protection statutes against CONA and/or COFC; and, alternatively, claims for breach of quasi-contract and promissory estoppel. *See* ¶¶ 130-311.

## STANDARD OF REVIEW

"When resolving a Rule 12(b)(6) motion, which tests the sufficiency of the complaint, the Court must take Plaintiffs' allegations as true and draw all reasonable factual inferences in their favor." *Va. Is for Movers, LLC v. Apple Fed. Credit Union*, 2024 U.S. Dist. LEXIS 45281, at *7-8 (E.D. Va. Mar. 13, 2024) (Novak. J.) (citation and quotation omitted). If the factual allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," then the complaint "makes out a case for liability that is plausible on its face, and the Motion to Dismiss must be denied." *Id.* (citations, quotations, and formatting omitted).

## ARGUMENT

### I.   Plaintiffs' Claims Against CONA Are Not Preempted

Capital One asserts that the National Bank Act ("NBA") preempts all of Plaintiffs' claims against CONA (but not COFC, which is not a bank). This preemption defense rests on the strawman premise that Plaintiffs are seeking to commandeer CONA's banking business by forcing CONA to pay "unspecified minimum" interest rates, or "whatever interest . . . Plaintiffs themselves

subjectively deem fair." ECF 30 at 30. That is not the case. CONA itself set its own objective standard by choosing to pay a certain variable "high-yield" interest rate to 360 Performance Savings customers. Plaintiffs allege that, because 360 Savings was an identical "high interest" product, CONA acted deceptively and in bad faith under the circumstances by not paying that same rate to 360 Savings customers. *See id.* at 30 (acknowledging that Plaintiffs "contend they are owed the amount of interest they would have earned if they had opened Performance Savings accounts"). Nor is it remotely accurate that "[u]nder Plaintiffs' theory, CONA could not offer deposit accounts with one rate applicable to account holders nationwide" and would instead need "to offer a variety of minimum rates implied through a patchwork of state-level laws." ECF 30 at 30, 31. Here, the rate Plaintiffs seek to apply is the nationally uniform rate that CONA itself chose to advertise and pay for 360 Performance Savings; no other rate is at issue.

Plaintiffs' claims are fully consistent with CONA's rights and obligations under federal law and are therefore not preempted. CONA asserts that paying interest on savings accounts is a power granted under the NBA because it is an "activity incidental to receiving deposits." ECF 30 at 29 (quoting 12 C.F.R. § 7.4007(a)).[5] However, Plaintiffs' claims are not preempted by the NBA because they do not significantly interfere with the exercise of CONA's deposit taking power, as

---

[5] CONA also cites *Hamilton Nat'l Bank v. District of Columbia*, which is not a Supreme Court case, for the proposition that national banks are "fully" (not just incidentally) "authorized to receive savings deposits and to pay interest on them." ECF 30 at 29 (quoting *Hamilton Nat'l Bank*, 156 F.2d 843, 845 (D.C. Cir. 1946)). However, *Hamilton* was citing to 12 U.S.C. § 371, which was subsequently amended to remove the language expressly permitting payment of interest on savings deposits. *See Hamilton*, 156 F.2d at 845 n.6; *cf.* Banking Act of 1935, 49 Stat. 684, § 208 (authorizing the making of real estate loans and providing that banks "may continue hereafter as heretofore to receive time and savings deposits and to pay interest on the same," but only in amounts that "shall not exceed the maximum rate authorized by law to be paid upon such deposits by State banks or trust companies organized under the laws of the State wherein such [bank] is located"); *with* Housing and Community Development Act of 1974, 88 Stat. 633, § 711 (amending and removing this language).

confirmed by the Supreme Court's recent *Cantero* decision. *See Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290 (2024).

In *Cantero*, the Supreme Court held that the analysis of "the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers" should be done "based on the text and structure of the laws [at issue], comparison to other precedents, and common sense." *Id.* at 1301 n.3. *Cantero* noted that the types of laws at issue in certain prior cases (*Franklin*, *Fidelity*, and *Barnett Bank*) were preempted because, in each of those cases, the state laws mandated specifically what a bank could or could not sell, say, or include in its contracts. *Id.* at 1298-99.[6] By contrast, the types of laws in other prior cases (*Anderson*, *National Bank v. Commonwealth*, and *McClellan*) were not preempted because, in each of those cases, the claims at issue were consistent with generally applicable common law. *See id.* at 1299-1301. For example, the Kentucky statute at issue in *Anderson*, which "required banks to turn over abandoned deposits to the State," "was as old as the common law itself" and thus "could produce no . . . deterrent effect" and "could apply to national banks." *Id.* (citing *Anderson National Bank v. Luckett*, 321 U.S. 233, 236, 251 (1944) (quotations omitted)). The Kentucky tax law at issue in *National Bank v. Commonwealth*, which "taxed the shareholders of all banks (including national banks) on their shares of bank stock," was not preempted because it was the type of "generally applicable state contract, property, and debt-collection law[]" that "in no manner hindered the national bank's banking operations, and produced no greater interference with the functions of the bank than any

---

[6] In *Barnett Bank of Marion Cty., N. A. v. Nelson*, 517 U.S. 25, 29 (1996), a Florida statute prohibited most banks from selling insurance. In *Fidelity Federal Savings & Loan Association v. De la Cuesta*, 458 U.S. 141 (1982), a California Supreme Court decision limited the right, otherwise allowed under federal law, to include due-on-sale clauses in the bank's contracts. And in *Franklin National Bank v. New York*, a New York statute prohibited most banks from using the word "saving" or "savings" in their advertising; the Supreme Court did not confront the issue of payment of interest. *See* 347 U.S. 373, 378 (1954).

other law governing businesses." *Id.* at 1300 (citing *National Bank v. Commonwealth*, 76 U.S. 353, (1870) (quotations omitted)).[7] Finally, in *McClellan*, the Supreme Court found that "a generally applicable Massachusetts contract law was not preempted as applied to national banks," because it did not "in any way impair the efficiency of national banks or frustrate the purpose for which they were created." *Id.* (citing *McClellan v. Chipman*, 164 U.S. 347, 357-58 (1896) (formatting omitted).[8]

Thus, under the *Cantero/Barnett Bank* analysis, Plaintiffs' claims are not preempted because they do not substantially interfere with CONA's federal banking powers. Plaintiffs are not seeking to insert any unwanted terms in CONA's contracts. Instead, Plaintiffs seek only to hold CONA to the account terms that it freely wrote and advertisements it freely made, consistent with the common law. This presents no obstacle to CONA's banking operations, and CONA articulates no real basis to conclude otherwise (other than the strawmen discussed above). The NBA preemption regulation endorses this conclusion, in observing that state laws regarding contracts and torts generally "are not preempted" because they "are not inconsistent with the

---

[7] As the Supreme Court held in *National Bank v. Commonwealth*, national banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." *National Bank v. Commonwealth*, 76 U.S. at 362.

[8] *McClellan* is instructive because it rejected an argument similar to the one CONA makes here. *See McClellan*, 164 U.S. at 357-58. The bank's argument in *McClellan* was, fundamentally, that state law could not apply so as to constrain the bank's contracts. *See id.* The Supreme Court noted that "this position denies the general rule" that banks are subject to generally applicable state laws, "and amounts to asserting that in every case where a national bank is empowered to make a contract, such contract is not subject to the state law." *Id.* The Supreme Court rejected this argument, noting that "the purpose and object of Congress in enacting the national bank law was to leave such banks as to their contracts in general under the operation of the state law," and to preempt only laws that "impair[] the efficiency of the banks to discharge the duties imposed upon them by the law of the United States." *Id.* at 359.

deposit-taking powers of national banks." 12 C.F.R. § 7.4007(c). District courts have readily held that the NBA does not preempt claims such as those asserted here. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 U.S. Dist. LEXIS 149629, at *89 (S.D.N.Y. Nov. 3, 2015) ("Here, [plaintiff] seeks to hold Bank of America to account for alleged misconduct that is proscribed by traditional common law. The National Bank Act does not preempt such a suit.").[9]

The cases Capital One cites are off point or refute its position.[10] In *Gutierrez v. Wells Fargo Bank*, for example, the 9th Circuit held that consumer protection claims regarding the bank's

---

[9] *See also, e.g., In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313 (Fla. S.D. 2010) (claim not preempted where bank "could follow both the requirements of sound banking judgment outlined in Section 7.4007 and good faith; these principles are not in irreconcilable conflict."); *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 517 (D.S.C. 2014) (denying preemption where the bank "has not established that refraining from the challenged wrongful conduct would prevent or significantly interfere with its ability to engage in the business of banking"); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 377-78 (D. Conn. 2018) (sustaining good faith and fair dealing claim; noting also that "the non-contract, state laws upon which the plaintiffs base their claims do not prohibit any requirements of the NBA or the OCC regulations, nor do such state laws require national banks to do anything that the federal laws prohibit"); *Burns v. TD Bank, N.A.*, 2022 U.S. Dist. LEXIS 222173, at *36 (D.N.J. Dec. 8, 2022) ("Numerous federal courts have observed that state consumer fraud claims, as well as the statutes underlying them, are not conflict-preempted" by the NBA) (collecting cases); *In re HSBC Bank, USA, N.A.*, 1 F. Supp. 3d 34, 46 (E.D.N.Y. 2014) ("federal courts addressing this type of alleged misconduct [regarding overdraft fees] have declined to hold that state claims, based on both statutory and common law, are preempted by the NBA or OCC regulations") (collecting cases); *Kriegel v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 82657, at *17 (D. Mass. Aug. 10, 2010) ("Claims that the non-required statements need to be accurate, not deceptive or fraudulent, else they violate state law, do not conflict with the NBA . . . .") (collecting cases).

