UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
---------------------------x    Civil Action No.:
IN RE: CAPITAL ONE 360      :   1:24-md-3111
SAVINGS ACCOUNT INTEREST    :   Monday, April 20, 2026
RATE LITIGATION             :   Alexandria, Virginia
---------------------------x    Pages 1-78
```

The above-entitled settlement approval hearing was heard before the Honorable David J. Novak, United States District Judge.  This proceeding commenced at 10:59 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    MATTHEW KAPLAN, ESQUIRE
                       THE KAPLAN LAW FIRM
                       1100 N. Glebe Road
                       Suite 1010
                       Arlington, Virginia  22201
                       (703) 665-9529

                       CHET WALDMAN, ESQUIRE
                       PHILIP BLACK, ESQUIRE
                       WOLF POPPER LLP
                       913 Dunleigh Meadows Lane
                       Houston, Texas  77055
                       (212) 759-4600

                       CARL STINE, ESQUIRE
                       WOLF POPPER LLP
                       570 Lexington Avenue
                       New York, New York  10022
                       (212) 759-4600

                       ADAM RIFF, ESQUIRE
                       OFFICE OF THE NEW YORK
                       ATTORNEY GENERAL
                       28 Liberty Street
                       20th Floor
                       New York, New York  10005
                       (212) 416-8262

1

A P P E A R A N C E S

FOR THE DEFENDANTS:    DAVID BALSER, ESQUIRE
                       JOHN TORO, ESQUIRE
                       KING & SPALDING
                       1180 Peachtree Street, NE
                       Suite 1600
                       Atlanta, Georgia   30309
                       (404) 572-4600

                       BRYAN FRATKIN, ESQUIRE
                       MCGUIREWOODS LLP
                       Gateway Plaza
                       800 East Canal Street
                       Richmond, Virginia   23219
                       (804) 775-4773

SPECIAL MASTER:        CRAIG SEEBALD
                       LARA MCMAHON
                       VINSON & ELKINS
                       2200 Pennsylvania Avenue, NW
                       Suite 500 West
                       Washington, D.C.   20037
                       (202) 639-6585

COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       401 Courthouse Square
                       Alexandria, Virginia   22314
                       S.AustinReporting@gmail.com

       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

THE DEPUTY CLERK: Civil Action 1:24-md-3111. In re: Capital One 360 Savings Account Interest Rate Litigation.

Would counsel please note their appearance for the record.

MR. WALDMAN: Sure. Good morning, Your Honor. Chet Waldman of Wolf Popper LLP, plaintiffs' class counsel in this matter. At the counsel table with me is local counsel, Matthew Kaplan, as well as my colleagues from Wolf Popper, Carl Stine and Philip Black.

THE COURT: Thank you.

MR. BALSER: Good morning, Your Honor.

THE COURT: Good morning.

MR. BALSER: David Balser, King & Spalding, on behalf of the Capital One defendants. With me today at counsel table are John Toro from King & Spalding and Bryan Fratkin from McGuireWoods.

THE COURT: Okay.

MR. SEEBALD: Craig Seebald, special master.

MS. MCMAHON: And Lara McMahon. Good morning, Your Honor.

THE COURT: Good morning.

Mr. Riff.

MR. RIFF: Good morning, Your Honor. Adam Riff for the New York Attorney General.

3

THE COURT: Okay. All right. We're here on the plaintiffs' motion for final approval of the revised class action settlement, as well as approval of attorney's fees, expenses and service awards.

Notably, I rejected the first settlement, gave guidance to the parties about what I thought would be acceptable. And it appears to me that everybody has heeded my guidance.

But, Mr. Waldman, I'll let you put on the record -- I've obviously read your motion, but do you want to just put on the highlights what the settlement is here?

MR. WALDMAN: Absolutely, Your Honor.

The settlement provides that each class member will receive cash up front in compensation from a $425 million non-reversionary settlement fund, and -- with no claims processed.

It also provides all customers still in the 360 savings account, which makes up nearly three-quarters of the class members, representing approximately 83 percent of the class's damages, they will benefit from a substantially higher interest rate going forward, which will match the interest rate paid on the 360 savings account, will match the interest rate currently being paid on the 360 performance savings account.

During most of the class period, Capital One paid 0.3 percent interest on the 360 capital savings account. The

4

360 performance savings account is currently paying 3.2 percent interest.  That is an approximate 11-time increase over the interest rate class members were paying during most of the class period.

Plaintiffs' goal in the -- goals in bringing this litigation have been almost completely addressed through the settlement.  Our arguments for why the settlement is fair has been made in both our preliminary approval briefs, as well as our final approval briefs.  These arguments include the following points, among others:

First, the settlement is one of the largest consumer fraud class action settlements ever.  In his eighth report, the special master concluded that the total benefit of the class is in excess of $1 billion.  And that is $1 billion being paid out in cash by Capital One.

THE COURT:  You know, it's actually -- as I look at that, I just want to make clear one thing, because I actually think the number will be higher.  Because, as we discussed the last time we were here, of course the 425 million addresses the historical losses, and what I wanted to deal with with my change was forward-looking, right, because it appears that people are still keeping their money in the lower account even though they know about this litigation, which, of course, reflects a defense that Capital One would have, to be candid with you, but I thought we had to remedy this forward.  And so

5

I think Capital One, very much to their credit, agreed to treat the -- those two accounts the same, the 360 savings and the 360 performance account.  And one of my fears was that, well, okay, after it's approved and they could close both accounts out, and then that relief would not be granted, so I said a minimum of two years for the accounts to be open.

And -- but I want to make clear, and it seems to be right in the papers.  What I was saying is, going forward, the 360 savings account in terms of interest will be treated the same as the 360 performance account, as long as they are open. They have to keep the accounts open for a minimum of two years. They can't just shut the accounts down.  So it's not as if in two years they can revert back on the 360 savings to a lower rate.  I think that's what everybody is intending.  I think that's what the paperwork says.

And my point is is that because, from my perspective, this is such a good product for Capital One, that -- well, at least for their customers, that they would want to keep at least, you know, these accounts open, certainly the performance accounts since it's done so well.  So it would be longer than two years.  But I set a minimum in terms of the accounts being open for two years.

So when I -- the relief here seems to be -- a reasonable calculation is in excess of 1.2 billion from my perspective, but it could go higher because it's forward

6

relief.

But I just want to make sure we're all on the same page about when I talked about the two years, what I meant by that. And it seems that the paperwork, as I went through that, reflects what I said.

Are you in agreement on that?

MR. WALDMAN: You're absolutely right. This is in perpetuity. As long as those two accounts are open, and a minimum Capital One has agreed that they'll be open for at least two years.

So Your Honor is correct, the numbers when the special master issued his report, it said it's over a billion dollars. That's assuming they closed it one day after the two years. If it goes on for ten years, this is incredible.

THE COURT: Right.

MR. WALDMAN: In a nutshell, and I think Your Honor just put your finger on the point, rather than give some relief and more money to the class for the future and then allow this to continue on, we actually fixed the problem. Why we brought this case in the first place was that it was unfair. One set of customers was being treated one way, and the other way more preferably. That's been fixed by, you know, Your Honor's tweak to the settlement, which you asked them to do, and how we negotiated the ultimate deal.

THE COURT: And I think importantly for that is that

7

the 18 attorney generals led by the New York Attorney General's Office, Mr. Riff, have now agreed that the problem has been remedied, and they're joining in this; is that correct?

MR. WALDMAN: It's absolutely true. That's one of the points that I was just going to make.

Eighteen separate state attorney generals objected, or at least in an amicus brief they filed in opposition to the first settlement, they're all on board. In fact, the only attorney general that actually brought a case was the New York attorney general, and the New York attorney general has -- actually, the office has put out a press release that not only they're going to drop their case if this settlement goes through through the effective date, but that they're -- and I want to get this right because I'm not quite up to there. But they basically called the settlement -- let me get my exact wording. They put out a press release applauding this settlement. So they have changed from we're against the first one, to we're applauding this one.

THE COURT: Well, they can also pat theirselves on the back.

You know, I want to say this, Mr. Riff, because last time I did give you a little bit of a hard time on this. I guess that's just the nature of my personality. But I thought your objection on behalf -- your office, as well as the other attorney generals' office was incredibly helpful to me, and I

8

think you deserve significant credit for what you've done here. And I just wanted to say that, for whatever you think it's worth.  You can quote that in a press release, too, if you want, that's up to you.

But it really was helpful here in terms of figuring out what I wanted to do here.  Because you can get lost in numbers, right, you can say, well, this number is the biggest ever, whatever it is.  But in terms of actually looking at relief for the class members, which is what my job is here, I thought your objections were really helpful, and I want to commend you for an excellent job.

MR. RIFF:  Thank you.

THE COURT:  You'll get a chance to be heard, too.  If you want to take more credit, you can, but I just wanted to tell you that.

MR. RIFF:  Thank you, Your Honor.

THE COURT:  Go ahead, Mr. Waldman.  I might even say something nice about you by the time we're done.  Okay.

MR. WALDMAN:  That's what I'm hoping.

The settlement was achieved after two years of expedited rocket docket litigation, following well-informed and hard-fought arm's-length negotiations by the parties' experienced counsel, aided by two well-qualified mediators, including the court-appointed special master.  These negotiations lasted for three months from the filing of the

9

mediation statements through the stipulation of settlement.

Thereafter, as Your Honor has noted, we had input from 18 state attorney generals, and we had input from Your Honor requesting that the initial settlement be amended to be even better for the class.

The special master has noted in his eighth report that when you include the prospective relief for an additional interest, that adds the $722.6 million to $877.5 million, in addition to the 425 million in settlement fund. And Your Honor already stated that you believe it may be about 1.2 billion is even a more accurate figure for the class. Again, this is money out of Capital One's pocket that they're going to be paying. This is not coupons, it's not something that's nebulous; it's real relief.

The special master ultimately concluded in his eighth report that the settlement is a remarkable recovery. I certainly concur with that.

As the road to the settlement also made clear, this settlement was not only the result of arm's length negotiations, it was the result of arm twisting, as Your Honor knows.