[10] *See Sec. Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1044 (2d Cir. 1989) (OCC Comptroller could not prohibit a national bank from selling mortgages by use of a pass-through certificate mechanism); *Ass'n of Banks in Ins. v. Duryee*, 270 F.3d 397, 410 (6th Cir. 2001) (Ohio statute prohibiting national banks from marketing insurance to their customers was preempted); *1409 W. Diversey Corp. v. JPMorgan Chase Bank, N.A.*, 2016 U.S. Dist. LEXIS 101440, at *5-8 (N.D. Ill. Aug. 3, 2016) (negligence claim related to third-party fraud in connection with depositing of checks preempted); *Easton v. Iowa*, 188 U.S. 220, 239 (1903) (states are "without lawful power to make . . . **special** laws applicable to [national] banks"); *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 14 (2007) (concerning visitorial powers, which are subject to a separate preemption provision); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1035 (9th Cir. 2008) (concerning specific disclosure provisions of California Civil Code that conflicted with OCC

posting method for overdraft fees were preempted by the NBA where OCC regulations and guidance specifically allowed the posting method, thus preempting a claim that the method was "unfair." 704 F.3d 712, 724, 726 (9th Cir. 2012) (citing 12 C.F.R. § 7.4002(b), pertaining not to taking deposits, but charging fees); *accord Hawthorne v. Umpqua Bank*, 2013 U.S. Dist. LEXIS 153697, at *38 (N.D. Cal. Oct. 25, 2013); *accord In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F. Supp. 3d 593, 607 (D.S.C. 2015). However, the claim that the bank engaged in fraud was ***not*** preempted. *See Gutierrez*, 704 F.3d at 727-28; *accord Hawthorne*, 2013 U.S. Dist. LEXIS 153697, at *29-30. The Ninth Circuit cited an OCC "advisory letter warn[ing] that the 'consequences of engaging in practices that may be unfair or deceptive under federal ***or state law*** can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation.'" *Gutierrez*, 704 F.3d at 726 (quoting OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 OCC CB LEXIS 16, at *2 (Mar. 22, 2002)).

Indeed, that OCC guidance specifically warns national banks that, to avoid liability under state law, they should "[v]erify that information provided to consumers is complete and accurate and is not likely to mislead or deceive a reasonable consumer. This includes a review to ensure that customers receiving the information can reasonably be expected to understand the information about products or services—including any material limitations—without having to do 'detective' work." 2002 OCC CB LEXIS 16 at *14-15. Here, by blurring the distinction between the two

---

provisions); *Deming v. Merrill Lynch & Co.*, 528 F. App'x 775, 778 (9th Cir. 2013) (statutory claims regarding real estate lending preempted but common law claims not analyzed); *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009) (concerning Ohio garnishment statute). *Monroe Retail*'s statement that the level of interference needed for preemption is "not very high" refers to *Duryee*'s holding that the operative "significantly interferes" standard should not be held to mean "effectively thwart[s]" (*see id.*), but the actual standard remains "prevents or ***significantly*** interferes." *Cantero*, 144 S. Ct. at 1294.

savings accounts and by hiding the continuing existence of the 360 Savings account and its interest rates from its website, CONA failed to heed this OCC guidance.

CONA's alternative argument—that Plaintiffs' statutory claims are preempted because they would require CONA to make "disclosures" not required by federal law (ECF 30 at 37-38)—fares no better, and in fact was previously rejected by this Court in *Murr v. Capital One Bank (USA), N.A.*, 28 F. Supp. 3d 575 (E.D. Va. 2014). There, like here, CONA argued that "holding it liable for fraud under Virginia common law is tantamount to imposing greater disclosure requirements" and therefore was preempted by the NBA. *Id.* at 583. The Court disagreed, finding that Plaintiff's claim that CONA engaged in "active concealment of relevant facts" constituted a "misrepresentation that is not subject to preemption." *Id.* at 583-84; *see also id.* at 594 (consumer statutory claims "based on a theory of misrepresentation" are "not preempted by the NBA"); *see also Burns v. TD Bank, N.A.*, 2022 U.S. Dist. LEXIS 222173, at *33, 37 (rejecting same argument where, as here, the claims did not "demand any specific disclosure be included in the Account Agreement. Rather, Plaintiffs argue that [the bank] conducted its [deposit related] practices at their expense, in an allegedly misleading and deceptive manner, and that [the bank] should accordingly be held liable for such conduct."). Again, here, Plaintiffs allege that CONA intended for consumers to compare rates by looking at its website, and in fact specifically directed them to do so, while concealing that it had two different savings account products with different rates. *E.g.* ¶¶ 3, 65, 73, 95(b).

CONA is simply overreaching in arguing that Plaintiffs' claims are preempted. CONA wrote the 360 Savings Account Disclosures and gave itself discretion over interest rates, which it was under no compulsion to do. CONA also freely chose Virginia law to govern, under which good faith and fair dealing applies to contractual exercises of discretion. *Infra* Section II(A).

CONA now invokes preemption in order to avoid enforcement of the terms that it wrote, and the "burden" of acting honestly and in good faith. *E.g.* ECF 30 at 28. But federal law does not permit CONA to simply disavow any of its contractual obligations when they become inconvenient or disadvantageous. This would fly in the face of "common sense" and, in effect, render CONA's contracts illusory, which federal law does not envision. *See Cantero*, 144 S. Ct. at 1301 n.3; *McClellan*, 164 U.S. at 357-58. Nor can CONA act deceptively, in violation of basic state law tenets, because it is a bank. For the foregoing reasons, Plaintiffs' claims are not preempted.[11]

## II.     CONA Breached the Covenant of Good Faith and Fair Dealing (Count I)

### A.     The Implied Covenant of Good Faith and Fair Dealing Applies to CONA's Exercise of "Discretion"

The 360 Savings Account Disclosures, drafted by CONA and imposed uniformly on all customers, state that 360 Savings "accounts are subject to both federal law and the laws of the state of Virginia," and that "[t]he interest rates and annual percentage yields are variable and may change at any time *at [CONA's] discretion*." ¶¶ 58, 60 (emphasis added).[12]

"In Virginia, every contract contains an implied covenant of good faith and fair dealing." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citing

---

[11] Capital One has failed to meet its burden on preemption. *See Burrell v. Bayer Corp.*, 918 F.3d 372, 382 n.3 (4th Cir. 2019) "[P]reemption is an affirmative defense. The burden of establishing preemption, in other words, is on the defendant . . . ."); *King v. Carolina First Bank*, 26 F. Supp. 3d at 517 ("TD Bank has not established that refraining from the challenged wrongful conduct would prevent or significantly interfere with its ability to engage in the business of banking. The court cannot conclude at this time that preemption applies as a matter of law. Accordingly, at this stage in the litigation, the court denies TD Bank's Motion to Dismiss based upon preemption.").

[12] CONA argues that the Account Disclosures are incorporated into the Complaint. ECF 30 at 22 n.4. Plaintiffs allege that the interest rate provision has always contained the "discretion" language. ¶¶ 58, 60. However, CONA attaches only what is apparently the most recent version of the document, effective June 5, 2024—long after this lawsuit was filed. *See* ECF 30-1. Thus, this particular document cannot be deemed integrated into the Complaint.

*Va. Vermiculite, Ltd. v. W.R. Grace & Co*., 156 F.3d 535, 541-42 (4th Cir. 1998)). Pursuant to this covenant, "a party [to a contract] may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd.*, 156 F.3d at 542. To plead a claim for a breach of the implied covenant, a plaintiff must show (1) the parties had a contractual relationship, and (2) the defendant breached the implied covenant. *Phillips v. Wells Fargo Bank, N.A.*, 2018 U.S. Dist. LEXIS 16995, *5-6 (E.D. Va. Feb. 1, 2018).

Importantly, there is a "distinction between contractual rights and contractual discretion. A contract that gives a party the sole discretion to act or not act is imbued with a duty of good faith. On the other hand . . . when a party acts according to an express contractual right, the exercise of that right is not enervated by a duty of good faith." *Teitz v. Va. Elec. Power Co. (In re Buffalo Coal Co.)*, 2010 Bankr. LEXIS 473, at *9 (E.D. Va. May 2, 2013). Thus, "[t]he case law shows two ways in which the duty of good faith and fair dealing may be breached: (1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly . . . . (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Stoney Glen, LLC v. Southern Bank & Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) (citations omitted).

CONA attempts to dodge the issue by arguing that its contractual "discretion" *is* a contractual right, thus waving away the distinction. But that is not how it works. The Account Disclosures—which CONA admits it drafted, ECF 33 (Answer) ¶ 60—are unambiguous in stating that interest rates are to be set by "discretion" and not as a matter of "right." And in substance, the interest rate provision does not confer a contractual "right," because the nature of contractual rights is that they *accrue* based on an objective circumstance, such as the conduct or breach of the other party. *See Stoney Glen, LLC*, 944 F. Supp 2d at 469 ("where a contractual right has *accrued*, its

exercise cannot be a breach of the implied duty of good faith and fair dealing" (emphasis added));

*Arrowsmith v. Warnick (In re Health Diagnostic Lab., Inc.)*, 2018 Bankr. LEXIS 2953, at *28 (Bankr. E.D. Va. Sep. 27, 2018) ("Whereas non-discretionary rights arise under a contract upon the occurrence of a specified event, discretionary rights do not arise based on the occurrence of an objective, undisputed event."). The Court affirmed this distinction in *Mawyer v. Atl. Union Bank*, acknowledging that a claim for breach of the covenant of good faith and fair dealing would obtain where the contract "explicitly gives [the bank] discretion" over the disputed conduct, as is obviously the case here. 2022 U.S. Dist. LEXIS 65397, at *18 (E.D. Va. Apr. 7, 2022) (Novak, J.) (citing *Va. Vermiculite*, 156 F.3d at 541-42 and *Stoney Glen*, 944 F. Supp. 2d at 467).

    *Arrowsmith* is also instructive. *See* 2018 Bankr. LEXIS 2953. *Arrowsmith* concerned allegations that the defendants violated the implied covenant in a shareholder agreement by unfairly revoking S-corporation status. *Id.* at *27. There, like here, the defendants argued that "that the covenant of good faith and fair dealing is inapplicable in this instance because the [defendants] merely exercised their statutory and contractual rights to revoke the S election. The decision was not one of contractual discretion." *Id.* Noting the difference between contractual rights and discretion, the Court rejected the argument, holding that the covenant applied because the defendants "were not contractually bound to the course of action they chose" and could have taken that course of action "at any time." *Id.* at *28. The application of the covenant is even clearer here, where the Account Disclosures specifically grants CONA unfettered "discretion."