According to the eighth report of the special master, the $425 million settlement fund alone represents between 38 and 57 percent of what class members could have obtained for their historical losses if plaintiffs were successful through

10

trial and appeal, which is an incredible recovery as a matter of percentage.

As the special master concluded also, this represents "a robust recovery in light of the state of the case when the parties settled and the significant defenses of Capital One." That's the eighth special master report at page 2.

Specifically, plaintiffs face the following categories of risks:

First, preemption risk.  Second, merits risk.  Third, class certification risk.  Fourth, trial risk.  Fifth, damages risk.  And sixth, appellate risk, as referenced on our final approval brief at pages 4 and 7 through 9, as well as detailed in the eighth special master report at pages 13 through 16.

You've already noted that the 18 state attorney generals have all stepped down and think this is a good settlement.  Several of them actually commented that this settlement is positive or beneficial to their consumers in their respective states, or nationwide.  And we already said that the New York State attorney general has agreed to drop its case and actually put out a press release applauding this settlement.  So from adversaries, they now agree this is a very good settlement.  And I'll let Mr. Riff speak for himself on that.

The method of distributing the relief is also highly effective.  The class cash payments will be sent via check or

11

electronic payment with no proof of claim required, and any unclaimed funds will be redistributed to class members before any *cy pres* relief is even considered.

THE COURT:  And, by the way, while we're on this *cy pres* point, I'm hoping we don't get to a *cy pres*.  Your papers talk about the -- me appointing a *cy pres*.  The one I always use is Feed More in Richmond.  And since I'm coming here to service you, it can go Richmond.  But Feed More is an outstanding charity, they have no dog in the hunt, and I've used them repeatedly for *cy pres*.  So if there is a need for a *cy pres* -- although I'm not envisioning that here because you know, really, who the folks are that -- and you can -- if somebody is dead or something like that, you can just redistribute the money to the other class members.  But to the extent that there is a need, that's who I always use.

MR. WALDMAN:  I think at the preliminary approval hearing, Your Honor suggested that, and we said we absolutely have no problem --

THE COURT:  All right.

MR. WALDMAN:  -- if there's a need.

Very significantly, more than 900,000 class members elected an electronic payment option.  That's how many people were reviewing the notice that clearly was an effective way of sending this information to the class.

THE COURT:  Well, the class size is in excess of

12

5 million people; is that right?

MR. WALDMAN:  5.1 million, approximately.

THE COURT:  And of that 5.1 million, you only have 56 opt-outs, and you have three objections levied.  Ms. Coles objects, along with five other people.  So if you look at the total number of objectors, it's eight people out of 5.1 million.  I've never seen numbers like that.  I've done a lot of class work in my career; I've never seen numbers like that before.  Of course they're going to get a chance to be heard if they want to be heard.

MR. WALDMAN:  Yeah.  And there was only two that were, in our view, timely filed.

But, in any event, I believe we cited some cases with you that cite the average people who object in a case like this is closer to 2,000.  So it's -- you know, it is truly incredible and overwhelming, and it's clear that the class got the notice when you have 900,000 of them actually electing affirmatively the electronic payment option.

THE COURT:  Well, I want to talk to you about that, though.  And, you know, I did receive a letter last week from a class member who alleges he opted into the electronic payments after the first notice went out, and he was told by Epiq that he had never made that selection.

Do you know anything else about that?  That's ECF Number 335.

13

MR. WALDMAN: Yes, I do, Your Honor.

As soon as we received that letter, we contacted Epiq because the concern was, was this a bigger issue, were they missing people. And the answer after they did their investigation, was no, there was simply -- they did not ever receive the electronic payment option from that person, and we -- and we said there's no problem, that only affects that one person. If he wants it, why not give it to him. So that has been fixed. And, again, 900,000 people selected it. People were getting the notice, they acted on it, they got the message.

THE COURT: I will say this, you know, because I've thought about this, you know, assuming I approve this. We had had some hiccups with Epiq here.

Now, I understand when you have a class size of 5 -- over 5 million people, you're going to have some hiccups, that's just the way it goes. But I thought as just a fail-safe mechanism that what I would do is -- assuming I approve it is have our incredible special master, who's done a great job, do one more report six months after disbursement begins just double-checking with Epiq, making sure that if there's any issues, they have been cured, and then file one more report with the Court, just to make sure we've got no more drama.

Do you have any problems with that?

MR. WALDMAN: We have no problem with that.

14

Stephanie Austin, RPR, CRR USDC/EDVA

THE COURT: I didn't think you would.

So I don't really envision anything, but I just -- it just -- look, I've heavily papered this case as we've gone through the use of our special master, who's done a great job. I think you would acknowledge that. And that way with this class size and this amount of money, I just want to be as careful as possible.

MR. WALDMAN: Again, we have no problem with that.

A little more on that theme, though, for what happened with this notice. At least one court-approved notice was mailed and/or e-mailed to at least 97.1 percent of class members directing them to the settlement website and the many documents that are posted thereon, detailing plaintiffs' allegations, all the details of the settlement and all other relevant information.

For the Court's consideration, nearly 700,000 people visited the settlement website, and nearly 16,000 phone calls by class members were answered since the settlement was preliminarily approved. You add that to the 900,000 who elected the electronic payment option. I mean, it's truly amazing how many people were notified, read it and were concerned enough to do something about it. In addition to that, an informational release, as ordered by the Court over PR Newswire, was also published on March 4th.

Now, Your Honor, you already touched on it, so I'll

15

kind of pass on it, but you noted that only 57 class members opted out, which is almost -- I believe it was 89 the first time. So far less. You know, whatever their reasons, we don't know. But that amounts to a 0.000011 percent of people opting out. And as we noted, 5.1 million notices that were highly effective, because people were taking action, and we had two timely objections, and then we had one untimely group objection.

I would certainly like an opportunity to respond to those objections, but I don't know if Your Honor wants to hear from them.

THE COURT: I'll deal with that. I'm going to deal with that.

MR. WALDMAN: Okay.

THE COURT: They're going to get a chance to be heard, and we'll deal with that.

MR. WALDMAN: That's fine.

So pretty much that sums up what the settlement is. We believe the settlement is excellent. We believe what Your Honor added to what was there fixes the problem that we brought this case in the first place to a rec, and we strongly believe this should be finally approved.

THE COURT: All right. All right. Mr. Balser, is there anything you want to add to that?

MR. BALSER: Good morning, Your Honor. David Balser,

16

King & Spalding on behalf of the Capital One defendants.  Just a couple of things to add.

I think it's important to note that Capital One has vigorously defended against and disputed the claims that have been asserted in this case.  Mr. Waldman touched upon a couple of the risks that the plaintiffs faced in this case, and I want to just touch on two of those.  One is merits, and one is class cert.

On the merits, without getting into a lot of the deals, there were over a million people who were 360 savings holders who converted to 360 performance savings during the class period, which, in our view, created a significant merits risk for the plaintiffs on their theory of confusion and deception.

And then on the class cert piece, a number of the named plaintiffs themselves had both accounts, both a 360 savings and a 360 performance savings.  And the predominance questions that were raised by the -- what people knew, when they knew it, what they understood, the reasons why they stayed in 360 savings despite the fact that they knew about 360 performance savings we felt created very serious risks for the plaintiffs getting a class certified here.

Notwithstanding all of that, to avoid further expense, risk and uncertainty, Capital One has agreed to resolve this case on the terms that are set forth in the

17

preliminary and final approval papers. As the Court noted, we did heed the Court's direction with respect to renegotiating and presenting a revised settlement to the Court. And Capital One supports the plaintiffs' motion for final approval of the settlement.

THE COURT: Let me just say a couple things. On the last point about heeding my advice, so-to-speak, you agree with my description, though, of what the two-year period is? I just want to make sure there's no misunderstanding.

MR. BALSER: I do, Your Honor.

THE COURT: And, actually, I think it's very much a credit to Capital One. I mean, look, they're paying a lot of money here; there's no question about it. I mean, I think that was the right decision, and I applaud them for that.

Now, I've obviously put a lot of work into this case myself, hopefully you can tell, and that began by ruling on your motion to dismiss. We haven't got -- we never got the class -- we did preliminary certification in the class, but I know you would have litigated that heavily as well.

And I say that to you because it is clear to me there were some strong defenses here. I don't know how that would have played out, I don't know what my rulings would have been, I don't know what the rulings of the Fourth Circuit would have been on some of these issues. I mean, you didn't touch on even preemption. It was certainly something you could have raised,

18

and that's something that has to be factored in here.

Now, at this stage, though, with the settlement, assuming, if I were to approve it, you're agreeing, though, that the class should be finally certified for purposes of settlement; is that correct?

MR. BALSER:  We do.

THE COURT:  And then we'll kind of go forward from there.

MR. BALSER:  Yes, Your Honor.

THE COURT:  All right.  Is there anything else you want to say?

MR. BALSER:  No.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Riff, I'll give you one opportunity to say whatever you want, but you already know that I think you've done a great job.

MR. RIFF:  Thank you, Your Honor.

Just very briefly.  We think this -- that consumer relief in this settlement is very strong.  We're certainly sympathetic to the -- that it can be -- it can feel unsatisfying not to have 100 percent of historical losses recovered.  But this is a settlement that not only fits within the range of fairness that Your Honor is considering today, but it is a uniquely strong settlement as far as consumer relief. And if it were anything less than that, we would not have seen the group of state attorneys general effectively releasing

19

their law enforcement claims as -- in exchange for a settlement that is before you today.  That is -- was an unprecedented result and reflects the strength of the consumer relief in this settlement.

At this point, our office would like to see the settlements go into effect as fast as possible so that the relief can begin to benefit New Yorkers.  And so, we urge the Court to finally approve the settlement today.

THE COURT:  All right.  Thank you.

MR. RIFF:  Thank you.

THE COURT:  All right.  Well, I've now heard from the lawyers.

Now, I have received the only three objections from class members; I'm going to address them in a moment.  I've also received several objections from non-class members, including those by Rick Hollifield, H-O-L-L-I-F-I-E-L-D, and James Louis, Jr.; however, they're not class members, and under the Fourth Circuit's opinion in *Gold v. Alico, Incorporated*, objectors who aren't part of the class lack standing to challenge the settlement.  Therefore, I'm going to overrule their objections for lack of standing.