    CONA's cases are off target. In *Riggs National Bank of Washington, D.C. v. Linch*, the good faith and fair dealing claim failed because the contract "did not confer an **unfettered** discretion," but actually capped the lender's ability to increase interest charged to borrowers. 36 F.3d 370, 373 (4th Cir. 1994). Thus, "[u]nder the circumstances," the borrower "could not have

had a reasonable expectation that [the lender's] discretion to set its own prime rate would be constrained by the ebb and flow of other commercial or governmental rates of interest." In this case, CONA's discretion is unfettered, and consumers do reasonably expect, based on CONA's own past conduct, that 360 Savings would continue to be CONA's high-interest account.[13] And in *In re Capital One Bank Credit Card Interest Rate Litig.*, the account terms stated that Capital One could change credit cardholders' APR at any time, but did not use the term "discretion," and importantly, further said "[i]f we do so, we will give you notice of such amendment or change if required . . . unless we had previously notified [you] that the account would be subject to such amendment or change without notice." 51 F. Supp. 3d 1316, 1322 (N.D. Ga. 2014). And, unlike here, the Capital One credit card holders were notified in advance by mail that Capital One planned to raise the APR associated with their cards, and were given the choice of whether to accept the change to their APR. *Id.* at 1346. In those circumstances—after declining to "dig to the philosophical bottom of Virginia law on the covenant of good faith and fair dealing"—the Northern District of Georgia court concluded that CONA had the right to change the APR. *See id.*

---

[13] Capital One's cases involving foreclosures are not to the contrary. *Cf. Wilkins v. United States*, 2016 U.S. Dist. LEXIS 61466, at *3 (E.D. Va. May 9, 2016) (foreclosing on a mortgage was a contractual right triggered by plaintiffs falling behind on loan payments); *Waters v. CitiMortgage, Inc.*, 92 Va. Cir. 460, 460 (Cir. Ct. 2013) (same); *Bennett v. Bank of Am., N.A.*, 2012 U.S. Dist. LEXIS 54725, at *29 (E.D. Va. Apr. 18, 2012) (same). Neither are *Dress v. Cap. One Bank (USA), N.A.,* 2019 U.S. Dist. LEXIS 126980, at *15-18 (E.D. Va. Jul. 30, 2019) or *Pfahning v. Cap. One Bank (USA), N.A.*, 570 F. Supp. 3d 337, 345-46 (E.D. Va. 2019). In those cases, credit cardholders' agreements and monthly statements contained clear statements informing them that they would be charged in certain circumstances. *See Dress*, 2019 U.S. Dist. LEXIS 126980, at *2-5, *Phahning*, 570 F. Supp. 3d at 345. The Court noted that decision of whether or not to exercise an explicit contractual right that accrues due to objective conduct by another party does not qualify as "discretion." *Dress*, 2019 U.S. Dist. LEXIS 126980, at *17 ("Capital One exercised its contractual right to charge interest on new purchases after Plaintiffs failed to pay their balances in full the previous month"); *Pfahning*, 570 F. Supp. 3d at 345 ("the contract documents authorized the particular conduct alleged"). Here, by contrast, Capital One reserved to itself unfettered discretion to set interest rates.

at 1345. Here, by contrast, the interest rate provision uses the word "discretion," and 360 Savings customers were given no advance warning presenting them with the choice to remain in 360 Savings or switch to 360 Performance Savings.

Plaintiffs are not seeking to hold CONA to a "fiduciary" duty—Plaintiffs are seeking to hold CONA to the unambiguous terms of the contract that it wrote. CONA did not give itself the "right" to adjust interest rates in certain amounts or in specific circumstances. Instead, CONA gave itself "discretion," under Virginia law, with no constraints.[14] Consequently, the covenant of good faith and fair dealing applies fully and prevents CONA from acting dishonestly, arbitrarily or unfairly in exercising its discretion.

### B. CONA's Conduct is a Breach of the Implied Covenant

The Complaint alleges that CONA's actions were dishonest. Here, instead of paying a high interest rate to 360 Savings accountholders, CONA created the duplicative 360 Performance Savings account, and then hid from customers that it had done so by scrubbing references to 360 Savings from its website, thus attempting to conceal from 360 Savings accountholders that they were being paid a low rate of interest. ¶ 135. And Capital One's representatives mischaracterized the situation, to Plaintiff Hans and likely others, by falsely stating that the 360 Savings rates were reported on the "view & compare rates" webpage—a fact ignored by Capital One in its motion and confirming an intent to deceive. ¶ 95.b. This is evidence of dishonesty. *See Enomoto*, 624 F.

---

[14] Plaintiffs are thus not seeking to create "duties [the parties] never agreed to," as Capital One argues. ECF 30 at 41. CONA's citation to *Ward's Equipment, Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) is unavailing. "[I]t is clear that the [c]ourt was not saying in *Ward's Equipment* that an implied duty of good faith and fair dealing did not exist at all under Virginia law. Rather, the court was saying that an implied duty of good faith and fair dealing must yield to the express terms of the contract when the latter might be conceived as inconsistent with the former." *Great Am. Ins. Co. v. GRM Mgmt., LLC*, 2014 U.S. Dist. LEXIS 164147, at *28 (E.D. Va. Nov. 24, 2014) (citation and quotation omitted)). Here, unlike in *Ward's Equipment*, Plaintiffs seek to hold CONA to the "discretion" term that it wrote.

Supp. 2d at 450 ("claim was properly pled because . . . Plaintiff alleges that Defendant's actions were not merely unfavorable, but actually dishonest"); *Marcus v. Dennis*, 2022 U.S. Dist. LEXIS 87149, at *13-14 (E.D. Va. May 13, 2022) (finding that the defendant acted "dishonest[ly]" when it "took steps to ensure that the [Plaintiffs] remained in the dark") (*citing Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 251 Va. 28, 35 (1996)).

*Murr* is again instructive. In that case, this Court observed that "[a]lthough silence does not constitute fraud in the absence of a duty to disclose, concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." 28 F. Supp. 3d at 584 (citation and quotation omitted). Like here, in *Murr*, this Court found that CONA engaged in "concealment of a material fact" when it "knew consumers like plaintiff . . . would mistakenly assume" facts that were not true, and where CONA's "customer service representatives . . . field[ed] a lot of upset calls to that effect." 28 F. Supp. 3d at 584-85 (internal formatting omitted). The Court rejected as "tepid" CONA's argument that "plaintiff cannot prove concealment because any consumer willing to sift through the multitude of documents governing her account would have discovered all of the terms." *Id*. at 586. Here, customers reasonably assumed that Capital One had only one online savings account that paid Capital One's advertised rate, and CONA concealed the fact that this was not true by scrubbing 360 Savings from its website, causing "a lot of upset calls" to its customer service. *E.g.* ¶¶ 78, 86, 89-90, 95-96, 98-100, 102-05, 108.

In addition, the Complaint also alleges that CONA's actions were unfair, because they significantly impaired the ability of 360 Savings accountholders to receive the benefits of their agreement with CONA. Here, CONA sought to take advantage of its discretion over Plaintiffs'

interest rates in order to benefit itself.[15] CONA did so by reneging on its promise to accountholders that they were in CONA's "high interest" savings account, and thereby subverting customers' expectations. ¶ 74. The consumer complaints cited in the Complaint explain how CONA's conduct subverted their expectations, with one noting that "there's no discernable difference between 360 Savings and 360 Performance Savings, so there's zero reason for this except to screw over existing customers." ¶ 112.b. Others described CONA's conduct as a "bait and switch" (¶ 114), and a "shell game" (¶ 116.a), and lamented, "I can never trust Capital One again. [Capital One] should not do this to long term customers to make a few bucks." ¶ 116.b. No reasonable consumer would, or should, expect their bank to act in the manner CONA did here, by quietly capping their interest rate well below both the market rate and what it offered on an identical account, as part of a scheme to increase its profits—especially for a savings account, which is designed to hold longer-term cash. *See, e.g.*, ¶¶ 112, 114–116. CONA's customers could not have avoided this mistreatment because they were given no advance warning. *See* ¶ 66 ("For every day that 360 Savings accountholders keep their money in the 360 Savings account and do not discover and switch to the 360 Performance Savings account, Capital One profits from paying less interest to those accountholders than it otherwise would.").

The anodyne disclaimer in the Account Disclosures stating that CONA "can cancel, change or add products, accounts or services whenever we want" does not bring the conduct at issue here within customers' reasonable expectations. *See* ECF 30 at 22. CONA fails to explain how this generic statement would put customers on notice that CONA would create a ***duplicative*** account,

---

[15] Capital One asserts that consumers that opened 360 Performance Savings accountholders "chose" that account over the 360 Savings account. ECF 30 at 19. Capital One does not, however, explain how this was possible since Capital One only offered one account at a time, and the accounts were never marketed simultaneously.

and instead of "canceling" the old account, simply hide its existence to ensure that customers do not notice for as long as possible. *Cf. Murr*, 28 F. Supp. 3d at 586. Again, in response to customer inquiries, CONA did not offer a good-faith explanation for its conduct or credit interest to customers who had been deceived; in essence, CONA simply blamed customers for losing the shell game. *E.g.* ¶¶ 78, 86, 89-90, 95-96, 98-100, 102-05, 108.

CONA's bad faith is also apparent considering that 360 Performance Savings Account Disclosures are identical to the 360 Savings disclosures in that they also say that "interest rates and annual percentage yields are variable and may change at any time at [CONA's] discretion." ¶¶ 7, 72. There is no good faith explanation for why CONA would use its discretion to offer high interest rates to 360 Performance Savings customers, but not 360 Savings customers, when both accounts have the same features, the same discretionary interest rate provision in their Account Disclosures, and were both marketed as "high interest" / "high yield."

These circumstances show unfair conduct and bad faith. *See Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 612 (4th Cir. 2021) (affirming jury verdict of violation where the plaintiff "negotiated for and purchased something from [defendant] that [defendant] then turned around and rendered valueless"); *SunTrust Mortg., Inc. v. Mortgs. Unlimited, Inc.*, 2012 U.S. Dist. LEXIS 74106, at *10 (E.D. Va. May 29, 2012) (a party that failed to disclose material information in a manner "contrary to [the other party's] expectations . . . acted unreasonably and in bad faith.").[16] For example, in *Townsley v. Atl. Union Bank*, the plaintiff alleged the defendant bank breached the implied covenant by choosing a method for posting credits and debits to

---

[16] *See also Moss v. Mfrs. & Traders Tr. Co.*, 2018 U.S. Dist. LEXIS 41794, at *10 (E.D. Va. Mar. 13, 2018) (sustaining good faith and fair dealing claim based on allegations of "carr[ying] out . . . discretion in bad faith"); *Bourdelais v. JPMorgan Chase Bank, N.A.*, 2012 U.S. Dist. LEXIS 158508, at *15 (E.D. Va. Nov. 5, 2012) (misrepresentation can also give rise to good faith and fair dealing claim).

checking accounts that enabled it to charge overdraft fees more often. 2020 U.S. Dist. LEXIS 151712, at *8-9, 14 (E.D. Va. Aug. 19, 2020). The bank debited charges from the plaintiff's account from largest to smallest to maximize number of $36 overdraft fees it could charge. *Id.* The bank moved to dismiss, arguing that the deposit agreement provided that the bank may "credit and debit items by any method and in any order it chooses." *Id.* at *3. This Court denied the bank's motion, holding that because the bank retained the discretion to choose its posting and debit order, it could have done so in a manner that would have mitigated the harm to the plaintiff.