Now, as to those class members who have raised objections, the first came from Tracy Goldych, G-O-L-D-Y-C-H, who objects to the amount of settlement.  Is Ms. Goldych here today?  I hear no response.  I would have given her a chance to

20

be heard.

The second class member that objected was Katherine Arnold who also objects to the amount of settlement, and who alleges that there are issues with notice.

Is Ms. Arnold here today, and would she like to be heard?

MS. ARNOLD:  Yes, Your Honor, I am.

THE COURT:  Ms. Arnold, do you want to be heard?

MS. ARNOLD:  Yes, Your Honor.

THE COURT:  Why don't you come up to the lectern.

Ma'am, if you could first state your full name and spelling both, I would appreciate it.

MS. ARNOLD:  My name is Katherine Arnold. K-A-T-H-E-R-I-N-E.  Arnold, A-R-N-O-L-D.

THE COURT:  Ms. Arnold, I read your objection, but is there anything you want to add to what you wrote in your objection?

MS. ARNOLD:  I think there are a couple of factual discrepancies here.  I've heard, for example, it seems that the Court is taking into account losses moving forward and stating that 83 percent of the class remains in the old accounts.

I would offer up that when I called -- when I realized what was happening and I called Capital One and I said please move me out of this account, they strongly encouraged me to leave the account open, despite the fact that I had zero

21

assets in there.  They said that there might be interest coming, there might be tax forms.  They told me not to close it.  So for the longest time, I have had a zero balance.  So saying there's 83 percent that remains there really doesn't say anything unless they tell us how many assets remain in the old accounts.

THE COURT:  Well, can I ask you this?

MS. ARNOLD:  Yes.

THE COURT:  Have you moved over, though, to the performance account?

MS. ARNOLD:  I did move over to the performance account, but that does not mean that I have not lost tens of thousands of dollars.

THE COURT:  Well, I understand.  I'm just asking.

When did you do that?

MS. ARNOLD:  I did so during the class period as soon as I realized what had been happening.  But by that time, I had lost at least a year's worth of massive interest to several years' worth.

THE COURT:  I understand that.  Of which you'll have a claim then to the 425 million.  I don't know how that's going to work out yet in terms of the pro rata basis, but I understand.  Yes, ma'am.

Anything else you want to add?

MS. ARNOLD:  Well, the thing is that anybody who

22

remains in the old account, they're under no legal obligation to be there. There's no contract that prevents them from moving today, whether or not the settlement is approved. So counting that amount as part of the settlement is illusory, because there's no reason that they can't take the relief that is purported to be part of the settlement today whether or not the settlement is approved.

THE COURT: But that's not you now; right?

MS. ARNOLD: No, that is not me.

THE COURT: Because you've moved over.

MS. ARNOLD: It seems that the Court continues to say that Capital One is offering this amount for two years, that that should be included as a settlement. And I'm saying if the members of the class could move today without the settlement, then it's not really relief being offered by this Court.

THE COURT: Well, that's not what the problem, though, is. The problem here is so many people have stayed in that account.

I mean, you're obviously a sophisticated investor, right, I can just tell. You're here, you're very articulate, you're obviously well educated, right. But others who have been in that account, they've continued to stay in that account. And so the best way to remedy that is to move the interest equal to the performance account. Could they do that on their own? 100 percent. But how much of them have not done

23

that?  And that's what that portion of the remedy is about to address those people.

Now, I think you heard from -- I don't know how many of these hearings you've been at.  I think you were at the one before --

MS. ARNOLD:  Yes, Your Honor.

THE COURT:  -- because I think I gave you a chance to be heard.  But there was a robust discussion about why people were keeping their money in the savings account despite knowing about the interest disparity.  And so that's the way that cures that.  That's kind of what that's about.  You may disagree with it, but that's what that's about.

MS. ARNOLD:  Well, what I disagree with is that I don't believe that this Court has been provided figures as to the number of assets.  And considering that my accounts remain technically open, I'm wondering if the 83 percent -- it means nothing if actually 60 percent of those accounts have zero balances.

THE COURT:  Okay.  All right.  Anything else, ma'am?

MS. ARNOLD:  I was just -- if you don't mind if I check my notes quickly.

THE COURT:  Of course.

MS. ARNOLD:  I continue to believe that the amount remains too low.  One of -- what plaintiffs' counsel put in the request, its recent motion for an appeal bond, they stated that

24

the 350 million would -- if not paid out immediately, would result in interest rate losses of over $1 million, $1,079,000 over -- in a single month period.  And I wanted to point out that if it had been invested in the old savings account with Capital One, it would have been only $87,000.  The delta is huge.  The losses are huge.

And I'm here because there are real people.  The plaintiffs' counsel has not taken into account that there are real people who have lost tens of thousands of dollars.  And, in fact, in their filings, they have insinuated that Ms. Coles was attempting to shake them down, saying that she would walk away with a $10,000 investment -- or $10,000 payoff.

And I would like to state that I'm sure her losses exceed $10,000.  So she's actually asking for the interest that she is owed.  Because I know our losses well exceed $10,000.  So it's not a shakedown; it's a reminder that we want to be paid in full.

Now, I know that may not happen, but, frankly, as somebody who has lost a lot, I would rather take our chances at trial, with a jury trial, even if it meant in the end we got nothing, just at the chance of holding Capital One responsible for what it has done.  Because in this case, there was absolutely no justification for starting a new account that was equal in every single respect to the old account except to bilk its loyal customers out of money.  That was the only possible

25

motivation here.  And it succeeded wildly.

And I am a sophisticated person, and when I went to their website when my husband said how much money are we making?  What's the interest?  And I went, and it said here are all our accounts, and it sounded -- the account name sounded like what we have.  And our accounts had been -- the savings account, the old one, had been scrubbed from the website.  So I said, look, we're making 4 percent, this is terrific.  This is our college savings, why put it in the stock market where we would risk if we're making this much interest.  So we left it.

Now I'm struggling to pay the college tuition because when I found out at the end of the year with my tax statement that we hadn't gotten all of that interest, that was the first time that I was actually led to believe -- or understood what had happened.  And they actively deceived all of us.  Very intelligent people were deceived.  And so I would rather see this go to a jury trial, because I think the jury would understand here, and they would be appalled at what has happened.  I am appalled.  And I don't think a single person here, if they knew that they were getting 25 cents on the dollar, if we said counsel, we're not going to pay all your fees, you get 25 cents on the dollar, they would walk away feeling happy.  And I think that --

THE COURT:  Have you opted out of the settlement, ma'am?

26

MS. ARNOLD: No, I have not because I assume that -- I mean, while I could represent myself here, I assume that the costs of representing myself going against them would be --

THE COURT: Significant.

MS. ARNOLD: Significant, yes.

THE COURT: As well as the risk of not prevailing, too; right? You could spend a lot of money, hire a lawyer and not prevail; right? You have to factor that in; right?

MS. ARNOLD: That is correct.

THE COURT: Right. And the defenses here, as you heard me say, are significant. That doesn't mean I'm agreeing with what Capital One did, but there are legal defenses here that are significant.

I mean, I don't know if you read my original opinion on the motion to dismiss, but these are complicated issues. Never -- there is significant issues about preemption, there are significant issues about people still staying in those accounts, as Mr. Balser just laid out, is a strong defense that they could mount in front of the jury.

Again, I'm not here to tell you that what they did was the right thing. That's why they're paying a lot of money, right. But you have to balance that. You have to balance the defenses with the return. That's part of what my job is.

I'm saying that to you just because you need to understand what the analysis here is.

27

MS. ARNOLD:  I do.  I would ask the Court then, I believe that -- you know, I tried to pull the 10-Ks to see what amounts were invested in the accounts -- the old account during the time in question, and it was very difficult to get that information, but I'm sure that Capital One has it.  So they could have told the Court exactly what the losses were, and right now they're representing that it's within this certain range of payback, but I would not be surprised if it was far lower than that.

THE COURT:  No.  So -- but I had the special master look at this and file that report.  I gather you've read that report; right?  So that's what that range is about because that's where you have expert testimony in terms of what is the viability of the claims.  That's why you can't say the exact number is $800 million, right, for example.  It has to be a range.  And it also goes back to how do the defenses work on that.  And that's -- and that's why there is a range.  All right.

MS. ARNOLD:  But the range would be -- should be pretty significant.  Based on looking at the settlement class, we know that there were this many assets involved.  Going month by month on the delta and interest rates, the loss was whatever, $500 billion.  They should be able to give us an exact figure, and they're not.  And I would ask that there be some recourse, if -- in the end, I wouldn't be surprised if I

28

walk away with 10 cents on the dollar. And then what is our recourse? And the Court can say, oh, well, they promised it was going to be between 33 and 57 percent, but I don't believe that.

THE COURT: All right. All right. Ma'am, thank you.

MS. ARNOLD: Thank you for your time, Your Honor.

THE COURT: All right. Lastly we had --

MR. WALDMAN: Your Honor, can I respond to the settlement thing she said?

THE COURT: No. I'm going to move forward. All right.

Lastly we had an objection by Michelle Coles, along with five others. The objection came in I believe a day late, but I'm going to allow the objection to move forward.

Ms. Coles, do you want to be heard?

MS. COLES: Yes, Your Honor.

THE COURT: Do you want to come up to the lectern.

Ms. Coles, do you want to state your full name on the record, spelling both your first and your last names.

MS. COLES: My name is Michelle Coles. M-I-C-H-E-L-L-E. Coles, C-O-L-E-S.

THE COURT: Ms. Coles, just to make sure that we're procedurally correct here. I know you're an attorney. I think you're barred in the District of Columbia; is that correct?

MS. COLES: Yes, Your Honor.

29

Stephanie Austin, RPR, CRR USDC/EDVA

THE COURT:  So you're not appearing here as a lawyer because you're not a member of our bar.

MS. COLES:  Correct, Your Honor.

THE COURT:  And I don't think you have local counsel; is that correct?