CONA's cases are distinguishable. Again, in the *Capital One Bank Credit Card Interest Rate Litigation*, credit card customers were given advance warning and a choice of whether to accept the change to their APR. 51 F. Supp. 3d at 1346. Further, unlike here, the plaintiffs in credit card litigation did not allege that Capital One took steps to conceal from them that the APR was increasing, or that Capital One created a duplicate, similarly named credit card product with a lower APR. *Cf.*, *e.g.*, ¶ 63.

In another case against Capital One concerning its relationship with credit cardholders, *Barton v. Cap. One Bank (USA), N.A.*, the plaintiff cardholder opened a Capital One credit card account after accepting a promotional offer of 0% interest on purchases. 2013 U.S. Dist. LEXIS 188174, at *2 (N.D. Cal. Apr. 16, 2013). To get the 0% promotional rate, new cardholders were required to "[pay] his or her previous purchases in full by the due date." *Id.* at *6. The court held that while the "[d]efendant could have been clearer with cardmembers" regarding the offer's terms, they were nonetheless disclosed to cardholders, the plaintiff failed to perform under the terms of the offer by failing to pay for all purchases by the due date, and the "[p]laintiff identifies no instance in which Defendant exercised any discretion at all" after the plaintiff failed to pay her balance in full. *Id.* at *10, 20. Here, there is no way in which Plaintiffs somehow failed to perform

under the Account Disclosures, and Plaintiffs have identified exactly how Capital One failed to exercise its "discretion" in good faith.

Also, in *Wenzel v. Knight*, a securities action brought under Virginia law, the defendant company offered a dividend or reinvestment in additional shares, and the plaintiff alleged that the share prices were artificially inflated to benefit the company. 2015 U.S. Dist. LEXIS 70536, at *1 (E.D. Va. June 1, 2015). The Court dismissed the complaint, holding the "defendants behaved exactly as envisioned by the agreement" and the plaintiff "assert[ed] no facts showing dishonesty." *Id.* at *22 n.6. Here, as described above, Plaintiffs allege that CONA did not behave as customers envisioned based on its prior conduct and representations.[17]

Finally, CONA's demurrer to the monthly 360 Savings account statements does not help its argument. Even if customers happened to review their account statements (which they had no particular reason to do, since savings accounts are intended to "park" cash and because balance information was available on the log in screen), the monthly statements at no point advised customers that CONA had introduced the 360 Performance savings product with a better APY, and so did not clear up the confusion created by CONA's conduct. ¶¶ 65, 77. That is, the information customers needed to uncover CONA's conduct was dispersed—at no single place and time did CONA advise customers that the 360 Savings rate was no longer high interest *and* that if they wanted high interest, they would need to open a new 360 Performance Savings account. For

---

[17] In *Skillstorm, Inc. v. Elec. Data Sys., LLC*, under the contract one party had "the *right* to *terminate* the purchase orders at will," and the other party had the same right—a far different situation. 666 F. Supp. 2d 610, 620 (E.D. Va. 2009) (emphasis added). And in *Chance v. Wells Fargo Bank*, the plaintiffs claimed that the covenant required the bank to modify their delinquent mortgages pursuant to the federal Home Affordable Modification Program ("HAMP"), in what the Court determined to be a meritless "disguised HAMP claim." 2012 U.S. Dist. LEXIS 137507, at *12 (E.D. Va. Sept. 25, 2012). Here, Capital One has pointed to no underpinning federal law or regulations that specifically permit its conduct, nor are Plaintiffs trying to disguise a nonviable federal claim as a state claim.

example, as Plaintiff Hans explained in his email to Capital One, he monitored his interest rate by looking at the rates available on Capital One's website, and because only one rate on a similar sounding account name was advertised, he reasonably assumed that was the rate he was getting. ¶ 95.c. Capital One fails to attach copies of the information available on the website, or on the login page, to show the total mix of information available to consumers, or how, when, and where it was presented. Companies cannot simply attempt to nullify misrepresentations with fine print (*see Murr*, 28 F. Supp. 3d at 586), nor can they impose "detective work" on customers (2002 OCC CB LEXIS 16, at *14-15). At best, the account statements present a factual issue that is not ripe for consideration on a motion to dismiss, especially against Plaintiffs, who are entitled to all reasonable inferences.[18]

### III.    CONA and COFC Violated Consumer Protection Statutes

#### A.   CONA and COFC Are Jointly Responsible for Capital One's Website

Capital One attempts to avoid liability for COFC by arguing Plaintiffs have not alleged sufficient facts to warrant piercing the corporate veil. ECF 30 at 26-27. This argument is off target because Plaintiffs seek to hold COFC ***directly*** liable for conduct and omissions on the Capital One online banking website, which COFC owns and operates jointly with CONA. ¶ 53; *see also Capital One Fin. Corp. v. Capital One Auto Group 1*, 2022 U.S. Dist. LEXIS 38798, at *3 (E.D.N.Y. March 4, 2022) (COFC owns a number of federally registered trademarks in the name "Capital

---

[18] The generic, unauthenticated account statements submitted by Capital One are not incorporated into the Complaint and, in any event, should not be construed against Plaintiffs at the pleading stage. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) ("Consideration of a document attached to a motion to dismiss ordinarily is permitted only when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." (formatting and quotations omitted)); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (documents arguably should not have been considered by district court, where the "claims d[id] not turn on, nor [we]re they otherwise based on, statements contained" in the documents).

One" as well as the website "CapitalOne.com"). Thus, piercing the corporate veil is simply not at issue.

Plaintiffs are not required to sharply differentiate the respective conduct of CONA and COFC at this stage. *See Rieger v. Volkswagen Grp. of Am., Inc.*, 2023 U.S. Dist. LEXIS 78785, at *8-9 (D.N.J. May 4, 2023) (declining to dismiss complaint where "the allegations pertain to sophisticated corporate entities that are related to each other, in which [case] a plaintiff need not distinguish the specific roles that each entity played in the fraudulent concealment in order to meet the Rule 9(b) standard" (formatting omitted)).[19] Regardless, the Complaint clearly and adequately specifies the role of each Defendant, as Plaintiffs understand it based on Defendants' own representations: CONA holds client accounts and is responsible for determining interest rates, while CONA and COFC jointly operate the website used to advertise and sell those accounts to consumers. ¶¶ 5, 53. Plaintiffs' allegations are sufficient at the pleading stage.[20]

## B. CONA's Choice of Law Provision Does Not Bar Plaintiffs' Statutory Claims

Capital One refers to the choice-of-law provision found in the Account Disclosures, which says "your accounts are subject to . . . the laws of the State of Virginia," to argue that Plaintiffs

---

[19] Capital One's Rule 9(b) argument is limited to this issue, and is ***not*** directed at the elements of any of Plaintiffs' claims (and Capital One should not be permitted to expand its Rule 9(b) argument on reply). *See* ECF 30 at 50. "Ultimately, Rule 9(b) requires plaintiffs to plead with particularity 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby,'" such that the "allegations adequately alert [the] Defendant of the claims against it," which the Complaint plainly does here as to the claims against each Defendant. *Barry v. Novartis Pharm. Corp.*, 2022 U.S. Dist. LEXIS 116391, at *31, 33 (E.D. Va. June 30, 2022) (Novak, J.) (quotation and citation omitted).

[20] As noted in the case cited by Capital One, it is not "shotgun" pleading where the complaint "specif[ies] the conduct attributable to each Defendant," and moreover, "courts have been hesitant to dismiss complaints as a whole under Rule 8 where," as here, "there is an allegation of group liability under each claim." *Marriott Int'l Inc. v. Dynasty Mktg. Grp. LLC*, 2022 U.S. Dist. LEXIS 245639, at *10 n.12 (E.D. Va. Sep. 21, 2022).

cannot assert claims under the laws of any other state. But Plaintiffs did not waive their consumer rights against CONA or COFC.

Plaintiffs' claims against COFC do not arise from any contractual relationship because COFC is not a party to the Account Disclosures. Capital One argues that "Plaintiffs' relationship with **Capital One** is governed by Virginia law pursuant to [the] contractual choice-of-law provision" in the Account Disclosures (ECF 30 at 45), but this is misleading because the Account Disclosures specifically define Capital One to refer **only to CONA**, and not COFC—indeed, they do not even mention COFC. *See Williams v. Big Picture Loans, LLC*, 2021 U.S. Dist. LEXIS 130251, at *8-9 (E.D. Va. July 12, 2021) ("it is axiomatic that a contract is only binding on the parties to the contract" and that any "third party must be **designated** a beneficiary in the contract" to benefit from its terms (emphasis added)). Notably, in *Gartner, Inc. v. HCC Specialty Underwriters, Inc.*, cited by Capital One, the court dismissed a MGL 93A claim against one defendant in a business-to-business dispute because the court found that it "essentially reduced to a contract claim." 2023 U.S. Dist. LEXIS 16426, at *22 (S.D.N.Y. Jan. 31, 2023). However, the court also **sustained** a MGL 93A claim against the other defendant, who like COFC, "was not a party to the" contract, and whom the plaintiff "ha[d] not sued . . . for breach of contract." *Id.* at *23.[21]

---

[21] Capital One plays fast and loose with its own corporate structure again later on in service of its argument that Plaintiffs cannot restate their implied covenant claim as a statutory violation. *See* ECF 30 at 57 ("the Agreement expressly allowed **Capital One** to adjust the rates" (emphasis added)). CONA adjusted the rates; COFC did not adjust the rates, and is not subject to the contract claim—only the statutory claims. In contrast to Plaintiffs' contract claims, their statutory claims do not stem from the Account Disclosures; they are based on the switcheroo effected on the Capital One website. ¶¶ 137-302 (Counts II through XXI are not based on the Account Disclosures). *See Guzman v. Candles, LLC*, 2016 U.S. Dist. LEXIS 135501, at *10 (M.D.N.C. Sept. 30, 2016) ("Contractual choice of law provisions should be 'set aside' where, as here, the dispute does not involve any issue of contractual construction, interpretation, or

Second, the choice-of-law provision saying that the "accounts are subject to . . . the laws of the state of Virginia" (¶ 60) is not the same as a **waiver** of other laws, and should not be construed (against Plaintiffs) to operate as such. *See In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 392 (E.D. Va. 2020) (rejecting argument "that Virginia substantive law must apply to all claims," including "tort claims that would otherwise be subject to foreign law under Virginia's choice-of-law rules," because "[t]here is no language in the Cardholder Agreement that can be reasonably construed to exclude the application of Virginia's choice of law rules"). Capital One cites one case that, according to Capital One, "dismiss[ed] [a] California statutory consumer-protection claim" because of a Virginia choice of law provision. ECF 30 at 45 (citing *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 468 (E.D. Va. 2016)). But *Run Them Sweet, LLC* was a business-to-business dispute that did not involve any "consumer protection" claim, and the same is true of Defendants' other cases. *Cf. In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 393 n.8 (distinguishing *Run Them Sweet*).[22] For disputes actually involving consumer protection claims, as here, the majority of the state statutes (California, Texas, New York, New Jersey, Pennsylvania, Massachusetts, Illinois, Maryland,

---

enforceability.") (quoting *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983)); *accord P&L Dev., LLC v. Bionpharma, Inc.*, 367 F. Supp. 3d 421, 429 (M.D.N.C. 2019).