MS. COLES:  That's correct, Your Honor.

THE COURT:  So you can't proceed *pro hac vice*.

But you -- I'm going to allow you to articulate your objections.  I don't want you to repeat everything.  I've read everything.

MS. COLES:  Okay.

THE COURT:  I hope you can tell by now.  But if there's something that you want to add on behalf of yourself and the others, you can do so.  But just don't repeat everything, because I've read it all.  So is there anything else that you want to add?

MS. COLES:  Yes, there is, Your Honor.

THE COURT:  All right.  Go ahead.

MS. COLES:  Like the previous objector, I think I take the greatest issue with the -- what I consider to be the illusory nature of the prospective relief.  The parties have already acknowledged that anywhere between 25 and 30 percent of class members are no longer in the 360 savings account.

THE COURT:  Well, can I ask you that?  Are you still in a 360 savings?

30

Stephanie Austin, RPR, CRR USDC/EDVA

MS. COLES:  No.  As soon as I found out what Capital One had done, I moved my money over.

THE COURT:  You moved it over.

MS. COLES:  I thought I was in a high-interest, high-performing savings account, because that's what my ING direct account had been, and that's what Capital One promised would continue.  Under the Truth in Savings Act, Capital One was required to provide notice when they made a change to my account that was material in a way that would affect my interest rate.

I previously had a high-interest, high-performance savings account.  Capital One changed that, changed my 360 account to a regular savings account where I went from, at some points, earning over 4 percent in interest, to, during the class period, earning .3 percent of interest.  I sustained losses exceeding $10,000.  And that is the reason that I requested that amount for class counsel because I wanted to know if I'm not going to object to the settlement, my original request to class counsel is what will I get under the settlement.  They refused to tell me.  When they refused to tell me, I said, well, can I at least have comfort that I'm getting somewhere close to my damages?  They said no to that.

THE COURT:  And just to be clear, look, I didn't take that as being --

MS. COLES:  Yeah.

31

THE COURT:  -- anything inappropriate.

MS. COLES:  Thank you.

THE COURT:  And it seems to me somebody who believes that they've been treated poorly --

MS. COLES:  Yes.

THE COURT:  -- which you clearly have, because not only did you -- have you objected here and been heard now twice, you went to the CFPB --

MS. COLES:  Yes.

THE COURT:  -- you've been I think pretty dogged, to your credit, about expressing your views here.  So I don't take anything as ill-will on that.

Now, for them to do that -- I will say this, I know since you're a lawyer you know local -- you know that Civil Rule 23 prohibits them from doing that agreement without my approval.

MS. COLES:  Yes, Your Honor.

THE COURT:  They would have to come to me, which is probably why they were a nervous wreck about that in the first place.

MS. COLES:  I completely understand that, Your Honor.

THE COURT:  Right.  Here's what I wanted to ask, what do you think is your reasonable loss?  Is it roughly 10,000?

MS. COLES:  I think roughly.  What I will say is because of the first settlement agreement, the parties

32

encouraged class members to close their 360 savings account because they said they would get an extra 15 percent in interest if they did. And in closing my 360 savings account, I lost all access to my statements, to my old information. And like the previous objector, I had kept my account open. So I was another class member who had both savings accounts, but I had all my savings in performance savings as of two and a half years ago once I found out about the fraud. And I only left, like, $5 in the 360 savings account.

THE COURT: Right.

MS. COLES: But going back to the point where anywhere between 25 and 30 percent of class members are no longer in the 360 account, that means we will derive no benefit from this prospective relief, which is yet another example of how class members are being treated differently and inequitably under this agreement. If $800 million of the value -- of the proposed value in this settlement agreement is actually prospective relief, 30 percent of class members will get nothing from that.

THE COURT: No, but you're getting -- because you're no longer being injured.

MS. COLES: Right.

THE COURT: Because you were smart enough to move it over to the performance.

MS. COLES: Yes.

33

THE COURT:  But you were getting -- your losses and those that are similarly situated as you are historical losses; right?

MS. COLES:  Correct.

THE COURT:  That's what you're saying.  Like, I lost all this interest --

MS. COLES:  Right.

THE COURT:  -- because they tricked me --

MS. COLES:  Yes.

THE COURT:  -- into believing that I was going to get the high yield from the savings, when, in fact, they moved everything to the performance and I only got .3.

MS. COLES:  Correct.

THE COURT:  Which is what this whole lawsuit is about; right?

MS. COLES:  Right.

THE COURT:  That's where -- your remedy lies in the -- whatever your share of the 425 million would be.

MS. COLES:  That's correct, Your Honor.

The problem with that is that class members' actual damages are 2.9 billion.  That's the actual loss.  So when you compare 425 million to 2.9 billion, that is 15 percent of our damages.  Then you subtract from that class counsels' fee request, litigation expenses, you're looking at an actual pot of around $350 million to address 5 million class members'

34

historical damages of 2.9 billion.  And so by claiming that the prospective relief increases the value of the settlement agreement is just false, and it leaves a third of class members out in the cold because we're not even getting that.  And so that's what I would really appreciate Your Honor realizing is that that prospective relief is entirely illusory.

Also --

THE COURT:  It's not.  No.  Ma'am, that's not true.

It exists.  What you're saying is it doesn't help those who moved their money from the savings to the performance.  It's not illusory because it's certainly going to help those who did not make the move.

What you're saying is you're not getting adequate relief because you're only -- since you made the move, rightfully, that you only are going to get a portion of your losses because it's going to come from the 425 million.

Now, there -- hold on a second.

Now, there is a question about what the actual damages are, which is why I had the special master make the report.  And you've seen that report, of course.

And, secondly, you've made calculations based upon what the -- you believe the fees are going to be based upon what they requested.  And I know you're also objecting to that. I'm going to deal with the fees down the road, so we don't know what that number is going to be yet; right?

35

MS. COLES:  Right.

THE COURT:  But you, as somebody who's been -- you worked for the Department of Justice, as I recall --

MS. COLES:  Yes, Your Honor.

THE COURT:  -- when you were here the last time.  You don't work for them anymore, though; right?

MS. COLES:  No, Your Honor.

THE COURT:  So you've been involved in civil litigation; right?

MS. COLES:  Yes, Your Honor.

THE COURT:  And you understand that in any litigation, it's a risk/reward.  You have to look at what is the likelihood of success versus what is your outcome, right.  It's kind of like the old Rolling Stones song, you don't always get what you want, but you get what you need; right?

MS. COLES:  Yes.

THE COURT:  And you have to look at these cases.  I've done a significant amount of class actions.  That's all an MDL is, just a bunch of class actions put together.  And you have to look at what the risk of litigation is for the plaintiffs against the reward, which is what the class counsel has done here.

The -- look, I want to say again, I don't agree with what Capital One has done here.  I think what they did is wrong, which is why they're writing such a big check.

36

MS. COLES:  It's not.

THE COURT:  Okay.  So let's be clear about that. Okay.  But at the same time, they have significant legal defenses.

I gather you read my incredibly well-written opinion on the motion to dismiss; right?  So you know the issues there. The Fourth Circuit could agree with me.  They're not -- or disagree with me.  It's not like God gave me all the answers in the world, right.  They might disagree with me.  But there's other issues, particularly preemption and class certification, and this issue about the number of people that stayed in those accounts, unlike you -- you know, you're obviously, like Ms. Arnold, a sophisticated investor, you're highly educated, you're extremely articulate, but some of those other people didn't do that, and they didn't look at the account.  And an easy defense would be to say, look, this portion of the people still stayed in it even though they received all these notices from the Court and all that.  That is a significant defense here.

MS. COLES:  Your Honor, I would -- I would respectfully refute that point because Capital One had a legal obligation to provide actual notice to class members about changing the terms of our account, and to this day, they haven't done that.  And that is why I disagree that the prospective relief so-called fixes the problem, because it

37

still does not require Capital One to provide their legally-required notice that they have fundamentally changed the terms of the 360 account.

So the responsibility was not on class members to suss out what Capital One was doing and how they were changing our interest rates.  No amount of constructive notice through logging into one's account or checking one's statement or reading a newspaper headline or seeing a letter that was issued in the course of this litigation at the tail end of the class period undoes Capital One's legal responsibility under the Truth in Savings Act to provide actual notice.

And so I think that so-called -- I think that defense would be pretty easily refuted also by a jury, because they would see Capital One did not do what it was obligated to do, and it was being sneaky, and it was changing the terms of our accounts without our notice --

THE COURT:  Let me ask you this then.

MS. COLES:  -- and taking our interest.

THE COURT:  Let me ask you this then, ma'am, have you opted out of the settlement?

MS. COLES:  No.

THE COURT:  Because you could opt out and sue them yourself.

MS. COLES:  No, Your Honor.  First of all, the opt-out deadline has passed.  But, secondly, I believe that in

38

this process where the Court is a fiduciary for the class, I have a better chance of speaking directly to the Court and also asking that all class members not be treated unfairly.

THE COURT: Okay.

MS. COLES: Whenever I've spoken to any class members, who are just my friends, to be honest, all of us had ING direct accounts because they were high-interest, high-performing savings accounts. All of us thought we still had that account under the 360 account, and all of us feel deceived. And nobody even knew this class action was occurring until I brought it up to them.

THE COURT: All right.

MS. COLES: And so the -- and if I could just say one more thing.

And so using the argument that there are few objectors in this case as a proxy for class members' satisfaction with the results I think is folly. Because the objectors are so low, what it really tells you is this whole time, notice has been inadequate, and that class members were not aware. And then when we receive a check in the mail that is 10 percent of the actual interest that has been taken from us, it will be too late for us to do anything. And so that is why we implore this Court to not sanitize Capital One's past conduct by putting the Court's imprimatur on its ability to continue deceiving 360 customers, because that's what they're

39

doing.  There's no promise here that they will continue paying performance savings customers a high interest rate.  They could drop performance savings customers down to .3 percent tomorrow, just like they did the 360 customers.  And they could say, hey, they're being paid the same interest rate, they're both being paid .3.

THE COURT:  I don't think that's going to happen because they --

MS. COLES:  What would stop them, Your Honor?