[22] *Pyott-Boone Elecs. Inc. v. IRR Tr. for Donald L. Fetterolf Dated December 9, 1997*, 918 F. Supp. 2d 532, 547 (W.D. Va. 2013) (business dispute; statutory claim was a securities law claim); *Precision Pipeline, LCC v. Dominion Trans., Inc.*, 2017 U.S. Dist. LEXIS 42498, at *2, 3 n.2, 9 (E.D. Va. Mar. 23, 2017) (business dispute; dismissing Contractor and Subcontractor Payment Act claim; "The two sophisticated parties in this case chose Virginia law to govern their contracts."); *Ne. Data Sys. v. McDonnell Douglas Comput. Sys.*, 986 F.2d 607, 610-11 (1st Cir. 1993) (business dispute; noting that "**corporations** may waive protection of 93A by contractual limitation of liability clause" but nevertheless that a fraud claim "falls outside the contract's choice-of-law provision" (citation omitted)).

Florida, Georgia, and Missouri) are not subject to waiver by contract.[23] Capital One has not shown

that the choice-of-law provision here operates as a waiver of consumer protection laws.

### C. Capital One's Conduct Is Misleading to a Reasonable Consumer

Capital One raises broadside challenges to Plaintiffs' statutory claims, but its horde of cases

is just a smokescreen. Fundamentally, Capital One acknowledges that the state consumer

protection statutes forbid conduct that would be "likely to mislead a reasonable consumer acting

reasonably under the circumstances." ECF 30 at 53-58 (arguing that statutory claims fail because

---

[23] *See Diep v. Apple, Inc.*, 2024 U.S. App. LEXIS 7214, at *6 (9th Cir. Mar. 27, 2024) ("waivers of certain statutory claims" including California CLRA, California UCL, and Maryland CFA, "are unenforceable as a matter of public policy"); Cal. Civ. Code § 1751. ("Any waiver by a consumer of the provision of the [the CLRA] is . . . unenforceable."); Tex. Bus. & Com. Code § 17.42(a) ("[a]ny waiver by a consumer of the provisions of [the DTPA] is contrary to public policy and is unenforceable and void"); *Catena v. NVR, Inc.*, 2023 U.S. Dist. LEXIS 4682, at *7 (W.D. Pa. Jan. 9, 2023) ("[T]he Third Circuit has recognized that UTPCPL claims are statutory and tortious in nature meaning that they are not bound by contractual language." (citation omitted)); *Carrow v. Fedex Ground Package Sys.*, 2017 U.S. Dist. LEXIS 48536, at *12 (D.N.J. Mar. 30, 2017) (NJCFA; "language that the contract was to be 'governed and construed in accordance with' a state's laws did not clearly indicate the signee intended to waive her statutory claims" (citation omitted)); Mass. Gen. L. 93, §101 ("Any rights granted to consumers . . . shall not be waived by agreement or otherwise unless specifically permitted by such law or regulation."); *Kleiner v. Cenage Learning Hldg. II, Inc.*, 66 F.4th 28, 29 (1st Cir. 2023) (finding unenforceable as to MGL 93A an agreement that stated "[t]his Agreement shall be construed and governed according to the laws of the State of New York"); 815 ILCS 505/10c (ICFA; "[a]ny waiver or modification of the rights, provisions, or remedies of this Act shall be void and unenforceable"); *Trinity Metals, LLC v. U.S. Conveyor Techs. Mfg.*, 2023 U.S. Dist. LEXIS 124159, at *20 (C.D. Ill. July 19, 2023) ("application of 815 ILCS 505/10c render[s] a waiver of ICFA rights or remedies unenforceable"); *Gleit v. Francois-Bodine*, 2018 U.S. Dist. LEXIS 85038, at *9 (S.D.N.Y. May 18, 2018) ("a party's ability to bring a claim under New York's GBL is not dependent on the law applicable to contracts between the parties"); *Tech. Sols. Int'l v. Partech, Inc.*, 2010 U.S. Dist. LEXIS 157566, at *8 (S.D. Fla. Nov. 8, 2010) ("FDUTPA claim — a statutory claim pursuant to Florida law — is obviously governed by Florida law," especially where contract does not "specifically preclude[] [plaintiff] from bringing a FDUTPA claim"); *Vino 100, LLC v. Smoke on the Water, LLC*, 2011 U.S. Dist. LEXIS 71172, at *21 (E.D. Pa. July 1, 2011) ("The provisions of the [Georgia] FBPA may not be waived or limited by contract." (citing Ga. Code § 10-1-393(c)); *Burnett v. Nat'l Ass'n of Realtors*, 2022 U.S. Dist. LEXIS 73682, at *55 (W.D. Mo. Apr. 22, 2022) ("[T]he MMPA does not allow a defense of waiver by contract.").

Plaintiffs allege no unfair or deceptive statements or omissions). However, Capital One distorts what "reasonable consumer" means.

The Seventh Circuit explained the "reasonable consumer" concept thoroughly in a recent decision, *Kahn v. Walmart Inc.*, 107 F.4th 585 (7th Cir. 2024). *Kahn* involved claims under multiple consumer protection statutes[24] based on allegations that items at Walmart would ring up at the register at a price higher than what was advertised on the shelf. *Id.* at 591. The district court dismissed the case, reasoning that "where Walmart provides its customers with a receipt to compare the scanned price with the shelf price, there is no possibility for deception." *Id.* at 593. The Seventh Circuit held that this reasoning misapprehended the "reasonable consumer" standard. *Id.* at 595. Since "human cognitive abilities are not perfect or infinite . . . [p]redictable tendencies in consumer behavior mean that retail settings can be engineered to influence consumers in ways they (meaning we) do not fully anticipate or appreciate." *Id.* at 595. "Only by interpreting the reasonable consumer standard in line with actual consumer behavior can consumer protection laws help address problems posed by unfair or deceptive market manipulation." *Id.* at 596. Thus, "[w]hen determining reasonable consumer behavior for purposes of consumer protection law, we should consider the behavior of real consumers instead of Adam Smith's *homo economicus* with perfect information." *Id.* at 597.

---

[24] The claims alleged in *Kahn* included many consumer protection statutes implicated here, such as the California CLRA ((Cal. Civ. Code § 1770(a)(9)); Delaware (Del. Code tit. 6, §§ 2511, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Illinois (815 ICLS § 505/1, et seq.); Maryland (Md. Comm. Law Code Ann. § 13-1301, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Nebraska (Neb. Rev. Stat. § 59 1601, et seq.); New Jersey (N.J. Stat. Ann. § 56:8-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); Oregon (Or. Rev. Stat. § 646.605, et seq.); Pennsylvania (73 Pa. Stat. § 201-1 et seq.); and Virginia (Va. Code Ann. § 59.1-196, et seq.). *See Khan v. Walmart, Inc.*, No. 1:22-cv-04177, ECF 1 (N.D. Ill. Aug. 9, 2022), ¶ 51 n.13 & ¶ 52 n.14.

Noting that inferences must be drawn in the plaintiff's favor at the pleading stage, the Seventh Circuit "reject[ed] Walmart's arguments that courts should overlook the realities of attempts to influence consumer behavior." *Id.* at 596. The Court specifically rejected the district court's conclusion that once "consumers were given receipts with the actual prices charged, no reasonable consumer would remain deceived." *Id.* at 599. Providing a receipt is insufficient because it happens "only after their transactions have concluded." *Id.* at 599. Additionally, requiring consumers to compare receipts to posted prices

> would require unreasonable efforts by consumers to protect themselves from the deception. As the district court acknowledged, a receipt by itself will not dispel deception created by inaccurate shelf prices. Rather, only plaintiff's comparison of the prices actually charged at the register against the advertised shelf pricing dispelled the potential deception. . . . Under Walmart's approach to these pricing inaccuracies, consumers must keep track of the advertised shelf prices for all the items they intend to purchase, either by memory or by documenting shelf prices while shopping. Next, after paying and obtaining a receipt, consumers would need to compare the scanned prices with the shelf prices for all the items. Only then would the comparison reveal the discrepancy and dispel any potential deception.
>
> ### ***Who does that?***

*Id.* at 599 (emphasis added; citations and formatting omitted).[25] Ultimately, the Seventh Circuit held that questions of reasonable consumer behavior "cannot be resolved as a matter of law based on only attorney arguments that reasonable consumers should audit their receipts." *Id.* at 600.

---

[25] *Kahn* accords with many prior cases holding that companies cannot avoid liability by hiding the truth in fine print. *Rivera v. Navient Sols., LLC*, 2020 U.S. Dist. LEXIS 150129, at *27 (S.D.N.Y. Aug. 19, 2020) ("based on Plaintiff's allegations, there would be no reason for a reasonable consumer to look beyond misleading representations on the front of the billing statement to discover the 'truth' from the fine print in the remainder of the billing statement" (citation and formatting omitted)); *McKay v. Sazerac Co.*, 2023 U.S. Dist. LEXIS 86621, at *21-22 (N.D. Cal. May 17, 2023) ("circuit courts [have] rejected the argument that a reasonable consumer, upon review of the package as a whole, would necessarily look beyond the misleading misrepresentations on the front of the box to discover the truth from the ingredient list in small print on the side of the box" (collecting cases)).