THE COURT:  A pretty good lawsuit.

MS. COLES:  But that's this lawsuit, and it hasn't stopped them.

THE COURT:  I don't agree.  So let me just say two things for you.

One, first of all, I appreciate all your objections. I read everything.  I thought you did a really fine job, by the way, in your objections, and I've considered all of that.

The last thing I want to talk to you about is the bond amount.  Now, I am going to require a bond.  They've asked for $6 million.

What do you think is a reasonable number for an objector who wants to appeal?

MS. COLES:  Your Honor, in the vast majority of the circuit cases that I have read, when you're dealing with a good-faith objector as I am, they do not set a bond.

40

THE COURT: I'm going to set a bond. So the question is is what do you think is a reasonable number?

MS. COLES: Perhaps $1,000, Your Honor. The supersedeas objection -- I mean supersedeas appeal bond that class counsel has requested under Rule 8, hope Your Honor has seen from my papers that that is only appropriate when the appellant is moving to stay a judgment, which I am not moving to do. The courts also make it quite clear that an objector appealing a class action, the automatic stay that comes from that does not qualify for the supersedeas bond. And most of the high bonds that courts issued were in the supersedeas context.

THE COURT: Okay.

MS. COLES: The Rule 7 bonds are cost bonds that, unless there's an applicable statute which class members have not identified, they don't include loss interest, they don't include administrative fees, they don't include attorneys' fees. So they really are the cost of appeal. But even in those instances when there's been not a vexatious objector, not a professional objector, which I am not. I am here in my own capacity. I'm a stay-at-home mom of five kids who has taken an hour away from my home to be here to speak on behalf of class members and to perform a service to the Court. In those cases, I have not seen a case where the Court has set any bond because that would be prejudicial, because what I am doing is in the

41

best interest of the entire class.

THE COURT:  Well, there's no question to me about what -- the sincerity of your objections, whether I agree with them or not.  I don't think you're a professional objector.

MS. COLES:  I'm not.

THE COURT:  I think you, like Ms. Arnold, have serious disagreements with what Capital One had done here, and I have to evaluate that, just like I have to evaluate everything else.  All right.

Ma'am, thank you for your comments.  You can have a seat.

MS. COLES:  Thank you, Your Honor.  I appreciate your attention and all of your consideration in this case.

THE COURT:  All right.  Mr. Waldman, if you want to say something briefly, you can.  But I've reviewed everything. I'm prepared to move forward.

MR. WALDMAN:  That's fine, but I think this is important.

I do believe that Ms. Arnold and certainly Ms. Coles are passionate, they care --

THE COURT:  And sincere.

MR. WALDMAN:  And are sincere.  I just don't know that they really understand the risk based on statements that they made today, and I'd like to just address just a few points --

42

Stephanie Austin, RPR, CRR USDC/EDVA

THE COURT:  Go ahead.

MR. WALDMAN:  -- as to what they're saying.

First of all, I don't think either of them understand the importance of the special master report.  Frankly, when it came to what was the reasonable likelihood of what the class could recover, obviously we put in numbers from our expert which matches what the objectors are saying.  That was -- if we win on every point, full damages, that's what it is, that's what they're reading.  Okay.  But I believe Your Honor may not have trusted plaintiffs saying what we think the likelihood of a reasonable recovery is, nor did you believe Capital One would tell an honest of what the reasonable recovery should be.

THE COURT:  Well, you're seeing that correctly.  That's why I had the special master do it to try to get a reasonable interpretation of what the damages could be, and that's anywhere from 742 million to a little bit over a billion.

MR. WALDMAN:  Correct.  But that's the point.  The special master is not plaintiffs, this is not us saying it, it's not defendants, it's not what they're saying.  This is a third-party neutral who has lived and breathed the case, and what he did is asked the parties for all the expert reports, of both sides' briefing, he was at the mediation, read all the mediation statements, heard what we had to say, heard what Capital One had to say, has heard what Your Honor had to say.

43

Stephanie Austin, RPR, CRR USDC/EDVA

And he looked at it and said this is what I believe.  If I'm a juror, this is how I'm coming down.

That should be a huge word of caution to both Ms. Coles and Ms. Arnold of what a third party -- what the jury might come down to if we were to prevail.  That has nothing to do with the risk.  But he is looking at categories of problems, and that's what he came down to.  That is a preview of what a juror might have done.  I may not agree with everything in the special master's report, but it's a third-party neutral, a very educated one, making a judgment as to what the likely damages are.  Not what we hope to get or what might have been an out-of-pocket loss, but what was reasonable.

Secondly, Ms. Coles mentions TISA.  Okay.  First of all, as Your Honor may know, there was no private right of action of TISA.  But Capital One would clearly argue they did not change the nature of the account, because if Ms. Coles or Ms. Arnold would look at their account agreement with Capital One with respect to the 360 savings, it quite clearly says that Capital One could change the interest rate at its discretion.  In fact, it is that account agreement that is the basis for our contract claim, our good-faith and fair-dealing claim.  So whether they violated TISA, even though we couldn't bring a case that says that because there is no private right of action, not so accurate.

Next thing.  Ms. Coles made the point that there was

44

nothing stopping Capital One from changing the collective interest now on both accounts, you know, to 0.3 tomorrow. Well, Economics 101 says there is a reason why they couldn't do that, and that is if they want to compete for depositors with other banks, they're not going to do an online savings account that goes down that low. You know, they set it as --

THE COURT: Hold on.

Stop that.

MS. COLES: Sorry, Your Honor.

THE COURT: We're not going to do that again. I've given you a chance to be heard, and Ms. Arnold as well. Whether you agree or disagree, you're not going to act like that in this courtroom.

Go ahead, Mr. Waldman.

MR. WALDMAN: Okay. I want to make one more point that I think is important for the objectors to understand. And that is one of the Coles objections point, and she raised it with Your Honor a few moments ago, is she says the settlement does not treat class members equitably. On the one hand on the Coles objection claims that all class members were damaged to the tune of --

THE COURT: Look, I think I have addressed that point. I addressed that when I went through my colloquy with her.

MR. WALDMAN: Okay. Again, I think Ms. Coles really

45

means well.  I think Ms. Arnold means well.

THE COURT:  Of course they do.

MR. WALDMAN:  But I don't think they're understanding the real big problem here.  What the Coles objection is saying is that the settlement doesn't treat class members equally because some class members had a better claim than others.  That's what she's saying.  Because under the special master's report, he's saying there's entire categories of people who are unlikely to survive here on a damages theory, or at least the jury could clearly say, well, if you had this account and that account, the 360 and the 360 performance, you know, you had the information.

So she now asks that somehow we make a determination to make it equitable of who had a better claim and who had a weaker claim.  But if class members -- if class counsel actually had to make that determination, Ms. Coles might get little or nothing in this case.  Why do I say that?  If Your Honor or Ms. Coles want to turn to page 6 and 7 of the Coles objection, Ms. Coles tells the story of how she got here.

THE COURT:  All right.  We're not going to go through that.

MR. WALDMAN:  Okay.  I just want -- okay.  I'll let it go.  But I wanted to show the problems that she is not taking into account, let alone the class certification issues she's raising.  If we have to look at everybody's

46

$5.1 million -- 5.1 million class members' individual circumstances, we can't get a class certified. We couldn't survive the predominance requirement of class certification. So if we go down that road, we lose. She is making Capital One's argument for them.

THE COURT: Well, that's what he said. Mr. Balser just made that point.

MR. WALDMAN: Okay.

THE COURT: All right. I have obviously considered the objections, the filings, their statements here today, and I obviously recognize the sincerity held by the objectors, Ms. Arnold, Ms. Coles and her colleagues, and the one that did not appear here today. And they have every reason to be upset. There was no reason for Capital One to do what they did here, and that's why they're going to write a big check. Hopefully they've learned a lesson.

You can't help but notice the number of class action cases against Capital One in our court. And I've got to tell you, I think it's a little disappointing, and I hope that Capital One learns something here from this instance. I'm glad they chose to make the right decision about fixing the situation going forward and resolving the case in the way that I suggested. But the number of class action cases in our court against Capital One -- because I see them all the time on my ECF notices -- are disturbing for a company that I believe

47

people recognize as a strong corporate citizen.  And maybe -- I think we've got Capital One's in-house folks here.  Maybe they take some advice and start looking at -- you know, you can be too cute sometimes to make some money, and I think that's what happened here.  Some genius thought they were going to be too cute to make a few extra bucks for Capital One, and now, not only are they paying a lot of money, I think it's hurting their brand.  By keeping the promise account and raising the savings account to the same number I think maybe helps them restore their reputation a bit here.

But, in any event, I'm going to deny the objections, and I'm going to turn to the settlement agreement, which I intend to approve as I go forward.

Before I approve it, I need to approve the class, and finding that here, as I turn through the factors in the settlement, in light of Rule 23(e)(2), the factors and the Fourth Circuit's findings in *Jiffy Lube*, I'm going to approve that.  I'll go through each of those factors in a second.

And I'm noting again the historical loss fund here is 425 million.  The special master's eighth report calculates losses between 742 million to a little over a billion dollars for just historical losses.  That recovery ranges between 38 to 57 percent.  And the future value, even if the accounts were closed in two years, which I would strongly encourage Capital One not to do as part of restoring their credibility here, even

48

then it's from 772.6 million to 877.5 million for folks that have not switched the accounts. So the recovery here is well over a billion dollars. In my view, I kind of think it's more closer to 1.2 billion.

So I'm going to begin with certifying the class, which was preliminarily approved. I'm certifying the class for settlement purposes defined in the manner that's in the papers and the proposed order. I, again, had previously approved the class, and I'll do so here again.

There is one class to certify now in this action. That class is defined to include all persons or entities who maintained a Capital One 360 savings account at any time during the class period, which would begin on September the 18th of 2019 and ran through June the 16th of 2025. This includes joint and co-holders of 360 savings account.

The class does not include, first, any Capital One -- or Capital One, any entity in which Capital One has a controlling interest, as well as Capital One's officers, directors, legal representatives, successors, subsidiaries and assigns. Any judge, justice or judicial officer presiding over the action, as well as any members of their immediate families and judicial staff, and any individual who timely and invaluably opted out of the settlement. I believe there were 57 opt-outs, as I recall.