Similar to Walmart's unsuccessful argument in *Kahn*, Capital One asserts here that consumers could not have been misled because they had their account statements and could have compared, retrospectively after the close of a monthly cycle, those rates to the rate then being advertised on the Capital One website. ECF 30 at 55. But Capital One does not even attempt to answer the critical question of "who does that?", let alone "who would knowingly place money in an identical account paying less interest when they could have earned significantly more?" This is simply not how consumers actually behave with regard to online savings accounts, and Capital One knows this and sought to take advantage of it. *See* ¶¶ 75-77; *see also*, *e.g.*, ¶ 6; ¶ 95 (Plaintiff Hans' explanation); ¶ 111-16 (Women's Money Blog and other online comments). And, again, even if consumers undertook to make this comparison, it would not clear up the confusion. Capital One intentionally frustrated customers' ability to compare by concealing information about 360 Savings from its website. Nowhere did Capital One give a complete, comprehensible explanation that the similarly named 360 Savings and 360 Performance Savings were actually different products with different rates (causing Plaintiff Hans and others to express their confusion in inquiries to Capital One). ¶¶ 75-77, 95. Capital One's conduct had the capacity to, and did in fact, deceive consumers acting reasonably under the circumstances.

### D. Capital One's Sweeping, Generic Challenges to Plaintiffs' Claims Fail

Failing to move the needle on the central issue, Capital One asserts various other purported problems with Plaintiffs' claims, none of which has any basis in the Complaint (or the law).

Capital One argues that Plaintiffs "do not allege that they purchased or leased anything from Capital One" because Plaintiffs "were not required to pay any fees for their accounts," thus defeating certain (but not all) of their statutory claims. ECF 30 at 48. This argument is meritless. *See In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 420-21, 426-27 (rejecting argument that Capital One customers are not consumers under California CLRA and

Texas DTPA).[26] Even if there were no "fees," a bank savings account is not a product that is offered *gratis*; acquiring one is a purchase in the ordinary sense of the word because it requires the customer to part with money and give it to the bank, in order both to obtain the account and to obtain interest on the balance (and the amount of interest earned is directly proportional to the money relinquished to the bank). Indeed, the 360 Savings Account Disclosures, written by CONA, acknowledge that the account is a consumer product. ECF 30-1 at 5 ("Your 360 Savings account is a consumer account and must be used primarily for personal, family, or household purposes.").[27]

Capital One argues that it had no duty to tell customers that 360 Savings and 360 Performance Savings were different products, and that the latter paid a higher rate, thus defeating certain (but again not all) of Plaintiffs' statutory claims. *See* ECF 30 at 53-54. This too is wrong. "While there are some differences among the relevant states[28] concerning when a party has a duty to disclose, all recognize a duty to disclose in at least one of the two following circumstances: (1) when one party voluntarily discloses information, the whole truth must be disclosed or (2) when one party possesses superior information to the other and knows or should have known that the other is acting on the basis of mistaken information." *In re Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. & Sales Practice Litig.*, 2017 U.S. Dist. LEXIS 105335, at *27 (E.D. Va. July 7, 2017). The Complaint alleges both: (1) Capital One failed to tell the whole truth on its website (and in customers' account statements) (*e.g.* ¶¶ 63, 65, 75-77); and (2) Capital

---

[26] Capital One presents no analysis or caselaw demonstrating that their argument applies to any statutes besides the California CLRA and Texas DTPA.

[27] The OCC confirms that "[d]epository **services** include checking and savings accounts." https://www.occ.treas.gov/topics/consumers-and-communities/consumer-protection/depository-services/index-depository-services.html (last accessed August 18, 2024) (emphasis added).

[28] The Court in *Lumber Liquidators* specifically analyzed the law in Virginia (as well as New York, California, and others). *Id.* at *27 n.11.

One knew and sought to exploit customers' mistaken impression that Capital One only had one online savings account. ¶¶ 66, 86, 93, 95(c). As explained below, every consumer protection statute contemplates claims such as those asserted here. *See infra* Argument § E.

Plaintiffs' allegations concern Capital One's **concealment** of the fact that Capital One actually had two different online savings accounts, and that 360 Savings had become the low interest product as between the two. *E.g.* ¶¶ 3, 65, 73. Plaintiffs do not allege that the "high interest" representation about 360 Savings was false when made; indeed, it was both true and important, which made the furtive relegation of 360 Savings to a low-interest account deceptive and unfair. Capital One itself defined the term "high interest" on its own website, as a descriptive term for a specific type of savings account—it cannot claim puffery with respect to a term it knows has a particular meaning to consumers. ¶¶ 47-52; *cf.* ECF 30 at 33; *see Carr v. Sheehy Ashland, Inc.*, 65 Va. Cir. 4, 7 (Cir. Ct. 2004) (sustaining fraud and VCPA claim against bank entity; holding that "best interest rate available" was not puffery under the circumstances).

Capital One's arguments on reliance and causation also fail. Reliance is not required under various of Plaintiffs' statutory claims (as explained in the respective sections below), but to the extent it is required, the Complaint pleads it. No customer was told that their 360 Savings accounts were no longer high interest accounts after Capital One established 360 Performance Savings. Any person who remained in 360 Savings necessarily relied on this deception, because otherwise they would have moved their money into 360 Performance Savings (or to another bank). *See* ¶ 129; *see, e.g.*, *Parrish v. Gordon Lane Healthcare, LLC*, 2023 U.S. Dist. LEXIS 173477, at *10 (C.D. Cal. Sep. 26, 2023) ("Actual reliance is presumed" when the defendant "fraudulently conceal[s]" material information); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 561 (E.D. Va. 2000) (the Court can presume reliance when "it is logical to do so or when the complaint's allegations make

reliance apparent," and should so presume if "conclu[ding] otherwise would deny human nature [or] run counter to the traditional presumption in favor of actors operating under rational economic choice") (citation and quotation omitted)). Causation and loss are also clearly pleaded. ¶ 79 ("Capital One's conduct has caused each of the Plaintiffs to lose out on interest payments proportionate to their account balances since September 2019, compared to what they each would have received had Capital One adjusted the 360 Savings interest rate in good faith, [commensurate] with the 360 Performance Savings rate.").

### E. Each of Plaintiffs' Statutory Claims Is Plausibly Alleged

#### 1. *Virginia: VCPA (Count II, Against COFC Only)*

The Virginia Consumer Protection Act is "remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code § 59.1-197. It is to be construed liberally in favor of consumers. *Ballagh v. Fauber Enters.*, 290 Va. 120, 125 (2015). "To state a cause of action under the VCPA, a plaintiff must allege (1) fraud, (2) by the supplier, (3) in a consumer transaction." *Enomoto*, 624 F. Supp. 2d at 456. Plaintiffs have done so here. *See Carr*, 65 Va. Cir. at 7; *Marcus*, 2022 U.S. Dist. LEXIS 87149, at *26 (sustaining VCPA claim based on concealment; noting "the VCPA provides a statutory duty that exists independent of the contracts entered into between the parties"); *Finney v. Clark Realty Capital, LLC*, 2022 U.S. Dist. LEXIS 18645, at *15 (E.D. Va. Jan. 31, 2022) (sustaining VCPA claim based on concealment).

Banks are exempt from the VCPA, and so this claim is brought only against COFC, which is ***not*** a bank.[29] Plaintiffs do not allege that COFC is a bank; Plaintiffs allege that "Defendant

---

[29] Capital One cites the definition of "bank" under the Virginia Commercial Code (Va. Code Ann. § 8.4-105) and contends that this is the definition "under Virginia law." This is misleading because that is not how the ***VCPA*** defines the term. *See* Va. Code Ann. § 59.1-198 (no VCPA statutory definition of "bank"). Even if the UCC definition applied, that section defines a "bank" as "a person engaged in the business of banking, including a savings institution, credit union or

Capital One Financial Corporation is a holding company," (¶ 41) and COFC admits as much. ECF 30 at 28 n.16 ("COFC is a 'bank holding company' under 12 U.S.C. § 1841."). Plaintiffs' allegation that COFC uses its website to market and sell savings accounts held by its subsidiary (CONA), in which it has a direct financial interest, do not somehow transform COFC into a bank.[30]

## 2. *California: CLRA (Count III, Against CONA and COFC)*

The CLRA applies to financial accounts that provide services besides simply access to money, such as convenience. *See Hawthorne v. Umpqua Bank*, 2013 U.S. Dist. LEXIS 153697, at *33-35 (N.D. Cal. Oct. 25, 2013); *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 421. "To [establish] a CLRA claim, a plaintiff must show (1) the defendant engaged in deceptive conduct and (2) the deception caused plaintiff harm." *Lytle v. Nutramax Labs., Inc.*, 99 F.4th 557, 580 (9th Cir. 2024). These elements are pleaded here.

## 3. *California: UCL (Count IV, Against CONA and COFC)*

"A business act or practice may violate the UCL if it is either 'unlawful,' 'unfair,' or 'fraudulent.' Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (last quotation omitted). The "plaintiff need not show reliance to state a claim for fraudulent business acts," but rather "need only allege that the public is likely to be deceived by the alleged business acts." *In re HSBC Bank,*

---

trust company." Va. Code Ann. § 8.4-105. COFC is none of these things. Correspondingly, Capital One argues that only Plaintiffs' claims against *CONA* are preempted by the NBA.

[30] Capital One's cited cases are inapposite. For example, the VCPA claim in *Norman v. Wells Fargo Bank, N.A.* was brought against Wells Fargo Bank, National Association, an entity similar to CONA. 2018 U.S. Dist. LEXIS 29818, at *12-13 (E.D. Va. Feb. 23, 2018). And in *McLean v. BB&T Bank Corp.*, the Court found that "[d]efendants are a *bank* based in Winston-Salem, North Carolina with branches located in fifteen states and Washington, D.C.," and the word "holding" does not appear in the opinion. 2020 WL 2744107, at *1 (E.D. Va. Jan. 13, 2020). Moreover, the defendant BB&T Bank was clearly a bank; the plaintiff brought suit because BB&T allegedly blocked access to his safe deposit box at one of its branches. *Id.*

*USA, N.A.*, 1 F. Supp. 3d at 55 (sustaining UCL claim). The UCL claim here is sufficient as to each prong (which Capital One does not challenge). *See Rubio*, 613 F.3d at 1204-05 (sustaining claims under "unlawful" prong based on alleged violation of another statute; "fraudulent" prong because "members of the public are likely to be deceived"; and "unfair" prong because the allegations showed Capital One easily "could have prevented consumer confusion"); *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 420 (UCL unlawful prong claim).[31]

### 4. *Texas: DTPA (Count V, Against CONA and COFC)*

A claim under the DTPA has three elements: "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing Tex. Bus. & Com. Code § 17.50(a)(1)). 360 Savings depositors are consumers within the meaning of the DTPA. *See In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 427; *Plaza Nat. Bank v. Walker*, 767 S.W.2d 276, 278 (Tex. App. 1989), writ denied (June 14, 1989); ECF 30-1 at 5 ("Your 360 Savings account is a consumer account and must be used primarily for personal, family, or household purposes."). Under Texas law, there is a duty to disclose when "new information makes [an] earlier representation misleading or untrue" or "when one makes a partial disclosure and conveys a false impression." *In re Jpg Renewables LLC*, Nos. 23-30628, 23-3027, 2024 Bankr. LEXIS 329, at *17 (Bankr. S.D. Tex. Feb.