I find that this class meets the Rule 23(a)

49

requirements of the numerosity, commonality, typicality and adequacy. I also find that the settlement class meets the demands of Rule 23(b)(3), and that questions the law or fact common to class members predominate over questions affecting individual members, and also that the class action is the superior method for fairly and efficiently adjudicating this controversy.

Now, during to the *Jiffy Lube* factors and the Rule 23 factors, I find that the proposed settlement is fair from a procedural standpoint. In determining fairness, *Jiffy Lube* instructs that the Court consider, first, the posture of the case; second, the extent of discovery conducted; third, the circumstances surrounding negotiations; and fourth, counsels' experience.

I'll first deal with the posture of the case because that supports final approval. Class counsel thoroughly investigated plaintiffs' claims. Plaintiffs fully briefed and largely prevailed on a motion to dismiss on extremely complicated issues. As the guy who had to rule on that, I can tell you, they were complicated.

And plaintiffs' counsel prevailed on a motion to strike the jury demand and a motion to certify a question to the Virginia Supreme Court. They proceeded deep into discovery, including depositions and expert discovery, and the parties also contemplated class certification and *Daubert*

50

briefing.

Throughout all these efforts, class counsel expended significant time, resources and effort.  The parties reached the initially proposed settlement after extensive good-faith and arm's-length negotiations.  Of course I rejected that, much to the dismay of plaintiffs' counsel at the last hearing.

But those settlement negotiations involve several mediation sessions with two independent mediators, Robert Meyer of JAMS, and our special master here, Mr. Seebald.  A proposal by the mediators led to the first proposed settlement.

At the first final approval hearing, I rejected the proposed settlement as inadequate and not equitable, as it did not provide relief going forward and left intact the situation that caused this lawsuit in the first instance.

The parties then re-engaged in further negotiations involving the special master, the attorney general's office, and attorney general's office of 17 other states.  These negotiations again were hard-fought, and they led to the vastly improved outcome for the class members, which I'll discuss in a moment.

Again, it bears emphasizing that I rejected the first proposed settlement, gave direction as to how I thought the infirmities could be remedied in a revised settlement, and those revisions have now occurred.  Given all these facts, I find that the posture of the case supports final approval.

51

Second, the extent of the discovery supports final approval. The parties engaged in significant discovery in this case. That includes completing expert discovery, as well as the substantial amount of fact discovery. Plaintiffs reviewed approximately 75,000 documents spanning approximately 2 million pages, and the parties also engaged in at least 46 depositions.

Both parties produced expert reports and deposed the other side's experts, and the parties filed multiple motions to exclude each other's experts. Given all these facts, I find that the extent of discovery also supports final approval.

Third, the circumstances surrounding negotiations support final approval. Again, the negotiations in this case clearly occurred at arm's length. The parties, as I said, engaged in four mediation sessions with Mr. Meyer of JAMS and Special Master Seebald, including two face-to-face meetings, which were initially unsuccessful.

The parties then ultimately reached their first proposed settlement under the supervision and direction of these respected lawyers, and following a mediator's proposal, which broke an impasse between the parties. But then I rejected it. And following my rejection of the first proposed settlement, the parties re-engaged in further negotiations, again with the special master guided by the Court's suggestion.

A special master -- I'm sorry.

A settlement was reached under the supervision and

directed -- direction of these independent counsel, and under the Court's watchful eye, also suggests that no collusion was at play.  And of course the attorney generals of 18 states were also involved.

Fourth, class counsels' experience also supports final approval.  Class counsel is highly experienced in class action litigation.  They brought their experience to bear litigating and settling this case.  Collectively, class counsel have a wealth of experience litigating and resolving such class actions across the country and have been appointed to represent plaintiffs in numerous class actions.  I afforded serious consideration to their opinions here on the fairness of a proposed settlement, but I'm particularly guided by the fact that the attorney generals also share my view at this point.

So, in sum, considering the relevant *Jiffy Lube* factors, I find that the proposed settlement is fair from a procedural standpoint.

Moving to the next factor, reasonableness and adequacy, I find that the proposed settlement is both reasonable and adequate.  In assessing these factors, *Jiffy Lube* instructs the Court to look to, first, the relative strength of the merits of the plaintiffs' claims; two, the existence of any difficulties of proof or strong defenses that the plaintiff will counter at trial; three, the anticipated duration and expense of additional litigation; four, the

53

Stephanie Austin, RPR, CRR USDC/EDVA

solvency of the defendant and likelihood of recovery; and five, the degree of opposition to the settlement.

We'll start with the relative strengths of the plaintiffs' claims viewed in light of the difficulties of proof and strong defenses that the plaintiff would encounter at trial supports final approval of this settlement.

Although the plaintiffs believe that they have a strong case, they will face challenges on the merits of their claims. These include class certification, prevailing on *Daubert* motions, there is a strong preemption argument here as well, and ultimately, approving their claims under various provisions of state law by a preponderance of the evidence.

Capital One had numerous defenses available to them, including the preemption argument that I spoke of. The existence of numerous disputed issues creates uncertainty and risk for all parties which supports settlement approval.

And that is why I asked Ms. Arnold and Ms. Coles about whether they opted out. I think they made the right decision not to opt out because they also, had they opted out, would have had to make the same decision-making on an individual basis of the risk versus reward. Any time there's civil litigation, there is a risk that you could lose. And the complexity of this case, particularly the way the statutes that are invoked and issues of preemption and class certification, but really if it were on an individual nature, there were

54

strong defenses here.

Now, that doesn't mean the jury would have accepted those defenses, but all of us as we make decisions in our lives, we have to weigh risk versus reward. Our objectors, who are rightly upset about what has happened here, whom I'm sure are disappointed in my ruling here today, have to go back and reflect and say what is my risk had I tried this case. And I think that's what was done when they decided not to opt out.

And that's what I have to do now on behalf of the class as a whole, look at what the risk was to 5 million people who, if you accept the special master's report, lost up to a billion dollars. And I looked at that also as somebody who had to evaluate initially the motion to dismiss filed by Capital One, made rulings -- I rejected the majority, but not all in that motion, had to look at the issues for class certification, look at the various *Daubert* motions that were significant, and knowing from my experience, as somebody who has done a significant number of amounts of consumer litigation cases and significant class actions, that I know myself what the risk was here from my experience. And I suggest to Ms. Arnold and Ms. Coles and Ms. Coles' friends that if you were to have opted out and had gone to consumer litigators, such as class counsel here, and laid out what your complaints are -- which, again, I will say are well justified -- any respectable lawyer would have told you all that there are significant risks to your

55

individual case.  And now I have to extrapolate that again to the class of 5 million people.  So weighed against that risk, I believe that the amount of recovery here is substantial.

As to historical losses, the proposed settlement provides for 425 million of which the vast majority will go to class members after we take out whatever attorney's fees I approve, class awards and expenses.

And so you factor in then the forward-looking relief in a proposed settlement for those class members who remain in the 360 savings account, the proposed settlement exceeds $1 billion.

And, folks, by the way, every person that stayed in those accounts hurts your case.  That's what the defense would have been from Capital One, and I hope that you understand that.

On the other side of the ledger, the special master, who I deeply respect, who wrote in his report that a reasonable estimate of the damages in this case ranges from approximately 742 million to a little over $1 billion.  And I asked the special master to do this review because as Mr. Waldman clearly points out, both sides here have a dog in the hunt. Plaintiffs' counsel, they always inflate the numbers.  I've never known a case where a plaintiff didn't say the numbers weren't the size of the moon.  That's just the way this works, right.  And I've never seen a defendant say that the damages

56

weren't the lowest possible thing in the world.  We call that posturing.  Which is why I had the third-party independent special master look at this so I could make an appropriate calculation for myself instead of people just making up numbers and slinging them up the wall, which is what has occurred here.  So I have great confidence in what the special master has done here.

On a basis of those numbers, the settlement fund alone represents up to 57 percent of what the class could have obtained at trial.  And I will tell you as somebody who does a lot of class action work, a 50 percent recovery is unheard of generally in class action settlements.  So factoring in the prospective payments and the success of the recovery increases dramatically.

This level of recovery I believe is remarkable and counsels for approval, especially in light of the ongoing litigation risks that the plaintiffs face.

Now, the anticipated duration and expense of continuing litigation also supports final approval.  If the litigation had proceeded towards trial, the parties would have needed to complete discovery, which was already extensive and costly.  Parties would also need to argue their various pending motions, including final judgment, which we -- or, I'm sorry, summary judgment, that we never got to, which, in itself, was a significant amount of risk for the plaintiffs.  And had

57

plaintiffs got over summary judgment, which is a major hurdle, they would have had to go to trial. And even if they prevailed at trial, there would have been significant post-verdict and appellate briefing. And nobody knows if the Fourth Circuit would have agreed with some of my rulings here.

So needless to say, further litigation would entail substantial time, expense and effort by the parties and counsel. This settlement avoids those additional costs, and, more importantly, the inherent risk with continued litigation.

The next factor, solvency. The defendant is not an issue in this case, but the degree of opposition is. Here, we have a class side of over 5 million. The degree of opposition supports final approval, including even the late filing by Ms. Cole, which I still allowed.

Only 57 members have requested to opt out of the class, and there were only three objections. Ms. Arnold, the other one, and Ms. Coles. Ms. Coles had five other folks join her. So even in the light most favorable to the objectors, that's a total of eight objections in a class of 5.1 million. I've never seen such stark numbers.

Notably, these numbers are significantly smaller than the number of class members who have objected or opted out in response to the first proposed settlement. In addition, and quite importantly to me, no state attorney generals have objected to this proposed settlement, and many of the same

58

attorney generals who objected to the first settlement actively support this.  And, in fact, what the revised settlement that minded my instructions did was really to cure the objections, the well-placed objections, of the attorney general of New York, and I think that is an important factor here.

These facts indicate a significantly greater degree of acceptance of the settlement by class members than with the first proposed settlement.  So in light of the millions of class members who were affected, these numbers also demonstrate a very limited degree of opposition, which strongly counsels in favor of final approval.