---

[31] *See also Nunez v. Saks Inc.*, 2023 U.S. Dist. LEXIS 85984, at *15-16 (S.D. Cal. May 16, 2023) (fraudulent prong alleged where defendant's conduct was "likely to deceive a reasonable consumer," and "[b]ecause Plaintiff plausibly alleges violation of the . . . CLRA, he also states a claim under the unlawful prong of the UCL"); *Fernandez v. Progressive Mgmt. Sys.*, 2022 U.S. Dist. LEXIS 120329, at *17-18 (S.D. Cal. July 7, 2022) ("whether reasonable consumers would be deceived by [defendant's] allegedly unlawful billing and debt collection practices . . . is a question of fact inappropriate for resolution on a motion to dismiss").

7, 2024); *accord In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 427. The Complaint alleges as much.[32]

### 5. *New York: GBL (Count VI, Against CONA and COFC)*

The Complaint states a New York G.B.L. claim by alleging that the defendant engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quotation omitted). "[A] determination of whether a particular act or practice is misleading is not ordinarily appropriate for decision on a motion to dismiss." *Rivera v. Navient Solutions, LLC*, 20-cv-1284-LJL, 2020 U.S. Dist. LEXIS 150129, at *21-22 (S.D.N.Y. Aug. 19, 2020). The Complaint here alleges conduct that is objectively misleading and therefore actionable under the G.B.L. *See In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 425 ("New York Plaintiffs have sufficiently alleged their claims under Rule 8"); *Burns v. TD Bank*, *N.A.*, 2022 U.S. Dist. LEXIS 222173, at *29 (allegation "that [the bank] used deception and misrepresented the true nature of its [account] practices; employed [account] practices that were contrary to the overall net impressions the Account Agreement worked to create; and did so for the purpose of increasing its . . . revenue" stated a claim under G.B.L. and were "sufficiently distinct from the allegations that [the bank] violated the terms of the Account Agreement"); *see also Chery v. Conduent Educ. Servs., LLC*, 581 F. Supp. 3d 436, 450 (N.D.N.Y. 2022).

---

[32] *Steele v. Goddard*, cited by Capital One, is inapposite. 2013 WL 3013671, at *7 (Tex. App. June 13, 2013) (in a real estate action, an individual who merely assisted a seller in filling out a seller's disclosure notice, but did not provide any information contained therein himself, had no duty to inform the buyer of defects in the property).

### 6. *New Jersey: CFA (Count VII, Against CONA and COFC)*

"To state a claim under the [New Jersey] CFA, a plaintiff must allege (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Burns v. TD Bank*, 2022 U.S. Dist. LEXIS 222173, at *26-27.[33] "[The] CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover," and "a duty to disclose is implied where such disclosure is necessary to make a previous statement true." *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 558, 560 (D.N.J. 2013) (citations and quotations omitted). The Complaint alleges a valid claim here. *See Burns v. TD Bank*, 2022 U.S. Dist. LEXIS 222173, at *26-27 (sustaining NJ CFA claim for same reasons as NY G.B.L claim).

### 7. *Pennsylvania: UTPCPL (Count VIII, Against CONA and COFC)*

Capital One's conduct is actionable under the UTPCPL. *See Gregory v. Metro Auto Sales, Inc.*, 158 F. Supp. 3d 302, 309 (E.D. Pa. 2016) (sustaining claim based on fraudulent concealment). Reliance is not required for the UTPCPL claim under these circumstances. *See Toth v. Northwest Sav. Bank*, 31 Pa. D. & C.5th 1, 11 (Ct. Comm. Pl. June 25, 2013) (reliance shown where "[t]he fraud consists of an omission-the Bank's imposing charges without authorization. Thus, every account holder who paid additional fees has been harmed.").

### 8. *Massachusetts: MGL 93A (Count IX, Against CONA and COFC)*

"Chapter 93A of the Massachusetts code authorizes consumers to sue for 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'"

---

[33] To the extent a New Jersey "CFA claim is predicated on a valid contract, a plaintiff must further allege a 'substantial aggravating circumstance,'" i.e., "the existence of bad faith or lack of fair dealing, sufficient to constitute an unconscionable business practice." *Id.* (citations omitted). The Complaint alleges as much here.

*Cooper v. Charter Communs. Entm'ts I, LLC*, 760 F.3d 103, 111 (1st Cir. 2014) (quoting Mass. Gen. Laws ch. 93A, § 2(a) (formatting omitted)). Under MGL 93A, it is "deceptive to simply remain silent . . . under circumstances that constitute an implied but false representation, such as where a misleading impression arises . . . based on ordinary consumer expectations." *Costa v. FCA US LLC*, 2022 U.S. Dist. LEXIS 239194, at *27-28 (D. Mass. Sep. 30, 2022) (quotation and formatting omitted)). Aggravated breach of contract also violates MGL 93A. *Barnia v. Kaur*, 646 F. Supp. 3d 154, 173 (D. Mass. 2022) (breach actionable under MGL 93A when it is "in disregard of known contractual arrangements and intended to secure benefits for the breaching party"). "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998). Reliance not required under MGL 93A. *See Cormier v. Carrier Corp.*, 2019 U.S. Dist. LEXIS 53222, at *11 (C.D. Cal. Mar. 25, 2019). Capital One's conduct here violates MGL 93A. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith*, 2021 U.S. Dist. LEXIS 13384, at *9 (S.D.N.Y. Jan. 25, 2021) ("Plaintiff has adequately alleged that Defendant engaged in a deceptive practice by indicating that her accounts were linked and failing to specify that her statements had to be 'statement-linked' in order to earn the higher interest rate").[34]

---

[34] *See Salois v. Dime Sav. Bank, FSB*, 1996 U.S. Dist. LEXIS 21901 (D. Mass. Nov. 13, 1996) (sustaining MGL 93A claim arising from bank's omissions concerning fees); *In re GM LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 418 (S.D.N.Y. June 30, 2017) (sustaining MGL 93A claims based upon failure to disclose defect); *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 487-88 (Mass. 1984) (sustaining MGL 93A claim concerning advertising that created a "misleading impression through failure to disclose material information"); *see also Offley v. Fashion Nova, LLC*, 2023 U.S. Dist. LEXIS 169106, at *16 (D. Mass. Sept. 22, 2023) (suppression of material information violates 93A).

### 9. *Illinois: ICFA (Count X, Against CONA and COFC)*

"The ICFA protects consumers against 'unfair or deceptive acts or practices,' including 'fraud,' 'false promise,' and 'misrepresentation or the concealment, suppression or omission of any material fact.'" *Mihalich v. Johnson & Johnson*, 2016 U.S. Dist. LEXIS 128082, at *7 (S.D. Ill. Sep. 20, 2016) (quoting 815 ILCS 505/2). "The Act is 'liberally construed to effectuate its purpose.'" *Id.* (quotation omitted). "To plead a deceptive practices claim under the ICFA, a private plaintiff must allege: (1) that the defendant engaged in a deceptive or unfair practice; (2) with the intent that the plaintiff (or others) rely on the deception; (3) that the act occurred in the course of trade or commerce; and (4) that the deception caused actual damages." *Kahn*, 107 F.4th at 598. "A plaintiff may survive a motion to dismiss [an ICFA claim] by alleging a material omission and that they would have acted differently had they been aware of the omitted information. . . . Further, pleading a common-law duty to disclose is not necessary for ICFA claims . . . and a plaintiff need not demonstrate their actual reliance or the defendant's bad faith . . . ." *Rieger*, 2023 U.S. Dist. LEXIS 78785, at *50-51[35]; *see also Chandler v. Am. Gen. Fin.*, 329 Ill. App. 3d 729, 739–41 (Ill. Ct. of Appeals Mar. 27, 2002) ("[N]o actual reliance is required to state a cause of action under the [ICFA]"). The Complaint adequately pleads an ICFA claim. *See generally Kahn*, 107 F.4th 585; *Rieger*, 2023 U.S. Dist. LEXIS 78785, at *50-51; *Suttle v. Calk*, 2022 U.S. Dist. LEXIS 39486, at *22 (N.D. Ill. Mar. 7, 2022) (violation of ICFA where failure to fully disclose mortgage terms caused plaintiff to enter into loan agreement).[36]

---

[35] Contrary to Capital One's argument, *Gouwens v. Target Corp.* observed that under the ICFA, the omission must create a "false impression," which the Complaint here plainly alleges. 2022 U.S. Dist. LEXIS 233653, at *8 (N.D. Ill. Dec. 30, 2022) (quotation omitted).

[36] *See Stockley v. Nissan of N. Am., Inc.*, 2023 U.S. Dist. LEXIS 198744, at *46-47 (M.D. Tenn. Nov. 6, 2023) (material omission of a defect violates the ICFA; "There is a plausible argument that the omission of such information from even fairly generic advertising and marketing

### 10. *Maryland: MCPA (Count XI, Against CONA and COFC)*

To state a claim under the MCPA, plaintiffs must allege "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. Md. 2013) (quotation and citation omitted). The MCPA makes actionable the "[f]ailure to state a material fact if the failure deceives or tends to deceive." Md. Code Ann., Com. Law § 13–301(3). The Complaint states an MCPA claim because it alleges a "reasonable inference . . . that a significant number of consumers in Plaintiff's position would have acted differently had they known that Defendant intended" to cease paying high interest on 360 Savings. *See Smith v. Capital One Auto Fin., Inc.*, 2011 U.S. Dist. LEXIS 84853, at *10 (D. Md. Aug. 2, 2011). This is demonstrated by the fact that Maryland Plaintiff Molloy promptly moved his money to 360 Performance Savings after discovering the deception. ¶ 103.