Now, moving past the *Jiffy Lube* factors to address the substantive terms of the settlement directly, I find that the settlement constitutes a substantial recovery for the class, as I said.  Settlement provides for a cash payment by Capital One of 425 million towards a cash fund that will provide payments directly to members of the settlement class.

In addition, Capital One is going to pay the same rate of interest on deposits and 360 savings accounts and 360 performance accounts going forward, and those accounts must remain open for at least two years.

Now, of course if the performance accounts continue to go forward, which clearly there's a business interest in Capital One to do so, they would continue to pay the same interest well past two years on those 360 savings accounts.  I

59

also think there's a reason Capital One ought to do this just to try to get the shine back on their reputation here so-to-speak.

So this is estimated to provide between 722.6 million and 877.5 million in additional relief for a total recovery well in excess of a billion dollars.  Of course that number is likely to rise the longer the accounts stay open.

The 425 million settlement fund covers as much as 57 percent of the estimated damages to the class, and in light of the risk associated with further litigation, as I discussed already, this represents a very significant recovery.

The allocution of the settlement is also fair and reasonable, and the manner of administrating the relief will be effective.  Class members will receive direct cash payments on a pro rata basis and are therefore treated equitably relative to each other.  Class members will not need to engage in the claims process to receive their payments.  Giving everything that I've just discussed, therefore, I find that the proposed settlement is fair, reasonable and adequate, and therefore warrants final approval under Rule 23.

Now, as to notice, I'm going to address that.  I previously approved the notice plan at the preliminary approval stage as the best notice practicable under the circumstances.  Now, on the back end, I find that the notice provided to the settlement class complied with the Court's orders and the

60

requirements of Rules 23(e)(1) and (c)(2)(B).  The notice contained all the information required to be included by Rule 23(c)(2)(B), and I find that the notice, including the new one, which I reviewed again, fully apprised the prospective members of the class of the terms of the proposed settlement and the options that are open to them in connection with the proceedings.

However, I do want to note for the record that there were several reports about issues that class members encountered with Epiq, the class administrator.  These include Epiq providing inaccurate information to class members who called the hotline and the subpar customer service experience.

I note that Epiq is well compensated for their work here, but I also recognize that in class actions of this size, in excess of 5 million class members, there is going to be some hiccups.  But they need to step up their game.  We've got to make sure we have no more drama going forward.

To address any lingering concerns -- again, I've tried to be careful in every aspect of this case -- I'm going to require an additional report from our excellent special master to ensure that payments were properly processed.  And that will come at the back end here.  The special master shall file an additional report six months after the disbursement of the funds begin, detailing the success of the disbursements, flagging any issues, and noting for me how these issues were

61

resolved.

That will ensure that I'm completely comfortable, that all the hiccups have been resolved, which I do expect to occur, by the way.  Again, as always, the cost of the special master's report will continue to be borne by each side on a 50 percent split.  And there's not going to be any additional attorney's fees for plaintiffs' counsel out of this, just so you know.  So whatever your requirements are will come out of what I approve here.

While I will ultimately approve the final order here and close the case, we're going to retain jurisdiction under the *Kokkonen* case for -- just to ensure that effectuation of the settlement terms.  Again, I don't anticipate any problems.

Mr. Waldman, do you have any problems with that?

MR. WALDMAN:  No, Your Honor.

THE COURT:  Mr. Balser, do you have any problems with that?

MR. BALSER:  No, Your Honor.

THE COURT:  All right.  All right.  We're going to get to attorney's fees and expenses.

Mr. Waldman, do you want to be heard?  I've read everything.  I've looked at this extensively.  Is there anything else you want to say?

MR. WALDMAN:  Probably, but you'll advise me if I should.

62

THE COURT:  Come up to the lectern.

Could we just start off with a couple points.

MR. WALDMAN:  Sure.

THE COURT:  I think you've done a great job.  Okay. This is not about that, right.  And two, I recognize the need for attorney's fees beyond the lodestar here because that encourages strong law firms like yourself and your fellow firms to take on these cases.  Because, look, you could have put $11 million into this case and then you could have lost, and that's a sunk fee, and that's gone.  And all plaintiffs' counsel, such as yourself, have to make that risk/reward, the same analysis that the class members have to do.  So, to me, it's all about, in a case of this size, to calculate -- what's the best way to calculate it.  Right.

Certainly -- I asked for the lodestar calculation from the special master just so I could have an anchor, so, again, we're not dealing with funny numbers, and I accept those numbers from the special master.

So the question then is, you did it on a percentage basis, which is common in class actions.  I've approved that repeatedly.  But when you get to the enormity of this amount of money, I think that the multiplier has to be used.

And, again, I want to reiterate, I think you've done a commendable job under -- against extremely good defense, who, themself, have done a stellar job here, and they have thrown

63

everything they can at you until we got to this point.  I also want to commend you in that you weren't greedy and you stuck to the 425 as the calculation and tried to reach -- because I would have told you I think I'm more responsible for that additional money.  So I'll give you credit for that as well.  I think it's all about the multiplier.

What you have asked for is not unreasonable.  It's not what I'm going to agree to, but I'm just going to tell you, it's not unreasonable.  I put a lot of thought into what I think it is here.  I think it has to be a multiplier.  Your professional -- your -- I'm sorry.  Your expert, Professor Fitzpatrick -- who I thought his affidavit was excellent, in fact, I intend to use that in other cases going forward -- says normally in class cases it's under two for the multiplier.  In large ones, it's under four.

And so from there -- why don't you go from there.  I'm going to approve your expenses.  I'm going to approve the individual award, so you don't have to worry about that.  It's all about what is the number here for you all.

MR. WALDMAN:  All right.  Based on what you said, you've already kind of made up your mind, I'll just say very few points, some of which you've made.

Yes, we asked for 15 percent.  Not of the whole -- not of the whole 1 billion plus recovery, just from the $425 million settlement fund for the reasons you say.  So the

64

fee request only amounts to 5.8 percent of the total maximum value of the settlement.

Now, 15 percent was picked for a number of reasons. First of all, that percentage was a substantial 25 percent cut from what we originally asked for, which was 20 percent. With respect to that initial settlement request of 20 percent, there were only four class members who objected to that request, and one of those class members, a Ms. Peggy Fendley (phonetic) said she thought 15 to 18 percent, plus expenses, was reasonable. So we came at the lowest number there, 15 percent. Not one of those four objectors have objected to this fee request. They seem all placated. So every fee objection --

THE COURT: Actually, no. I seem to recall that there was within the objections some -- particularly Ms. Coles, about the amount of money.

MR. WALDMAN: I'm just talking about the four who objected the first time.

THE COURT: Oh, the first time. I'm sorry.

MR. WALDMAN: Very importantly, neither Ms. Coles or any of the objectors here today objected to the 20 percent fee. But now in connection what they're trying to argue against the whole settlement, they've objected to the 15 percent fee. Moreover, while 20 percent was slightly above the median range for settlements of the large size achieved for class members in this case, it is -- 15 percent is below that range entirely.

65

You mentioned the Fitzpatrick declaration.  The range was 17.8 to 19.5.  So we are below the lowest part of the reasonable range of those fees.

With respect to the normal fee percentage in this district and the Fourth Circuit, the normal range is 15 to a third is considered reasonable.  Again, we're at the lowest number in that range.

THE COURT:  But you would have to acknowledge that the amount of the settlement here -- which, again, you have every reason to be quite proud of -- is so much higher than the norm, and that's kind of what I think I have to worry about.

You have to agree with that; don't you think?

MR. WALDMAN:  Well, absolutely.  It's a mega settlement compared to most.

THE COURT:  Yeah.

MR. WALDMAN:  But that's why the second figure I gave you were of mega settlements, and we're below that range completely.  And the Fitzpatrick declaration -- I'll give you the exact paragraph if you want, but as you said, he's, you know, a leading expert in this field.  A lot of the settlement -- the fee requests you've looked at probably have his declaration in there.

THE COURT:  Well, I credit it, and I've actually given it great weight.  I've put a lot of thought into this, because you also have to remember every dollar I award to you

66

comes from the class members, right, because that's who's really paying your fee at the end of the day.

MR. WALDMAN: Uh-huh. Okay.

And --

THE COURT: And rightfully so. I mean, you deserve your fee. I want to stress that. You've worked incredibly hard at great risk. You could have lost the whole enchilada here and lost $11 million of work.

MR. WALDMAN: Plus the over 1.8 million dollars in expenses as well.

THE COURT: Of expenses. 100 percent.

MR. WALDMAN: That was -- you know, we funded, and, you know.

THE COURT: Right. Okay.

MR. WALDMAN: You've acknowledged a lot of the points I'm going to make. I'll sit down now and listen to you.

THE COURT: All right. That's fine.

Mr. Balser, did you want to say anything about the fees?

MR. BALSER: No, Your Honor.

THE COURT: Mr. Riff?

MR. RIFF: No, Your Honor.

THE COURT: All right. Well, again, to plaintiff counsels' credit, they've only focused on the $425 million in historical recovery in calculating their fees, and so I'm going

67

to only focus on that amount, too, in addressing the reasonableness.

Based on the plaintiffs' filings and the special master's ninth report, the appropriate lodestar comes to $11,651,770.  And with their request, that represents a multiplier of around 5.5.

As I said, I've looked at the different options to determine attorney's fees in a case of this magnitude.  In a standard class action, I think Mr. Waldman is right.  I've regularly approved 25 to 35 percent, depending on what the situation is, using the percentage basis.

Now here, the lodestar, while a benchmark for me to start with is clearly not appropriate in terms of these kind of cases, because plaintiffs' counsel, where they're essentially working as the private attorney general, need to have an incentive to take on these cases, and so the question is how do I determine that.

One could be the percentage basis, which is similar to contingency fees, and the other is the multiplier.  Normally I use the percentage basis in class actions.  As I've said, I've handled an extensive number of class action cases, and I generally award between 25 to 35 percent, depending on the cases.  But the magnitude of the numbers here is such that I don't think it's appropriate, and I think Professor Fitzpatrick's affidavit points you to use of a multiplier.  And

68

so that's where I think we have to go here.