### 11. *Florida: FDUTPA (Count XII, Against COFC Only)*

Like the Virginia VCPA claim, the Florida statutory claim is brought only against COFC, which is not a bank. *See Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 779 (Fla. 5th DCA 2007) (cited by Capital One) ("Nothing in FDUTPA suggests that bank subsidiaries, affiliates or agents are necessarily exempt from FDUTPA."). To state a claim under the FDUTPA, "a plaintiff must allege (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages. . . . Deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Borg v. Warren*, 545 F. Supp. 3d 291, 329 (E.D. Va. 2021) (Novak, J.) (citations omitted). The Complaint meets

---

materials is deceptive, in light of . . . the consumer's reasonable expectations."); *see also Fleury v. GM LLC*, 2023 U.S. Dist. LEXIS 95961, at *15 (N.D. Ill. June 2, 2023) (sustaining ICFA claim where auto manufacturer encouraged use of certain fuel but did not disclose risk of damage to the engine posed by continuous use of it).

this standard. *See id.* (sustaining FDUTPA claim plaintiff alleged the defendants committed the "deceptive . . . act of making certain promises about their product without the intention of ever fulfilling them for the express purpose of swindling their customers out of thousands of dollars"); *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 423 (sustaining FDUTPA claim based on "omitting and suppressing and concealing the material fact").

12. *North Carolina: UDTPA (Count XIII, Against CONA and COFC)*

"To set forth a [North Carolina] UDTPA claim, a plaintiff must plead (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused injury to plaintiff." *Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010, 1019 (W.D.N.C. 2021) (quoting *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018) (internal quotations omitted)). A claim "based on failure to disclose a material fact" is valid where "the party accused of fraud [took] steps to actively conceal facts." *Id.* at 1020. Such is alleged here.

13. *Georgia: FBPA (Count XIV, Against CONA and COFC)*

The purpose of the GFBPA is "to protect consumers . . . from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state," and it is to "be liberally construed and applied to promote its underlying purposes and policies." O.C.G.A. § 10-1-391(a)). "A private FBPA claim has three elements: a violation of the Act, causation, and injury." *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1289 (N.D. Ga. 2018) (quotation omitted). These factors are alleged here, as is justifiable reliance. *See id.* at 1291. (claim sustained where defendant "knew of but failed to disclose a material" fact).

14. *Oregon: UTPA (Count XV, Against CONA and COFC)*

The Oregon UTPA "is a remedial statutory scheme, enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Miller v. Winco Foods*, 2020 U.S. Dist. LEXIS 212534, at *7 (D. Or. Sep. 3, 2020) (quotation omitted). The Complaint here pleads

a violation. *See Vinci v. Hyundai Motor Am.*, 2018 U.S. Dist. LEXIS 139979, at *33 (C.D. Cal. Apr. 10, 2018) (noting that under Oregon law "a duty to disclose arises when the defendant knows a fact that a reasonable person would find material at the time of the transaction" and sustaining UTPA claim where defendant concealed a product defect).

### 15. *Ohio: DTPA (Count XVI, Against CONA and COFC)*

Individual consumers can assert claims under the Ohio DTPA. *Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618, 630–32 (S.D. Ohio 2014) ("the better statutory analysis," considering the "actual language of the ODTPA," is that consumers can sue under it because "included within the statutory definition of 'person' is an 'individual'") (emphasis removed); *accord Bower v. Int'l Bus. Machines, Inc*., 495 F. Supp. 2d 837, 844 (S.D. Ohio 2007). The Complaint here states a claim under this statute. *See Schumacher*, 47 F. Supp. 3d at 633; *Bower v. IBM*, 495 F. Supp. 2d 837, 844 (S.D. Ohio 2004) (sustaining claims based on allegation that consumers "have been misled, deceived and suffered actual damages").

### 16. *Michigan: CPA (Count XVII, Against CONA and COFC)*

The Michigan CPA "is much broader than the common law tort of fraud, covering not only deceptive practices but also unfair and unconscionable conduct." *Canfield v. FCA US LLC*, 2019 U.S. Dist. LEXIS 3218, at *38-39 (D. Del. Jan. 8, 2019) (sustaining claim alleging defendant' "knowledge of the alleged defect" and "concealment of this information"); *see also Flynn v. FCA US LLC*, 327 F.R.D. 206, 220 (S.D. Ill. 2018) ("[A] claim premised on a failure to disclose material facts does not require a consumer to prove reliance or a duty to disclose." (applying Michigan law)). Capital One argues that Plaintiffs' Michigan CPA claims should be dismissed because the "payment of interest" on deposit accounts is "regulated by multiple federal agencies." ECF 30 at 47. This is an affirmative defense, not susceptible to resolution on a motion to dismiss. *Golden Star Wholesale, Inc. v. ZB Importing, Inc.*, 531 F. Supp. 3d 1231, 1253 (E.D. Mich. 2021)

(declining to address "regulated business" affirmative defense at pleading stage).[37] And, in any event, the defense fails because Capital One has not demonstrated that the conduct at issue is within the purview of, and authorized by, a regulating body. *See Custard Hut Franchise LLC v. H & J Jawad LLC*, 697 F. Supp. 3d 723, 733 (E.D. Mich. 2023).

### 17. *Missouri: MPA (Count XVIII, Against CONA and COFC)*

The Complaint states a claim under the MMPA, which "declares unlawful the use of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." *Tucker v. Gen. Motors LLC*, 58 F.4th 392, 396 (8th Cir. 2023) (citation omitted) (sustaining claim for failure to disclose product defect). "A consumer's reliance on an unlawful practice is not required under the Missouri [MPA]." *See Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 701 (E.D. Mo. 2018) (citation and quotation omitted). There is a duty to disclose where, as here, the defendant "has superior knowledge of material facts that were not disclosed." *Hartley v. Sig Sauer*, 2019 U.S. Dist. LEXIS 229507, at *21 (W.D. Mo. Mar. 25, 2019).

### 18. *Nebraska: CPA (Count XIX, Against CONA and COFC)*

The Nebraska CPA likewise broadly prohibits deceptive conduct, and there is no requirement for "plaintiffs to plead a 'duty to disclose' in order to establish a fraudulent omission claim under the Act." *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 109978, at *69-72 (D. Neb. Nov. 7, 2008) (sustaining claim based on fraudulent concealment of a product defect). As with the Michigan CPA claim, the argument that the "regulated" exemption applies fails. *See Bassett v. Credit Bureau Servs.*, 554 F. Supp. 3d 1000,

---

[37] *Newton v. Bank, W.* is not to the contrary. *See* 686 N.W. 2D 491, 493 (Mich. Ct. App. 2004) (only "specifically authorized" conduct is exempt; "the Legislature did not intend to exempt illegal conduct from the MCPA").

1016 (D. Neb. 2021) (rejecting argument because while defendant was regulated, "the various tactics [at issue] are not regulated so as to exempt them from the NCPA").[38, 39]

### 19. *Delaware: CFA (Count XXI, Against CONA and COFC)*

The DCFA prohibits deception in connection with the sale of "merchandise," which includes "intangibles." Del. Code Ann. tit. 6, §§ 2511(6), 2511(8), & 2513. "Stating a claim under the DCFA requires showing that (1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a victim of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Lincoln v. Ford Motor Co.*, 2020 U.S. Dist. LEXIS 180985, at *17-18 (D. Md. Sep. 29, 2020). Again, such is alleged here. *See id.* (sustaining claim for active concealment of product defect).

## IV.     Plaintiffs Adequately Allege Claims for Unjust Enrichment and Promissory Estoppel (Counts XXII and XXIII)

Plaintiffs' unjust enrichment and promissory estoppel claims are properly asserted. *See* Fed. R. Civ. P 8(d) (claims may be made "alternatively or hypothetically" and "regardless of consistency"). Plaintiffs allege that Capital One promised that 360 Savings was its high interest account, and that Capital One reneged on this promise, such that Capital One unjustly retained a benefit at Plaintiffs' expense via the payment of lower interest rates. ¶¶ 46, 52, 81, 115.d. These allegations adequately state a claim for unjust enrichment, which is not *per se* foreclosed by the existence of a contract. *See James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 592 (Va. 2020); *see also In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 412.

---

[38] *Wrede v. Exch. Bank of Gibbon* is not to the contrary. *See* 531 N.W. 2d 523, 529-30 (Neb. 1995) (claim exempted where form at issue was "was at least indirectly approved by virtue of the authority of the state, through the director of the Department of Banking and Finance").

[39] After consideration of Capital One's argument, Plaintiffs do not contest dismissal of the second Nebraska statutory claim under the Nebraska UDTPA (Count XX).

Plaintiffs' promissory estoppel claim is not brought under Virginia law. Complaint at 95.

Allegations of a contract do not foreclose an alternative claim for promissory estoppel.[40]

## **CONCLUSION**

Capital One's Motion should be denied.

Dated: August 23, 2024

Respectfully submitted,

By: /s/ Matthew B. Kaplan
Matthew B. Kaplan VSB #51027
The Kaplan Law Firm
1100 N Glebe Rd
Suite 1010
Arlington, VA 22201
(703) 665-9529
mbkaplan@thekaplanlawfirm.com

*Local Counsel for Plaintiffs and the Putative Class*

Chet B. Waldman (admitted *pro hac vice*)
Philip M. Black (admitted *pro hac vice*)
Timothy D. Brennan (admitted *pro hac vice*)
WOLF POPPER LLP
845 Third Ave.
New York, NY 10022
212-759-4600
cwaldman@wolfpopper.com

---

[40] Capital One contends in its Answer that the Account Disclosures are a contract. *See* ECF 33 ¶ 132. This still does not necessitate dismissing Plaintiffs' promissory estoppel claim. *See, e.g.*, *Richardson RFPD, Inc. v. Nexus Techs., Inc.*, 2022 U.S. Dist. LEXIS 96119, at *12-13 (W.D.N.C. May 4, 2022) ("Since Plaintiff's claim for promissory estoppel is made in the alternative to Plaintiff's breach of contract claims, an analysis of the merits of this claim is not necessary at this time as Plaintiff's contract claims are sufficiently stated to survive the Motion to Dismiss."); *Orange Barrel Media, LLC v. KR Sunset Weho, LLC*, No. 2:21-cv-4988, 2022 U.S. Dist. LEXIS 119499, at *15 (S.D. Ohio July 6, 2022) ("Plaintiff may plead breach of contract and also promissory estoppel in the alternative if his breach of contract claim fails."); *Los Alamitos Luxury Apts. v. City of Los Alamitos*, 2023 Cal. Super. LEXIS 69548, at *10 (Sup. Ct., Orange Cnty. Sept. 7, 2023) ("Plaintiff may plead breach of contract and promissory estoppel in the alternative."); *Kasmin v. Josephs*, 2024 NY Slip Op 03085, ¶ 2, 228 A.D.3d 431, 432 (App. Div. 2024) (alternative pleading permitted if dispute about application of contract).

pblack@wolfpopper.com
tbrennan@wolfpopper.com

*Lead Counsel for Plaintiffs and Interim Class*
*Counsel Classes*