But I have to recognize again, not just the great work that class counsel did here, but the substantial risk that these cases necessarily involved and the need to -- for class counsel to receive adequate compensation to recognize that risk, or otherwise lawyers aren't going to take these cases, and they need to occur.  So I'm going to use the multiplier here.

Professor Fitzpatrick indicates, as I just said a few moments ago, that the average multiplier is two across class action settlements, and below four in the largest class actions.  Again, recognizing the considerable work that plaintiffs' counsel have done here in this case and their risk, including fronting a significant amount of expenses, I do think that the fee request here is neither fair nor reasonable.  In saying that, though, I do want to stress that I think class counsel has done an exceptional job, and nothing in my calculations should suggest otherwise.

Instead, I'm going to approve attorney's fees in the amount of 32 million.  That comes out to a multiplier of 2.75, which is solidly within the two to four average range for class actions, including large class actions that Professor Fitzpatrick discusses in this declaration.  That is roughly $20 million above the lodestar and expenses that plaintiffs' counsel put into it, and it consists of roughly half of what

69

class counsel seeks, which is 7.5 percent now of the 425 million.

In reaching this amount, I've also considered the views of the objectors who expressed their dismay with the large amount of fees requested.  So I guess to the extent that the objectors objected to the amount of fees requested, I'm granting in part their objection.

This fee multiplier I believe preserves the incentives for plaintiffs' counsel to act as private attorney generals and accounts for the risk that they take in taking on such cases.  It also ensures that class members receive a meaningful recovery for their injuries, which is, after all, why we're all here.

So, in sum, I'm going to find that an award of $32 million in attorney's fees is fair and reasonable in light of the substantial and exceptional work that class counsel has performed, and I'm going to approve that amount.

Further, I'm going to approve class counsels' request for expenses that amount to $1,809,988.29.  Class counsel states that their expenses consisted mostly of expert fees, in addition to depositions expenses, mediation and special master fees, as well as other necessary expenses required to litigate this case.  And having reviewed the filings, I find this request to be reasonable and therefore approve their requested expenses.

70

I also find that the plaintiffs' service award requests are reasonable.  Plaintiffs requested service awards of $10,000 for each of the 26 named plaintiffs.  Defendants do not oppose this request.  And they look -- I've looked at prior service awards in this district in the circuit, and I -- that's well within the norm.  In fact, $10,000 is the normal number here in this district.  The named plaintiffs gathered and reviewed documents to respond to defendants' discovery request, and they were deposed, all of which is no small sacrifice.

Their willingness to serve as class representatives is certainly deserving of the requested service awards, so I'm going to approve, as I said, the $10,000 sum of a service award for each of the named plaintiffs.

Now, in ruling on the objections, I'd like to -- I'll begin -- Ms. Goldych did not appear.  Ms. Arnold and Ms. Coles obviously have.  Under the Fourth Circuit's opinion in *Banner Life Insurance Company,* objectors must state the basis for their objections with enough specificity to allow the parties to respond and the Court to evaluate the issues at hand.  That standard has been met here.  In fact, I think the objectors have really aided the process here.

The parties propounding the settlement then bear the burden of showing that the objections should fail and demonstrate the proposed settlement is ultimately fair, reasonable or adequate, which I have since found.

71

As to the objection about the settlement amount, I'm overruling those objections given the significant recovery for the class members, as I've discussed, which is -- it could be as high as 57 percent of the damages amount given the significant litigation risks that remain.  Recovery of this class is significantly higher than it would have been under the proposed first settlement and well above what the Court typically sees in these cases.

As to Ms. Coles' objections, I think I largely addressed them before, but one of her objections was as to the amount of attorney's fees.  So I guess I'm granting in part that as I cut in half the requested attorney's fees.

As to the claims that class counsel has not adequately represented the class, and the record doesn't support her allegations of this bait-and-switch or any conclusion.  It's actually the opposite.  Class counsel has strenuously litigated this case in an exceptional manner.

Her criticisms of class counsel for failing to calculate specific estimates of each class member's recovery are misplaced.  Since such calculations really can't be made with any accuracy at this time, and also for the same reason that Mr. Waldman indicated, that calculation would essentially defeat class certification here if we go on an individual basis.

I've already addressed some of Ms. Coles' concerns

72

about the level of the attorney's fees, as I said, so I'm also overruling her objection, though, that is based on what she believes to be inequitable treatment of the class members.  I spoke about that when she raised her objections going forward.

As to notice, I've also, as I said, reviewed the various forms of notice that were provided to the class.  I know there's been some concerns about that.  I think they've been addressed, but as a backstop, I'm requiring that additional report from the special master.

And, finally, Ms. Coles' objection to public interest grounds.  Rule 23 doesn't really require a settlement serve the public interest.  But to the extent that there is such an issue, I think that it does, because I think it fairly, reasonably and adequately addresses the interests of the class members who were injured, importantly, the attorney generals of the 18 states that represent the class members who have a duty to their citizens.  They've now withdrawn their objection in light of the revised settlement, which I think to be important.

So, in sum, I find that the plaintiffs have successfully met their burden to establish that none of the objections, other than the reduction in attorney's fees, demonstrate a lack of fairness, reasonableness or adequacy in the settlement, and I, therefore, overrule the objections.

Now, plaintiffs have filed a motion for appeal bond in this case.  I entered an order then allowing the objectors

73

to respond.  I got a late response from Ms. Coles, and then I allowed a reply by plaintiffs' counsel on Saturday.

Under Federal Rule of Appellate Procedure 7, I can -- and I have substantial discretion -- impose an appellate bond on anyone appealing a final order of judgment as to the other parties' costs on appeal.  I'm going to grant the plaintiffs' motion and require an appellate bond, but not in the amount sought by the plaintiffs.  $6 million is ridiculous.  I mean, all that would do is deter people from exercising their right to object.

But I'm going to order that any and each objector who appeals the final order and judgment must post a cash bond of $25,000 per objector on a bond along with their appeal.  So I want to make it clear it's per objector.  So, for example, Ms. Coles, and she had five colleagues join her on her objector, it's 25,000 apiece.  So if the other five want to join her, that total would be 150,000 [sic] there.

I believe the appellate bond here is appropriate for several reasons.  First, as I've already said, the outcome here is overwhelmingly favorable to the class.  And there's so few objectors, a total of eight in the face of a class of 5 million, who would be delayed their payments here.  There are 57 opt-outs.  And, again, the attorney generals of the 18 states who initially objected are now satisfied.

There's also substantial cost for the continued

74

administrating of the existing settlement. The plaintiffs' counsel has estimated up to $10,000 per month in costs. And I believe quite strongly there's an unlikely chance of reversal on appeal here, particularly since I rejected the first settlement, gave them guidance on how to revise it, and Capital One capitulated to my requirements. And, thereafter, the attorney generals withdrew their objection. An appeal in this case is going to be costly to the lawyers, which would ultimately be paid in fees from the settlement fund without the bond. So while I reject the amount of $6 million, I will require a cash bond of $25,000 per objector at the time of the filing of an appeal to move forward.

As to *cy pres*, I previously indicated that *cy pres* should be Feed More in Richmond, although I don't anticipate the need for a *cy pres.*

So I'll conclude then by reaffirming the settlement class as the final settlement class as to Rule 23 and grant the plaintiffs' motion for final approval, as well as granting their motion for attorney's fees in part, again, approving 32 million litigation expenses and service awards in the amounts stated during this hearing.

Out of an abundance of caution, again, I'm ordering the special master prepare that additional report due six months from the disbursement of the funds to the class, in which he shall confirm to the Court the status of the payments

75

to the class members, including any issues concerning with those payments. The special master shall continue to work with the plaintiffs' counsel and Epiq in preparing their report.

In doing so, I want to express my gratitude to our special master, Mr. Seebald and his excellent associate, Lara McMahon for all their work. They've done outstanding work in this case, and they've helped to resolve a very complicated matter quickly and in a manner that's efficient.

Again, I don't want to make Mr. Riff's head too big, but I want to say I thought he was very helpful here to what I had to achieve, and I want to thank them for all their work.

You previously stipulated you were going to file a motion to dismiss then your case within 14 days of prior approval.

You still intend to do; is that right, Mr. Riff?

MR. RIFF: Yes, Your Honor. I did just want to clarify one thing from your order --

THE COURT: Sure.

MR. RIFF: -- from the last time we were here.

The stipulation with Capital One we agreed to dismiss with -- once the settlement goes into effect as opposed to keying it to final approval.

THE COURT: That's fine. That's fine.

MR. RIFF: So I don't want to be in violation of your order.

76

THE COURT:  No, you're right.  And that's why I said the special master's report is six months after disbursement, because I don't know if the objectors are going to appeal or not.  I don't know if they're willing to put up $25,000.

Considering the likelihood of success on appeal, which I think is minimal, the objectors may say that they don't want to run the risk of losing that $25,000.  Particularly Ms. Coles, she said she's out of pocket 10,000.  To lose another 25,000, I don't know if she would want to do that or not, but that will be up to her to decide that.  So that's why I've timed everything off of disbursement.  I think that's what you're saying then, too, and I'm agreeing with you on that.

MR. RIFF:  Correct.  Thank you very much.

THE COURT:  All right.  Look, I want to again thank all the counsel in this case.  I said a lot of good things about plaintiffs' counsel.  I could say the same about defense counsel, Mr. Balser and your team.  You've done a great job here.  I know this is a tough case for you all and you're writing a big check, but you did a great job lawyering the case.

So with that in mind, is there anything else from counsel for the plaintiff that I need to do?

MR. WALDMAN:  No, Your Honor.

THE COURT:  Mr. Balser, anything else from your side?

MR. BALSER:  Thank you, Your Honor.  No.

77

Stephanie Austin, RPR, CRR USDC/EDVA

THE COURT:  Okay.  Mr. Riff, you're good?

MR. RIFF:  Yes, Your Honor.

THE COURT:  All right.

(Proceedings adjourned at 12:44 a.m.)

-----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

*Stephanie Austin*

Stephanie M. Austin, RPR, CRR

78

Stephanie Austin, RPR, CRR USDC/EDVA